No. 24-12273

In the

# United States Court of Appeals
## for the Eleventh Circuit

---

NetChoice, LLC,

*Plaintiff-Appellee,*

v.

Christopher M. Carr,
in his official capacity as Attorney General of Georgia

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:24-cv-02485 — Steven D. Grimberg, *Judge*

---

## BRIEF OF APPELLANT

---

Logan Winkles
*Deputy Attorney General*

Christopher M. Carr
*Attorney General of Georgia*
Stephen J. Petrany
*Solicitor General*
Zachary A. Mullinax
*Assistant Attorney General*
William D. Rodenberg
*Honors Fellow*

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Attorney General of Georgia*

*NetChoice, LLC v. Attorney General of Georgia*, No. 24-12273

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Defendant-Appellant Christopher M. Carr hereby certifies that the following persons and entities may have an interest in the outcome of this case:

Caplan, Kana A., Counsel for Plaintiff-Appellee;

Carr, Christopher M., Defendant-Appellant;

Cressler, Taylor A., Counsel for Plaintiff-Appellee;

Clement & Murphy PLLC, Counsel for Plaintiff-Appellee;

Clement, Paul D., Counsel for Plaintiff-Appellee;

DeMott, Joseph J., Counsel for Plaintiff-Appellee;

Draper, Paul R., Former Counsel for Defendant-Appellant;

Garnett, Nathan, General Counsel of OfferUp Inc., Declarant supporting Plaintiff-Appellee;

Grimberg, Steven D., Judge, U.S. District Court for the Northern District of Georgia;

Krevolin & Horst LLC, Counsel for Plaintiff-Appellee;

Lewis, Joyce Gist, Counsel for Plaintiff-Appellee;

Mullinax, Zachary A., Counsel for Defendant-Appellant;

Murphy, Erin E., Counsel for Plaintiff-Appellee;

NetChoice LLC, Plaintiff-Appellee;

*NetChoice, LLC v. Attorney General of Georgia*, No. 24-12273

O'Connell, Andy, Vice-President of Product Policy at Meta
    Platforms Inc., Declarant supporting Plaintiff-Appellee;

Patterson, Amy, Former Counsel for Defendant-Appellant;

Petrany, Stephen J., Counsel for Defendant-Appellant;

Sparks, Adam M., Counsel for Plaintiff-Appellee;

Szabo, Carl, Vice President & General Counsel of NetChoice LLC,
    Declarant supporting Plaintiff-Appellee;

Winkles, Logan B., Counsel for Defendant-Appellant;

Xi, James Y., Counsel for Plaintiff-Appellee.

*/s/ Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

The Attorney General requests oral argument in this case. The district court preliminarily enjoined a state law on the basis that it supposedly conflicts with a federal law, where the Georgia law is nearly identical to and in fact simply goes slightly further than the federal law. Oral argument would be beneficial in resolving the appeal.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ................................................................. iv

Jurisdiction ........................................................................... x

Statement of the Issue ............................................................. 1

Introduction .......................................................................... 2

Statement of the Case .............................................................. 5

    A. Statutory Background ........................................................ 6

    B. Factual Background .......................................................... 14

    C. Proceedings Below ........................................................... 16

    D. Standard of Review .......................................................... 19

Summary of Argument ............................................................... 19

Argument ............................................................................... 24

    I. NetChoice is unlikely to succeed on the merits of its federal
       preemption claim because Georgia's law does not "conflict"
       with the federal INFORM Act's requirements. .................. 24

        A. It is plainly possible for online marketplaces to comply
          with both the federal law and Georgia's law. ............... 27

        B. Georgia's law poses no obstacle to the federal law's
          purpose. ...................................................................... 33

        C. The district court's contrary rationales are
          unpersuasive ................................................................ 41

    II. The remaining equity factors weigh against a preliminary
       injunction. ......................................................................... 52

# TABLE OF CONTENTS
## (continued)

**Page**

Conclusion ........................................................................ 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) .................................................................. 54

*Ala. Ass'n of Realtors v. Dep't of Health & Human*
    *Servs.,*
    594 U.S. 758 (2021) .................................................................. 35

*Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.,*
    182 F.3d 1284 (11th Cir. 1999) ...........................................25, 26

*Cal. Fed. Sav. & Loan Ass'n v. Guerra,*
    479 U.S. 272 (1987) ......................................................26, 28, 43

*Capron v. Off. of Att'y Gen. of Mass.,*
    944 F.3d 9 (1st Cir. 2019)...................... 22, 23, 34, 37, 38, 39, 45

*Carson v. Monsanto Co.,*
    72 F.4th 1261 (11th Cir. 2023) (*en banc*) .................................. 47

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011) ..........................................28, 31, 35, 50, 52

*Cliff v. Payco Gn. Am. Credits, Inc.,*
    363 F.3d 1113 (11th Cir. 2004) ...........................................35, 41

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ..........................................................50, 51

*Curling v. Raffensperger,*
    50 F.4th 1114 (11th Cir. 2022)................................................. 19

*Democratic Executive Committee of Florida v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) ............................................... 20

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ................................................................... 39

*FAA v. Cooper*,
  566 U.S. 284 (2012) ................................................................ 25

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ........................................................20, 27, 30

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ................................................. 25

*Fresenius Medical Care Holdings, Inc. v. Tucker*,
  704 F.3d 935 (11th Cir. 2013) .............................................30, 31

*Graham v. R.J. Reynolds Tobacco Co.*,
  857 F.3d 1169 (11th Cir. 2017) ...............................27, 32, 38, 48

*Hall v. Hall*,
  584 U.S. 59 (2018) ................................................................... 43

*Jones v. Google LLC*,
  73 F.4th 636 (9th Cir. 2023)........................................26, 43, 44

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*,
  955 F.3d 908 (11th Cir. 2020) ................................................. 48

*Marrache v. Bacardi U.S.A., Inc.*,
  17 F.4th 1084 (11th Cir. 2021)
  ........................................................ 21, 23, 27, 32–34, 36, 49, 52

*Maryland v. King*,
  567 U.S. 1301 (2012)  .............................................................. 24

*MetroPCS Cal., LLC v. Picker*,
  970 F.3d 1106 (9th Cir. 2020) ................................................. 37

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*,
  423 F.3d 1056 (9th Cir. 2005) ................................................. 43

*Murphy v. Dulay*,
  768 F.3d 1360 (11th Cir. 2014) ..........................22, 26, 37, 46, 48

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ......................................................25, 46, 51

*Nken v. Holder*,
  556 U.S. 418 (2009) ..............................................................20, 52

*S. Blasting Servs., Inc. v. Wilkes Cnty.*,
  288 F.3d 584 (4th Cir. 2002) .................................................... 26

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ...........................................19, 20

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) ..............................................................46, 49

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
  590 U.S. 604 (2020) .................................................................. 48

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ................................................ 25

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) .............................................................35, 51, 52

*Williamson v. Mazda Motor of Am., Inc.*,
  562 U.S. 323 (2011) ................................................32, 39, 49, 50

*WinRed, Inc. v. Ellison*,
  59 F.4th 934 (8th Cir. 2023)................................................37, 40

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................... 19

*Wuebker v. Wilbur-Ellis Co.*,
  418 F.3d 883 (8th Cir. 2005) ........................33, 34, 40, 41, 45, 46

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................27, 52

**Statutes**

15 Okla. Stat. 799A.2.................................................................... 8

7 U.S.C. § 136v(b) ...................................................................... 36

7 U.S.C. § 228c ........................................................................... 43

15 U.S.C. § 45f
    ........................................... 1, 3, 11–13, 22, 23, 25, 28, 29, 31, 33,
    36, 39, 40–42, 44–46, 48, 49, 53

15 U.S.C. § 6502(d) .................................................................... 43

18 U.S.C. § 848........................................................................... 43

21 U.S.C. § 360k(a)(1) ............................................................... 36

29 U.S.C. § 1144(a) .................................................................... 36

42 U.S.C. § 1320d-7(a)(1)........................................................... 43

42 U.S.C. § 2000h-4 ................................................................... 43

47 U.S.C. § 276(c)....................................................................... 43

73 Penn. Stat. 201-9.4................................................................. 8

815 Ill. Comp. Stat. § 356/1-5 ....................................................... 8

93d Ark. Gen. Assemb. Act 555 ................................................... 7

A.C.A. § 4-119-101 ...................................................................... 7

A.C.A. § 4-119-103 ...................................................................... 7

Ala. Code § 8-41-1 .................................................................. 2, 8

Ala. Code § 8-41-2 ...................................................................... 2

Cal. Civ. Code § 1749.8 ........................................................ 8

Cal. Legislature S.B. 1144 § 3 (2023-2024) ............................14, 15

Colo. Rev. Statutes § 6-1-1401 ............................................. 8

2024 Georgia Laws Act 564 .................................................. 14

2022 Georgia Laws Act 820 .................................................. 10

Iowa Code § 554F.1 .............................................................. 8

La. Rev. Stat. § 51:3261 ....................................................... 8

Mich. Code § 445.903n ......................................................... 8

N.C. Gen. Stat. § 66-491 ....................................................... 8

O.C.G.A. § 10-1-940 ................................. 1, 4, 8, 9, 12, 14, 15, 29, 53

O.C.G.A. § 10-1-940 (West 2023) ........................................ 3

O.C.G.A. § 10-1-941 .....................................9, 10, 11, 28, 29

O.C.G.A. § 10-1-942 ............................................................. 11

O.C.G.A. § 10-1-943 ............................................................. 11

O.C.G.A. § 10-1-944 ............................................................. 11

O.C.G.A. § 10-1-945 ............................................................. 11

O.C.G.A. § 16-8-14.2 ............................................................ 8

Ohio Rev. Code § 1349.64 ..................................................... 8

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......................................... 34

Conflict, *Am. Heritage Dictionary of the English Language* (accessed Sept. 24, 2024), https://bit.ly/45qgYxW................................................................ 44

Conflict, *New Oxford Am. Dictionary* (3d ed. 2010)...................... 44

eBay Inc., *Offering to buy or sell outside of eBay policy* (last visited Sept. 24, 2024), https://tinyurl.com/5c2eb9zs  .................................................... 54

Hearing on S.B. 472 Before the H. Agric. & Consumer Affs. Comm., 157th Gen. Assemb., Reg. Sess. (Ga. 2024), https://bit.ly/4b5PdMq.................................................... 13

Michael Hanson, *Study: Retail Theft Balloons to Over $68 Billion*, (Nov. 18, 2021), https://tinyurl.com/47sxuvd6 .................................................. 6, 7

Nat'l Retail Fed'n, *Organized Retail Crime: An Assessment of a Persistent and Growing Threat* (Nov. 29, 2023), https://tinyurl.com/bdenkjm5 .......................... 6

Nat'l Retail Fed'n, *Organized Retail Crime* (last visited Sept. 24, 2024), https://tinyurl.com/3kzvemfk ...................... 6, 7

Off. of the Ga. Att'y Gen., *Carr: We're Creating Georgia's First Statewide Organized Retail and Cyber Crime Unit* (May 7, 2024), https://tinyurl.com/mwdy4c3....................................................... 6

## JURISDICTION

The district court had subject-matter jurisdiction under

28 U.S.C. § 1331 because NetChoice's asserted causes of action

arise under federal and constitutional law.

This Court has appellate jurisdiction under

28 U.S.C. § 1292(a)(1) because this is an appeal from the district

court's grant of NetChoice's motion for a preliminary injunction.

Doc. 29.

This appeal is timely because the district court entered its

preliminary injunction order on June 30, 2024, *id.*, and Georgia

filed its notice of appeal on July 15, 2024, Doc. 31.

# STATEMENT OF THE ISSUE

The federal INFORM Consumers Act requires online marketplaces to collect, verify, and disclose to consumers certain information about high-volume sellers who enter into a threshold number of transactions "made through [an] online marketplace." 15 U.S.C. § 45f(a), (b), (f)(3)(A)–(B).  The law preempts state law to the extent that it "conflicts with" these requirements.  *Id.* § 45f(g). Georgia's law extends these same collection, verification, and disclosure requirements slightly further.  Under Georgia's law, the definition of high-volume sellers counts transactions where payment is processed through the online marketplace and *also* transactions completed online but where payment is made separately.  O.C.G.A. §§ 10-1-940(a)(2), 10-1-941(a).  The question is whether the federal INFORM Consumers Act preempts Georgia's law, which merely regulates slightly further than the federal law.

## INTRODUCTION

The ordinary rule is that states may regulate beyond federal government regulation.  If the federal government requires certain safety measures, states can require more.  If the federal government prohibits certain commercial activity, states can prohibit more.  Only when state rules conflict with federal rules are they preempted—for example, if the federal government requires regulated parties to disclose information, states can't require them *not* to disclose it.  Yet in this case, the district court preliminarily enjoined a Georgia anti-retail-theft law, simply because it requires slightly more of online marketplaces than does a similar federal law.  That is untenable, and this Court should reverse.

In 2021 and 2022, a group of states, Georgia among them, passed commonsense laws to curb the online sale of consumer goods obtained through organized retail theft.  These state laws require "online marketplaces" (Amazon, Facebook Marketplace, eBay, and the like) to collect, verify, and disclose certain identifying and contact information regarding "high-volume third-party sellers" who sell a large number of "new or unused" consumer products "through" the online marketplace.  *See, e.g.*, Ala. Code §§ 8-41-1(2), 8-41-2(a).  Greater transparency about

these sellers benefits consumers and businesses alike and deters large scale retail theft operations.

Congress recognized the value of these disclosure requirements and, after a dozen states had passed nearly identical laws, passed its own law called the INFORM Consumers Act. *See* 15 U.S.C. § 45f. That law mirrored the state laws. It defines "high-volume third-party sellers" as those who sell a certain amount of new or unused consumer goods per year, requires online marketplaces to verify their identifying information, and provides penalties for noncompliance. *Id.* § 45f(a)(1)(A), (b)(4), (f)(3)(A). The INFORM Act prohibits all laws that "conflict with" its requirements, while also making clear that states can still enforce their own civil and criminal laws. *Id.* § 45f(d)(6)(B), (g).

Two years later, Georgia slightly expanded its version of the law. Georgia's original statute, like the other state (and federal) laws, did not capture transactions where the payment was *processed* outside the online marketplace. *See* O.C.G.A. § 10-1-940(a)(2) (2023). So, for instance, transactions on Amazon "count" toward identifying high-volume sellers because the payment is processed through Amazon. But transactions completed on Facebook Marketplace would generally not count if the parties exchanged cash or used a phone app like Venmo for payment. To

3

capture this second category of sales, Georgia revised its definition of "high-volume third-party seller" to include transactions where the parties process payments outside the online marketplace. O.C.G.A. § 10-1-940(a)(2). In other words, Georgia's amendment left the same reporting requirements in place, just slightly expanding the category of "high-volume third-party sellers" to include those who process payments offsite.

NetChoice—a trade association representing a class of online marketplaces—sued Georgia, arguing that this amendment was preempted by the federal INFORM Act. Never mind that the separate laws sit comfortably together. Never mind that firms can easily comply with both—indeed, complying with Georgia's law means you have necessarily complied with federal law. Never mind that Congress expressly limited preemption to cases of "conflict," declining to broadly field preempt or otherwise limit state activity. Never mind the presumption against preemption. Despite all that, the district court agreed with NetChoice, preliminarily enjoining the Attorney General from enforcing the amended Georgia law.

That decision was wrong and cries out for reversal. Ordinary preemption principles, which should have guided the district court's analysis, demand a real *conflict* between federal and state

4

law.  And here, Georgia's law furthers the same goals, through the same requirements, as its federal counterpart.  That is not a conflict but a consensus.  Though conceding that point, the district court read the federal law to preempt even complementary state regulation.  The district court's holding finds no support in the federal INFORM Act's text or structure and flouts the basic presumption that federal law operates parallel to, not in place of, state law.

Some preemption cases are hard.  This is not one of them.  The Court should reverse.

## STATEMENT OF THE CASE

NetChoice sued Georgia's Attorney General on June 6, 2024.  Doc. 1.  NetChoice's complaint sought a declaratory judgment that Georgia Code §§ 10-1-940–45, as amended, is preempted by the federal INFORM Consumers Act, unconstitutional under the First Amendment, and unconstitutionally vague under the Due Process clause of the Fourteenth Amendment.  *Id.* at 26–44.  NetChoice then moved to preliminarily enjoin the enforcement of Georgia's law.  Doc. 2.  The district court granted NetChoice's motion on preemption grounds.  Doc. 29.

## A.  Statutory Background

**1.** Organized retail theft—the large-scale theft of retail goods for resale to unsuspecting consumers—is a persistent, nationwide problem.  National Retail Federation, *Organized Retail Crime* (last visited Sept. 24, 2024), https://tinyurl.com/3kzvemfk. Georgia businesses alone lose an estimated $3 billion annually from this criminal phenomenon.  Off. of the Ga. Att'y Gen., *Carr: We're Creating Georgia's First Statewide Organized Retail and Cyber Crime Unit* (May 7, 2024), https://tinyurl.com/mwdy4c3. And the percentage of retail losses attributed to organized retail theft appears to be on the rise, increasing costs for retailers and consumers alike.  *Organized Retail Crime: An Assessment of a Persistent and Growing Threat*, National Retail Federation 6, 21 (Nov. 29, 2023), https://tinyurl.com/bdenkjm5.  Organized retail theft also threatens public safety, since organized retail theft incidents often involve violent crimes, such as coordinated "smash-and-grab" operations or the physical assault of customers and store employees.  *Id.* at 12, 22.

The internet plays an important role in organized retail theft, because thieves can resell stolen goods online while concealing their identities with fake business or identifying information.  *See id.* at 15–19; Michael Hanson, *Study: Retail Theft Balloons to over*

6

*$68 Billion*, Retail Industry Leaders Association (Nov. 18, 2021), https://tinyurl.com/47sxuvd6.  One industry group's database of organized retail crime rings, for example, revealed that roughly 45% of those organizations used online marketplaces for resale operations.  *Organized Retail Crime: An Assessment*, *supra*, at 15.  A study estimated that 25% of goods typically associated with organized retail theft ("everyday consumer goods" such as cosmetics, personal care products, and baby formula) listed for sale on Craigslist and Facebook Marketplace are procured through organized retail theft.  *Id.* at 16.

**2.** Arkansas was the first state to pass legislation addressing the role online marketplaces play in facilitating organized retail theft.  93d Ark. Gen. Assemb. Act 555; A.C.A. § 4-119-101.   In 2021, the state enacted the Online Marketplace Consumer Inform Act, which requires online marketplaces that host high-volume third-party sellers to verify and display identifying information for consumers.  A.C.A. § 4-119-103.  Arkansas adopted the law so that online marketplaces would better inform consumers about third-party sellers and help deter fraudulent sellers from reselling stolen goods.  *See* 93d Ark. Gen. Assemb. Act 555.

Twelve states, including Georgia, adopted materially identical laws the following year.  Ala. Code § 8-41-1; Cal. Civ. Code §

7

1749.8; Colo. Rev. Statutes § 6-1-1401; O.C.G.A. § 10-1-940; 815
Ill. Comp. Stat. § 356/1-5; Iowa Code § 554F.1; La. Rev. Stat.
§ 51:3261; Mich. Code § 445.903n; N.C. Gen. Stat. § 66-491; Ohio
Rev. Code § 1349.64; 15 Okla. Stat. 799A.2; 73 Penn. Stat. 201-9.4.

Along with the creation of a new felony crime, O.C.G.A. § 16-8-14.2, Georgia's response to organized retail theft is the Inform
Consumers Act.  Like its state counterparts, it deters organized
retail theft by making it harder to resell stolen goods online, and it
does that by requiring online marketplaces to collect identifying
information from certain sellers.  *Id.* §§ 10-1-940–945.

The Act defines "online marketplaces" as entities that operate
a "consumer directed, electronically based or accessed platform"
with "features that allow for, facilitate, or enable third-party
sellers to engage in the sale, purchase, payment, storage,
shipment, or delivery of a consumer product" in the state.  *Id.*
§ 10-1-940(a)(3).  And under the Act's definition, an "online
marketplace" must have a "contractual or similar relationship
with consumers" that "govern[s] their use of the platform to
purchase consumer products."  *Id.* § 10-1-940(a)(C).  Put simply,
online marketplaces are websites that allow third parties to list
items for sale to others.  That includes websites like Amazon,
where transactions occur completely on the platform, and websites

8

like Facebook Marketplace, which usually involve the parties processing payment outside of the website via cash or a payment app.

To deter criminal operations, these online marketplaces must collect and verify identifying information—a bank account number, a business or taxpayer identification number, and certain contact information—from "high-volume third-party seller[s]." *Id.* § 10-1-941(a), (d). "High-volume third-party sellers" are those who, in any continuous twelve-month period, complete two hundred or more sales of "consumer products" totaling at least $5,000 in gross revenue. *Id.* § 10-1-940(a)(2). Consumer products are "tangible personal property … which is normally used for personal, family, or household purposes," *id.* § 10-1-940(a)(1)—everything from laundry detergent to power tools. Importantly, sales or transactions count towards a seller's volume only if they involve "new or unused" consumer products. *Id.* § 10-1-940(a)(2).

In sum, a seller is a "high-volume" seller only if they have completed two hundred unique sales in the past twelve months, those sales generate at least $5,000 in gross revenue, and the consumer products sold are in new or unused condition. So a person selling a refinished dresser or a pile of used clothes is not a

9

high-volume third-party seller, but someone selling hundreds of brand new, shrink-wrapped power drills could be.

As the statute was originally enacted, covered transactions included only sales made "through the online marketplace and for which payment was processed by the online marketplace or through a third party." 2022 Georgia Laws Act 820 (S.B. 332). So direct buyer-seller transactions completed on Amazon counted, but a sale consummated on Facebook Marketplace, where the buyer pays the seller in cash, would not.

Once the online marketplace collects a high-volume third-party seller's information, it must verify that information and any changes to it within ten days' notice from the seller. *Id.* § 10-1-941(d). If a covered seller provides a copy of a valid, government-issued tax document, any information it contains is presumed verified. *Id.* § 10-1-941(d)(2). If any high-volume third-party seller does not provide the required information, the online marketplace must suspend the seller from all sales activity until the seller supplies the information. *Id.* § 10-1-941(c); *id.* § 10-1-942(c)–(d).[1]

---

[1] A few additional requirements apply to high-volume third-party sellers with at least $20,000 in aggregate gross annual revenue. Online marketplaces must require those sellers to disclose to consumers their full name or company name, a physical address,

Online marketplaces also have to provide a reporting mechanism for suspicious marketplace activity, allowing consumers to flag potential fraudulent sellers. *Id.* § 10-1-943. And online marketplaces are prohibited from using information collected from high-volume third-party sellers for any purpose besides identify verification. *Id.* § 10-1-944(a). Online marketplaces must adopt reasonable security procedures to guard that information from unauthorized use or access. *Id.* § 10-1-944(b). The Attorney General is authorized to enforce compliance with these requirements and to obtain appropriate public remedies from noncompliant online marketplaces. *Id.* § 10-1-945.

**3.** Recognizing the value of these many state statutes, Congress joined Georgia and the dozen other states by adopting the federal INFORM Consumers Act in late 2022. 15 U.S.C. § 45f. Like Georgia's Inform Consumers Act, the federal law requires online marketplaces to collect and verify tax, banking, and contact information from high-volume third-party sellers. *Id.* § 45f(a). It also imposes additional collection and disclosure requirements for sellers with more than $20,000 in aggregate annual gross revenue,

---

a direct means of contact like a working phone number or email address, and whether the seller used a different seller to supply the product to the consumer. O.C.G.A. § 10-1-942(a).

*id.* § 45f(b)(1)(A), requires online marketplaces to provide a reporting mechanism, *id.* § 45f(b)(3), and requires online marketplaces to suspend noncompliant high-volume third-party sellers, *id.* § 45f(a)(C). The law contains virtually identical terms as the various state statutes. *Compare, e.g.*, *id.* § 45f(f), *with* O.C.G.A. § 10-1-940–945 (2022).

As with the initial group of state laws, the federal statute limits its definition of "high-volume third-party sellers" to include transactions where payment is processed through the website. The definition of high-volume third-party seller clarifies this point. "For purposes of calculating the number of discrete sales … under subparagraph (A)"—the definition of high-volume third-party seller—"an online marketplace shall only be required to count sales or transactions made through the online marketplace and for which payment was processed by the online marketplace." *Id*. § 45f(f)(3)(B).

The federal law does not specifically preempt state law on any particular point; instead, it generally prohibits laws that "conflict with" the federal INFORM Act's requirements. *Id*. § 45f(g). And the law expressly includes a "[s]avings provision," which provides that "[n]othing in [the act] may be construed to prohibit an authorized [State] official … from initiating or continuing any

proceeding in [state] court … for a violation of any civil or criminal law of the State." *Id.* § 45f(f)(6)(B).

**4.** After these state and federal laws had been in force for a couple of years, Georgia's General Assembly identified a loophole in its Inform Consumers Act. *Hearing on S.B. 472 Before the H. Ag. & Consumer Affs. Comm.*, 157th Gen Assemb., Reg. Sess. (Ga. 2024) (statement of bill sponsor Sen. John Albers), https://bit.ly/4b5PdMq at 1:22:15–33. The law identified high-volume third-party sellers based only on transactions where payment was processed by an online marketplace. These sellers could escape oversight by listing consumer goods on online marketplaces, agreeing to terms, but then accepting payment in cash or via a peer-to-peer payment network like Venmo. *See id.* (statement of Brian Hudson, Manager of State & Local Gov't Relations for The Home Depot, Inc.) at 1:38:00–35 (noting criminals' switch to platforms that do not process payments after states passed laws like Georgia's Inform Consumers Act).

Georgia closed that loophole by amending the definition of high-volume third-party sellers to include sales or transactions made "by utilizing [an] online marketplace." 2024 Georgia Laws Act 564 (S.B. 472); O.C.G.A. § 10-1-940(a)(2). The amendment eliminated the previous requirement that transactions be

processed through the online marketplace.  Now, high-volume third-party sellers cannot evade verification by selling potentially stolen goods on online marketplaces and then accepting payment in cash or with external payment processors like Venmo and Zelle.  If they use an online marketplace to sell new or unused consumer goods (and meet the statute's high volume and revenue threshold), those sellers are "high-volume third-party sellers."  The law's reporting and verification requirements are otherwise unchanged.

Georgia is not alone in adjusting the definition of "high-volume third-party seller."  For instance, California recently adopted a similar amendment for its definition of "high-volume third-party seller," which now covers transactions made "utilizing [an] online marketplace."  Cal. Legislature S.B. 1144 § 3 (2023-2024).  California's amended statute also expands the definition of "online marketplace" by eliminating the requirement that the entity have a contractual relationship with consumers "governing their use of the platform to purchase consumer products."  *Id.*; *cf.* O.C.G.A. § 10-1-940(a)(3).

## B.  Factual Background

NetChoice is a trade association representing various internet companies.  Doc. 2-3 at 3, 5.  Some of those companies, like Amazon, Etsy, and eBay, operate electronic marketplaces

connecting third-party sellers to consumers, who process payments online. *Id.* at 4. Others, like Facebook Marketplace, let third parties process payments for sales offline (i.e., via cash or a peer-to-peer payment network). *Id.*

Both types of marketplaces heavily regulate use of their services. For example, Facebook's Community Standards bar individuals, manufacturers, and retailers from using the platform to sell certain goods and services. Doc. 2-4 at 5, 8. Facebook Marketplace users must also comply with Meta's Commerce Policies and Meta's Facebook Seller Agreement. *Id.* at 5. Failure to comply can result in content removal, suspension of access, or termination of access. *Id.* at 6. Meta enforces those policies with both automated and human review. *Id.* at 8.

OfferUp, another platform where users do not process payments through the website, strictly regulates the types of goods that can be listed on its website. Doc. 2-5 at 6. OfferUp removes noncompliant listings and suspends or cancels accounts with repeated violations. *Id.* It has an internal team that investigates potentially fraudulent activity on the platform. *Id.* at 7. OfferUp's operations also include cooperation with law enforcement in organized retail theft cases. *Id.* And OfferUp grants law enforcement permanent access to its users' names,

15

email addresses, IP numbers, and other identifying information. *Id.* at 7–8.

It's not uncommon for these companies to regulate whether users can pay for items outside of their platforms.  eBay, for instance, prohibits users from processing payment for listed items outside eBay.  Doc. 2-6 at 24.  It charges users a fee for referencing or asking for "contact information in the context of buying or selling outside of eBay."  *Id.*  eBay says it adopted this policy because "[o]ffers to buy or sell outside of eBay are a potential fraud risk for both buyers and sellers," and eBay "want[s] to participate in ongoing transactions."  eBay Inc*., Offering to buy or sell outside of eBay policy* (last visited Sept. 24, 2024), https://tinyurl.com/5c2eb9zs.  Likewise, OfferUp advises its users to "protect [themselves] from fraud and theft" by only accepting cash for in-person transactions because it is "the safest payment option."  Doc. 2-6 at 38.

## C.  Proceedings Below

NetChoice sued the Attorney General on June 6, 2024, claiming that Georgia's amended Inform Consumers Act is preempted by federal law, unconstitutionally vague, and unconstitutional under the First Amendment.  Doc. 1 at 26–43.

NetChoice also moved to preliminarily enjoin the amended law from taking effect on July 1, 2024. Doc. 2.

NetChoice argued that the federal INFORM Act preempts Georgia's amended Inform Consumers Act because the former's prohibition of "conflict[ing]" state laws means that it displaces all "different" state laws. Doc. 2-1 at 18 (quotations omitted). And since Georgia's slightly broader definition of "high-volume third-party seller" is not identical to the federal definition, Georgia's law is supposedly invalid. *Id.* at 19.

The district court concluded that NetChoice's preemption claim would likely succeed on the merits. Doc. 29 at 6. It reasoned that while "conflict" is "laden with meaning in the *implied* preemption context," the dictionary defines the term to mean "fail[s] to be in accord with" or "clash or be at variance." *Id.* at 7–8 (quotation omitted). And, the court reasoned, since federal law requires online marketplaces to count "only" transactions with payments processed "through" those marketplaces, it sets a regulatory ceiling that displaces any higher state standard. *Id.* at 8–9.

The court relatedly concluded that Georgia's INFORM Consumers Act is an "obstacle" to its federal counterpart. *Id.* at 9–12. "Despite the laws' similar goal,"—which the court did not

identify—Georgia's slightly expanded high-volume seller definition "punches a hole through the calibrated middle path that Congress intended." *Id.* at 12.  The court did not explain how it knew Congress "intended" a "middle path" or explain how Georgia's attempt to protect consumers from fraud poses "an obstacle to the accomplishment and execution of" Congress's (identical) purposes and objectives.  *Id.* at 10 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).

Instead, the court homed in on the federal statute's use of the word "only."  Again, the court reiterated the federal law's definition of a "high-volume third-party seller," which holds that an online marketplace need "only" count sales "for which payment was processed by the online marketplace." *Id.* at 12.  And again, the district court reasoned that this word was a "critical" limiting term, or "ceiling" that proscribed what the States could do: "[N]o state c[ould] adopt a law that require[d] an online marketplace to account for *any other type* of transaction when determining who qualifies as a high-volume third-party seller." *Id.* (emphasis added).  The court granted NetChoice's motion for a preliminary injunction, *id.* at 16, and the Attorney General appealed.

18

### D.  Standard of Review

This Court reviews a district court's grant of a preliminary injunction for abuse of discretion, but it reviews *de novo* the court's holding that Georgia's law is preempted, because that is an "underlying legal conclusion."  *Curling v. Raffensperger*, 50 F.4th 1114, 1121–22 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

A preliminary injunction is "an extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), "not to be granted unless the movant clearly establish[es] … four prerequisites," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  NetChoice must demonstrate (1) that it is likely to succeed on the merits of its federal preemption claim, (2) that it will likely suffer irreparable harm absent a preliminary injunction, (3) that its potential injury outweighs any hardship to Georgia if an injunction were granted, and (4) that enjoining Georgia's law is in the public interest.  *See id.*  NetChoice cannot establish any, let alone all, of these factors, and the district court was wrong to hold otherwise.

**I.** NetChoice is not likely to succeed on the merits of its federal preemption claim.  This factor, the most "critical" factor in the preliminary injunction analysis, *see Nken v. Holder*, 556 U.S.

418, 434 (2009), requires a "strong" likelihood of success. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1317–18 (11th Cir. 2019).  NetChoice lacks that.

NetChoice is simply wrong about preemption.  The default rule is that states *can* regulate beyond what the federal government requires.  *See, e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 146–47 (1963).  Under ordinary conflict-preemption principles, state law conflicts with federal law only when it renders compliance with the federal law impossible or otherwise stands as an obstacle to the federal law's objectives. *See id.* at 141–43.  And neither is true here.

NetChoice, first off, "concedes that [impossibility preemption] does not apply here."  Doc. 29 at 10.  And that is the only conclusion that makes any sense.  It is entirely possible for online marketplaces to comply with both Georgia's and the federal law's requirements—indeed, complying with Georgia's law means an online marketplace has necessarily complied with federal law. Georgia's law requires slightly *more*, but that is ordinary.  Again: state law requiring more than federal law is a prosaic fact of everyday life, not a suggestion of conflict.

NetChoice similarly failed to prove that Georgia's law poses an obstacle to the federal INFORM Act's purposes.  Notably,

NetChoice never argued for obstacle preemption in its motion for a preliminary injunction, *see generally* Doc. 2, mentioning it only in passing in its reply brief below, Doc. 27 at 11.  The district court's opinion, likewise, pointed to obstacle preemption, Doc. 29 at 9, but hardly even engaged in an obstacle preemption analysis.  Those omissions are telling, because the appropriate analysis leads only one way.

Obstacle preemption exists when the state law in question frustrates the federal's law's purpose, as "discerned from the language of the … statute and the 'statutory framework' surrounding it."  *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021).  But nothing in the federal INFORM Act's language, or its structure, suggests a congressional design to override complementary laws like Georgia's, which *further* Congress's goal of ensuring online transparency and do nothing to deter it.  Absent any "clear and manifest" scheme on the part of Congress to displace such laws, *id.* at 1095 (quotation omitted), Georgia is entitled to the presumption that Congress did *not* intend to override its state legislation.

The district court's contrary rationales are unpersuasive.  First, the district court zeroed in on a single word in the federal INFORM Act.  Because the federal law requires online

marketplaces to count "only" transactions that are "processed by the online marketplace," 15 U.S.C. § 45f(f)(3)(B), the district court declared the law a nationwide ceiling that bars all 50 states from requiring online marketplaces to account for any "additional" type of transaction, Doc. 29 at 9. But the district court simply mistook a limitation on the federal law's *own* reach to be a limitation on state laws. That flips basic preemption principles—not to mention the presumption against preemption—on their head. And although the district court held that the presumption against preemption does not "appl[y]" in express preemption cases, *id.* at 8 (quotation omitted), that is too general a statement. Where Congress simply identifies the *kind* of preemption at issue (here, conflict preemption) the presumption very much applies. *See, e.g.*, *Murphy v. Dulay*, 768 F.3d 1360, 1367–68 (11th Cir. 2014).

When the federal government regulates, it ordinarily sets a *floor* for regulatory requirements. *See, e.g.*, *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 29–30 (1st Cir. 2019) (holding states could raise their own minimum wage standards above the federal minimum). There must be significant textual evidence to hold that Congress meant to set an across-the-board *ceiling* instead. *See id.* at 28. And here it is particularly obvious Congress did not intend any such thing, where Congress provided that state law is

preempted only to the extent it actually "conflicts with" the federal law's express requirements. 15 U.S.C. § 45f(g). Congress knows how to expressly preempt specific regulation (or preempt entire fields) when it wants to, but did not do so here. In any event, the particular provision the district court relied on, § 45f(f)(3)(B), makes clear that its limitation on counting transactions is only "[f]or purposes of calculating … transactions … *under subparagraph (A)*." *Id.* (emphasis added). In other words, the provision explicitly limits itself to a single subparagraph of the federal law. There is no way to read that provision to broadly preempt state laws.

The district court's second error concerns what it did *not* do. The court failed to perform a meaningful inquiry into the federal INFORM Act's purpose—which is step one for any preemption case. *See, e.g.*, *Marrache*, 17 F.4th at 1094. That omission was critical because nothing in the federal law suggests a purpose that is in any tension with Georgia's law. Georgia's law in fact advances the same purposes as the federal law: informing consumers and deterring retail theft. And, yet again, the district court failed to apply the presumption against preemption.

**II.** Finally, with respect to the equitable factors, NetChoice's evidence below was at best speculative and at worst harmful to its

23

theory of irreparable harm. NetChoice's members can easily comply with the law and even if they could not, any potential enforcement would be of minimal expense. On the other hand, Georgia's interest in the enforcement of its own valid law is self-evident. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted). This Court should reverse.

## ARGUMENT

### I. NetChoice is unlikely to succeed on the merits of its federal preemption claim because Georgia's law does not "conflict" with the federal INFORM Act's requirements.

Federal preemption of state law is a "well-worn" doctrine that falls into three (sometimes overlapping) categories: (1) express preemption; (2) field preemption; and (3) conflict preemption. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). "Express preemption occurs when Congress explicitly defines the extent to which federal law applies instead of state law." *Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284, 1287 (11th Cir. 1999). Field preemption exists "when federal law occupies a 'field' of regulation so comprehensively that

it has left no room for supplementary state legislation." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (quotation omitted).

Conflict preemption, the relevant concept here, "may arise in two ways"—impossibility or obstacle preemption. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). State law is preempted where it is "impossible [for a private party] to comply with both [the] state and federal law" or state law otherwise "stands as an obstacle to the [federal law's] objective." *Id.* (quotation omitted).

This is an ordinary conflict-preemption case. The federal INFORM Act declares that state laws are preempted to the extent they "conflict[]" with the Act. 15 U.S.C. § 45f(g). As even the district court acknowledged, the term "conflict" is "laden with meaning" in the preemption context. Doc. 29 at 7. Congress legislates against the backdrop of well-known legal terms, *see FAA v. Cooper*, 566 U.S. 284, 292 (2012), so when it uses the term "conflict," it means to use that phrase as a term of art that calls for the application of ordinary conflict preemption principles.

This Court has recognized as much before. In *Tison Hog Market*, for instance, the Court applied basic conflict-preemption principles to hold that a state common-law defense was not

25

preempted where the express preemption provision forbade state law "in conflict with" the Packers and Stockyards Act.  182 F.3d at 1287 n.2.  Other courts have done the same.  The Fourth Circuit in *Southern Blasting Services, Inc. v. Wilkes County*, applied conflict-preemption principles where the federal law in question preempted state law only to the extent there was "direct and positive conflict" between the two.  288 F.3d 584, 590 (4th Cir. 2002) (quotation omitted).  As that court explained, when Congress uses these well-known terms to preempt state law, it "simply []states the principle that state law is superseded [only] in cases of an *actual* conflict," *id.* at 591 (emphasis added), which just means impossibility or obstacle preemption.  *See also, e.g.*, *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281–82, 291 (1987) (federal law expressly preempted all "inconsistent" state laws); *Dulay*, 768 F.3d at 1368 (federal law preempted "contrary" state law); *Jones v. Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023) (federal law preempted all "inconsistent" state laws).  Here Congress used the term "conflict," and Congress knows what that term means.

One other rule comes along with ordinary conflict preemption: a strong presumption *against* preemption.  Absent clear evidence otherwise, courts must presume that Congress did not preempt

overlapping state laws, "particularly" when—as here—Congress legislates "in a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation omitted); *see Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 144; *see Marrache*, 17 F.4th at 1095; *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1190–91 (11th Cir. 2017).

Accordingly, NetChoice must prove that Georgia's law conflicts with the federal INFORM Act: that it is either impossible to comply with both statutes or that Georgia's law stands as an obstacle to Congress's purposes. And NetChoice must do so in the face of a clear presumption to the contrary. It cannot do so, and the district court's contrary holding was unsupported.

### A. It is plainly possible for online marketplaces to comply with both the federal law and Georgia's law.

NetChoice "concede[d]" below that impossibility preemption "does not apply here," Doc. 29 at 10, and it is easy to see why. This is clearly "not a case where 'compliance with both federal and state regulations is a physical impossibility.'" *Guerra*, 479 U.S. at 291 (quoting *Fla. Lime & Avocado Growers*, 373 U.S. at 142–43). But it is worth explaining this point because the lack of any

conflict here critically undermines the district court's mistaken analysis and NetChoice's other arguments.

Georgia's law and the federal INFORM Act's reporting and verification requirements "closely track[]" each other "in all material respects." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 601 (2011). Online marketplaces, under either statute, have 10 days to require any high-volume third-party seller to disclose its bank account number, contact information, and tax ID to the online marketplace. *See* 15 U.S.C. § 45f(a)(1)(A)(i)–(iv); O.C.G.A. § 10-1-941(a)(1)–(4). This obligation does not trigger under federal or Georgia law unless the seller enters into "200 or more discrete sales" within a "continuous 12-month period" and aggregates "$5,000 or more in gross revenues" from those sales. *See* 15 U.S.C. § 45f(f)(3)(A); O.C.G.A. § 10-1-941(a)(2). And if a qualifying high-volume seller fails to disclose the required information, both laws require the online marketplace to "suspend" all future sales from the noncompliant seller's account after 10 days' notice. *See* 15 U.S.C. § 45f(b)(4); O.C.G.A. § 10-1-941(c). To comply with these requirements in one of the laws is to comply with the requirements of the other.

Georgia's law meaningfully differs from its federal counterpart in only one relevant respect: it slightly broadens the

category of "discrete sales" that count toward identifying high-volume third-party sellers.  Under the federal law, sales are counted "only" to the extent they include payment processed through the online marketplace.  15 U.S.C § 45f(f)(3)(B).  Georgia's law, after amendment, also includes sales in which the payment is processed offsite.  O.C.G.A. § 10-1-940(a)(2).  As previously explained, that is a simple change: Georgia's law now gathers in transactions that are consummated online but where the *payment* is not made through the online marketplace's payment processor. If two parties agree to a sale on Facebook Marketplace but exchange cash, Georgia's law will count that transaction (assuming it is for new or unused consumer goods).  By contrast, the federal law "only" requires transactions to be counted where the user pays for the goods through the website.  15 U.S.C § 45f(f)(3)(B).

But the federal INFORM Act does not *forbid* online marketplaces from counting sales where payment was not processed on the marketplace.  For that matter, it does not forbid online marketplaces from requiring all sellers to provide that relevant information.  The federal Act mandates that online marketplaces do certain things; it doesn't prohibit them from doing *anything* with respect to the monitoring of transactions.

29

Preemption case law is replete with examples of state regulation permissibly going beyond federal regulation in this way. In *Florida Lime & Avocado Growers, Inc.*, for instance, federal law prohibited the marketing of avocados harvested after a certain date—while California law went one step further, mandating that the fruit meet a threshold 8% oil content before sale. 373 U.S. at 133–34. "[D]espite the dissimilarity of the[ir] standards," compliance with both laws was entirely possible because it was not as though Congress "forbade the picking and marketing of … avocado[s] testing *more* than 7% oil." *Id.* at 143 (emphasis added).

*Fresenius Medical Care Holdings, Inc. v. Tucker* is another example. 704 F.3d 935 (11th Cir. 2013). In that case, Congress had enacted a general prohibition on physicians providing self-interested referrals to patients. *Id.* at 937. But the federal government had "created various exemptions" to this rule—several of which Florida included in its own analogous law but then *expressly repealed* in a follow-up amendment. *See id.* at 937–39. Even though Florida's amended statute now "penalize[d] conduct that federal law permit[ted]," physicians in Florida could still comply with both state and federal law simultaneously. *Id.* at 940–41.

30

Of course, the federal INFORM Act limits its *own* reach in numerous ways. For instance, the law's disclosure requirements do not apply to third parties who sell fewer than 200 products within a 12-month period. *See* 15 U.S.C. § 45f(f)(3)(A). Nor do they extend to third-party sellers who aggregate less than $5,000 from any sales. *See id.* And relevant here, § 45f(f) of the Act does not count marketplace sales where payment occurs offsite, because it mandates that, "for purposes of" the Act's definition of "high-volume third-party seller," an "online marketplace shall only be required to count sales … made through the online marketplace." *Id.* § 45f(f)(3)(B). But these and similar provisions "contain[] no language circumscribing state action," *see Whiting*, 563 U.S. at 608, or even private action.

That silence makes all the difference, otherwise conflict preemption would never run its course. No federal law is without its fair share of exceptions, carveouts, or qualifications. And if a conflict existed whenever state law filled in those regulatory gaps, that "would treat all … federal standards as if they were *maximum* standards." *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011). That "cannot be" the case. *R.J. Reynolds Tobacco Co.*, 857 F.3d at 1190.

31

It is common for the federal government to explicitly limit the reach of its own laws, but courts do not hold those *self*-limitations to be preemptive.  In *Marrache*, for instance, the Food and Drug Administration had declared that "grains of paradise," a botanical ingredient, was a "generally recognized as safe" food additive under the Food, Drug, and Cosmetic Act, thereby "permitting [it] to be included in food or alcohol."  17 F.4th at 1091, 1095.  Florida law, however, classified it as a "poison[]" and declared that anyone who sold it in liquor products was guilty of a third-degree felony.  *Id.* at 1092 (quotation omitted).  Clearly, that was a difference of opinion on an area of both national and local concern—but not a conflict.  "While the FDA ha[d] determined that grains of paradise" were safe and opted not to prohibit their sale, that "d[id] not mean that federal law mandate[d] individual states to *allow* [it in] the sale of alcohol." *Id.* at 1095 (emphasis added).  And nothing in the federal Act's stated objectives otherwise evinced a plan to "prevent states from regulating or banning [the same] food additives" that the agency had already deemed safe.  *Id.* at 1096.

Georgia's slightly broader monitoring obligations go beyond federal regulation, not against federal regulation.  They are complementary, there is no conflict.

### B. Georgia's law poses no obstacle to the federal law's purpose.

NetChoice cannot prove obstacle preemption, either, which likely explains why it barely mentioned the concept in its briefing below. Whether a state law stands as an obstacle to a federal law's objectives turns on "Congress's purpose in enacting the [federal law]—as derived from the statutory text." *Marrache*, 17 F.4th at 1096. And here, "nothing in the language" of the federal INFORM Act suggests that Congress intended to displace state laws that supplement, rather than "conflict[] with," 15 U.S.C. § 45f(g), the federal INFORM Act's requirements, *see Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 888 (8th Cir. 2005). In fact, the text cuts in the opposite direction.

"[T]wo principles" guide this Court's obstacle preemption analysis. *Marrache*, 17 F.4th at 1094. First, because congressional intent "is the ultimate touchstone in every preemption case," *id.* (quotation omitted), the "existence … of a conflict depends on whether [Congress] intended [the federal law] to be a minimum standard that could be supplemented by the states," or a regulatory ceiling above which states could not go, *see Wuebker*, 418 F.3d at 888; *see also Capron*, 944 F.3d at 27 (noting the "frequency" with which this "floor-ceiling issue arises … in [the] obstacle preemption" context). Critically, in the absence of

33

any "affirmative evidence" in the federal law of Congress's "ceiling-setting—and thus obstacle-preemption-creating—intent," states by default may supplement federal law with regulation of their own.  *Id.* at 28.

Second, this Court "assume[s] that 'the historic police powers of the States are not superseded unless that [i]s the clear and manifest purpose of Congress."  *Marrache*, 17 F.4th at 1095 (quotation omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 290 (2012) (presumption-against-federal-preemption canon) ("A federal statute is presumed to supplement rather than displace state law.").  This presumption against preemption "particularly applies in [this] case" because the federal INFORM Act and Georgia's law regulate in the area of consumer protection, "a field which the States have traditionally occupied."  *Marrache*, 17 F.4th at 1095 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see, e.g.*, *Cliff v. Payco Gn. Am. Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004).  This presumption is a species of the broader rule that, where Congress would "significantly alter the balance between federal and state power," it must use "exceedingly clear language." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S.

34

758, 764 (2021) (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020)).

That presumption is especially important because it is dangerous for courts to locate obstacle preemption in tenuous cases. When there is no "clear congressional command" to override state law, a finding of preemption "represent[s] not only a significant federal intrusion into state sovereignty" but a "significant *judicial* intrusion into Congress's authority to delimit the preemptive effect of its laws." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (plurality op.) (emphasis added); *Whiting*, 563 U.S. at 608 ("Implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.") (quotations omitted). So "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption." *Va. Uranium, Inc.*, 587 U.S. at 767.

These principles make this an easy case. NetChoice identified nothing in the federal law that suggests its "purpose" was to serve as a ceiling on the regulation of online marketplaces. *See Marrache*, 17 F.4th at 1096. Indeed, Congress's specific textual directive that states cannot *conflict* with the law's requirements indicates that Congress did *not* intend for the federal INFORM

Act to be the last word in this area.  15 U.S.C. § 45f(g).  Congress
knows how to broadly preempt or field preempt when it wants to.
*See, e.g.*, 29 U.S.C. § 1144(a) (Employee Retirement Income
Security Act) (preempting state law "relat[ing] to" employee
benefit plans); 7 U.S.C. § 136v(b) (Federal Insecticide, Fungicide,
and Rodenticide Act) (preempting state law requirements "in
addition to" any of the federal law's labeling or packaging
requirements); 21 U.S.C. § 360k(a)(1) (Medical Device
Amendments of 1976) (preempting state law "different from" any
requirement in the act).  That Congress chose not to do so here is
telling.

The purpose that can be inferred from the statute's text and
structure is that Congress wanted "to inform consumers" and
minimize retail theft by requiring high-volume, online sellers to
provide identifying information and make certain disclosures to
consumers.  15 U.S.C. § 45f (title).  That much can be gleaned
from the statute—but there is no quasi-field-preemption hiding in
its text.

Georgia's law "does not interfere with [the] goal" of protecting
retail stores and consumers from theft and fraud.  *Dulay*, 768 F.3d
at 1377.  Quite the opposite.  By extending the federal law's
disclosure requirements to those who process payments outside

the online marketplace, Georgia zeroed in on a category of high-volume sellers that the federal law—and its preceding state analogues—did not reach.  That means more transparency for consumers and more protection against retail theft, not less.

It is not even the State's burden to prove that the purpose of its law and the federal law align, *see Capron*, 944 F.3d at 28, but it plainly undermines the case for obstacle preemption.  Numerous cases confirm that when the federal and state laws achieve "a common purpose[]," the "case for federal pre-emption is less persuasive."  *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020) (internal citations omitted); *see also, e.g.*, *Dulay*, 768 F.3d at 1377 (no obstacle preemption where state law allowed healthcare providers to settle out of court, which furthered HIPAA's objectives of reducing healthcare costs); *WinRed, Inc. v. Ellison*, 59 F.4th 934, 944–45 (8th Cir. 2023) (no obstacle preemption where federal law's "primary purpose" was "to limit" quid pro quo corruption in electioneering, and plaintiff failed to prove "Minnesota's consumer-protection law facilitate[d]" such corruption).

On the other side of the ledger, there is no evidence in the text or structure of the federal Act that Congress intended to set a nationwide ceiling on the requirements states could impose on

37

online marketplaces. To nevertheless locate a "ceiling-setting intent would [therefore] necessarily rest on … unfounded speculation about [Congress's] *implicit* intentions," which is "precisely the sort of 'freewheeling judicial inquiry'" this Court should avoid. *Capron*, 944 F.3d at 28, 39–40 (emphasis added) (quoting *Whiting*, 563 U.S. at 607). Put another way, "deliberate federal inaction" in a field where federal and state interests intertwine has never "serve[d] as justification for finding federal preemption." *R.J. Reynolds Tobacco Co.*, 857 F.3d at 1190 (internal citations omitted).

These principles are borne out in case after case. In *R.J. Reynolds*, as one example, Congress had regulated the labeling of cigarettes "when and if" they were sold. *Id.* at 1188. But that did not imply a broader congressional purpose against "banning the[ir] sale" altogether. *Id.* (no preemption of $145 billion state jury verdict against tobacco companies for selling cigarettes). In *Williamson*, it was seatbelt standards. The Department of Transportation had opted against requiring lap-and-shoulder belts for middle-passenger car seats nationwide. 562 U.S. at 333–35. Yet "the fact that DOT made [this] negative judgment" based on "cost-effectiveness" did not "by itself show that DOT sought to

forbid [state] tort suits … [where] a judge or jury might" think differently. *Id.* at 335.

If anything, through the law's "savings provision," 15 U.S.C. § 45f(d)(6)(B), Congress indicated its affirmative intent for the federal INFORM Act's requirements to "operate[] parallel to, rather than in place of," complementary state laws like Georgia's, *see Capron*, 944 F.3d at 30. That provision provides that "[n]othing in" the federal law "may be construed to prohibit" states from "initiating or continuing any" state court action "for a violation of any civil or criminal law of the State." § 45f(d)(6)(B). Congress "fores[aw] the likelihood" that states would "supplement" the Act's requirements with regulation of their own, *Williamson*, 562 U.S. at 335, which should surprise no one given the robust state regulatory framework that preceded Congress's passage of the Act.

To be sure, "every subject that merits congressional legislation is, by definition, a subject of national concern." *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990) (quotation omitted). But only "in a limited sense," *see WinRed*, 59 F.4th at 945, did Congress seek uniformity here. It preempted state laws that *actually* "conflict[] with" the federal law's express "requirements." 15 U.S.C. § 45f(g). That is a national *floor*, not a national ceiling.

39

For instance, a state could not, in the interest of protecting internet privacy, prohibit an online marketplace from requiring high-volume sellers to disclose identifying information. *See id.* § 45f(a)(1)(A) ("[A]n online marketplace shall require any high-volume third party seller … to provide … [such] information."). Nor could it bar online marketplaces from "counting" a third party's transactions to determine whether it is selling at a high volume. *Id.* § 45f(f)(3)(B) ("[A]n online marketplace shall … be required to count [certain] sales or transactions"). But the mere fact that Congress "preempt[ed] [this] subset of state laws," without more, "does not imply a grand statutory design" for "uniformity writ large." *WinRed*, 59 F.4th at 945. And it certainly does not imply a scheme for a uniform ceiling as opposed to a uniform floor.

The "dearth" of any evidence that Congress intended to displace add-on state regulation speaks for itself. *Wuebker*, 418 F.3d at 888. But there is also the presumption against preemption. Consumer protection and the regulation of economic transactions "is a field traditionally regulated by the states," and this Court has consistently said "that there is a presumption against finding implied preemption of state law in th[is] field." *Cliff*, 363 F.3d at 1125 (internal citations omitted).

40

Moreover, that Congress expressly preempted only conflicting state laws in this sphere of traditional state concern serves to "reinforce[]" the presumption.  *Id.* at 1126.  Congress knows what "conflict preemption" is, it knows about the presumption against preemption, and it chose to use that specific language.  Were there otherwise any doubt—and there should not be—the presumption against preemption wins the day.

### C.  The district court's contrary rationales are unpersuasive.

The district court's opinion is unsupportable.  Relying all but exclusively on the federal INFORM Act's use of "only" to describe an online marketplace's obligation to track sales under the federal law, *id.* § 45f(f)(3)(B), the district court inferred a sweeping nationwide standard: "[N]o state can … require[] an online marketplace to account for *any other type* of transaction," Doc. 29 at 12 (emphasis added); *id.* at 9 ("Only means only.").  Supposedly, Georgia's law "punche[d] a hold through" the federal INFORM Act by defining high-volume sellers "more expansive[ly]."  *Id.* at 12.  On that tenuous basis, the district court held that Georgia's definition "conflict[ed] with" the federal law under § 45f(g) *and* posed an obstacle to the law's objectives under implied preemption

principles.  *Id.* at 13.  The district court's analysis makes no sense on either point, and this Court should reverse.

**1.** To start, Georgia's law does not "conflict" with the federal law, as that term is used in the statute.  As already explained, "conflict" preemption just means impossibility and obstacle preemption, and neither apply here.  Yet the district court appears to have applied a quasi-*field* preemption analysis without any basis in the text.  The court acknowledged that the only word doing any work in the express preemption provision—"conflict[]"—is "laden with meaning in the *implied* preemption context."  *Id.* at 7.  But rather than stop there and apply conflict preemption principles, the court went on to read that phrase broadly to conclude that any state law that merely "expan[ds]" on Congress's definition of a high-volume seller presents a "conflict[] with" the federal law's provisions under § 45f(g).  *Id.* at 9.  That was error.

When, as here, Congress "transplant[s]" a word or phrase "from another legal source" the word "carries the old soil with it."  *Hall v. Hall*, 584 U.S. 59, 73 (2018) (internal citations omitted).  The preemption context is no exception to this rule.  Congress routinely imports ordinary conflict preemption terms into express preemption provisions.  *See, e.g.*, 7 U.S.C. § 228c (Packers & Stockyards Act) (preempting state law "in conflict with" federal

law); 18 U.S.C. § 848 (Organized Crime Control Act) (preempting state law in "direct and positive conflict" with federal act's provisions); 42 U.S.C. § 1320d-7(a)(1) (Health Insurance Portability & Accountability Act) (preempting state law "contrary" to federal act's provisions);  42 U.S.C. § 2000h-4 (Civil Rights Act) (preempting state law "inconsistent" with provisions of federal act); 15 U.S.C. § 6502(d) (Children's Online Privacy Act)  (same); 47 U.S.C. § 276(c) (Communications Act) (same).  And when it does so, Congress "has indicated that state laws will be pre-empted only" in cases of "actual[] conflict."  *See Guerra*, 479 U.S. at 281.

Accordingly, courts uniformly "collapse[] [the preemption analysis] into one" inquiry: Does the state law make compliance with the federal law impossible or pose an obstacle to the law's objectives?  *Jones*, 73 F.4th at 644; *Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1073 (9th Cir. 2005) (express and implied preemption analyses are "substantially identical" where federal law preempts "inconsistent" state laws). Had the district court followed this well-trodden, correct legal path, the right answer would have been obvious.

Regardless, there is no "conflict" between state and federal law here, under either the clear meaning of that term (conflict

43

preemption) or a colloquial use of the term "conflict." As explained, the default rule is that "state laws that 'supplement' … federal law[] do not stand[] as an obstacle to Congress's objectives, and so are not" in "conflict" with federal law. *See Jones*, 73 F.4th at 642 (internal quotations and quotations omitted). And in ordinary language, the term "conflict" likewise refers to incompatibility or contradiction. *See New Oxford Am. Dictionary* 365 (3d ed. 2010) (to "be incompatible or at variance; clash"); *Am. Heritage Dictionary of the English Language* (accessed Sept. 24, 2024), https://bit.ly/45qgYxW (to "come into opposition"). There is no opposition of any kind between Georgia's law and the federal INFORM Act: they are sympatico.

The district court reached the opposite conclusion by misreading a single word in the text. Section 45f(f)(3) of the federal law defines a "high-volume third party seller" as any "participant on an online marketplace[]" who "enter[s] into 200 or more discrete sales or transactions" that gross more than $5,000 in revenue within a certain time frame. 15 U.S.C. § 45f(f)(3)(A). Subparagraph (B) then clarifies that, "[f]or the purposes of … subparagraph (A)," online marketplaces "shall only be required" to count sales or transactions "for which payment was processed by the online marketplace." *Id.* § 45(f)(3)(B). The district court

44

construed this "clarification" as a "ceiling" that confined what transactions *the states* could "require[]" online marketplaces to count.  Doc. 29 at 12.

The district court's reading has no basis in the text.  As explained, that clarification is a limitation on the reach of the *federal* law.  It cabins how far the federal INFORM Act itself reaches—it does not purport to or even suggest that it is a limitation on anyone else.  Where a federal law limits its own reach, that is a reason to reject preemption; it is certainly not a reason to infer it.  *See, e.g.*, *Capron*, 944 F.3d at 30; *Wuebker*, 418 F.3d at 888.

The district court erroneously declared that "by using the word 'only,'" § 45f(f) "expressly prohibits" any actor from "requir[ing]" online marketplaces to surveil transactions other than those that the provision expressly mentions.  Doc. 29 at 9.  "Only means only," in the district court's view.  *Id.*  But the district court entirely ignored that "only means only" *for federal law*.  Perhaps the Federal Trade Commission could not require more.  But one does not assume that a federal law that limits its own reach preempts every state law that goes further.  *See, e.g.*, *Dulay*, 768 F.3d at 1367–68; *Wuebker*, 418 F.3d at 888; *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (federal

agency's decision "not to regulate a particular aspect" of a legislative concern was "fully consistent with an intent to preserve state regulatory authority ….").

If the scope of § 45f(f)(3) were otherwise unclear, subparagraph (B) specifically limits itself to modifying *only subparagraph (A)*.  Subparagraph (B) provides that an online marketplace "shall only be required to count" transactions processed by the online marketplace "[*f*]*or purposes of calculating the number of discrete sales … under subparagraph (A)*."  15 U.S.C. § 45f(f)(3)(B) (emphasis added).  In other words, the clarification, by its own terms, applies solely to subparagraph (A). That is a clear indication that Congress was *not* extending to online marketplaces a general "federal right to be free from any other … requirements."  *Murphy*, 584 U.S. at 479.

Lastly, although it should not be necessary to reach the question, the district court erroneously declined to apply the ordinary presumption against preemption.  Doc. 29 at 8.  The court invoked *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (*en banc*) for a blanket rule that whenever a statute contains preemptive language, "no presumption … applies."  *See* Doc. 29 at 8 (quoting *Carson v. Monsanto Co.*, 92 F.4th 980, 989

46

(11th Cir. 2024) (quoting *Carson*, 72 F.4th at 1267)).  That was wrong.

The differences between the preemptive language Congress chose here and in *Carson* are stark.  In *Carson*, Congress had explicitly defined the categories of state law that it wanted to displace, expressly preempting all state "labeling or packaging" requirements for pesticides "in addition to or different from those required under" the federal law.  72 F.4th at 1267 (quoting 7 U.S.C. § 136v(b)).  Because the state law in question was a "labeling or packaging" requirement, there was no need to apply any background presumption about what Congress intended with respect to the state law.  *See id.* at 1267.  The only "remaining question" became whether the state law's requirements "add[ed] to or [were] different from" the federal act's standards, which the Court treated as an ordinary question of statutory interpretation. *See id.*

When, however, the state law falls outside the express language of the preemption clause, *see, e.g.*, *Lawson-Ross v. Great Lakes Higher Education Corp.*, 955 F.3d 908, 917–20 (11th Cir. 2020); *R.J. Reynolds Tobacco Co.*, 857 F.3d at 1188, 1190–92, or when (as here) Congress frames preemption using implied preemption terms, *see, e.g.*, *Dulay*, 768 F.3d at 1377–78, courts do

47

what they've always done—apply the presumption.  And that makes particular sense here because, again, where Congress legislates in an area traditionally regulated by the states, it must use "exceedingly clear language" to "alter the balance between federal and state power." *U.S. Forest Serv.*, 590 U.S. at 621–22. The Court need not reach the presumption—the statute is plenty clear—but if it does, the presumption applies.  Either way, the district court's first holding must be reversed.

**2.** The district court purported to hold, in the alternative, that obstacle preemption applies as well.  Doc. 29 at 9–13.  But the district court's obstacle preemption analysis boils down to the identical misunderstanding: the district court believed that subparagraph (B) of § 45f(f)(3) somehow sets a nationwide *ceiling* on requirements for online marketplaces, and so it held that a state law that goes further is an "obstacle" to that provision.  Doc. 29 at 9–13.

For the reasons already explained, subparagraph (B) does not mean what the district court thought it meant, and it evinces no purpose to provide a nationwide ceiling on requirements for online marketplace regulation.  But it is also striking that the district court never even identified the supposed "purpose" of the federal law that Georgia's law is somehow in tension with; that analysis is

48

supposed to be the "touchstone" of every preemption case. *Marrache*, 17 F.4th at 1094. If the district court had engaged in the correct analysis, the only conclusion to reach would be that the purpose of both laws is identical: informing consumers and deterring retail theft. Georgia's law just goes slightly further in pursuing its ends.

If it were in doubt, the savings provision, 15 U.S.C. § 45f(d)(6)(B), "buttresses th[e] conclusion" that Congress contemplated states continuing to regulate, *see Sprietsma*, 537 U.S. at 63. The savings provision holds that "[n]othing in this subsection may be construed to prohibit" States from pursuing action in state court "for a violation of any civil or criminal law of the State." § 45f(d)(6)(B). Through it, Congress expressly contemplated Georgia's "continued … role" in protecting online consumers with parallel regulation. *Williamson*, 562 U.S. at 335. But that responsibility vanishes now that the district court "eliminat[ed] … the possibility" that Congress "only … set forth [the] *minimum*" rather than the "*maximum* standard[s]" that govern online marketplaces. *Id.*

The district court extensively cited *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), but that case is inapposite here. To start, *Crosby* concerned whether a state law imposing

49

sanctions on Burma "directly interfered" with a federal program that granted the President authority to do the same. *See Whiting*, 563 U.S. at 604 (citing *Crosby*, 530 U.S. at 373–74, 377). The case thus involved the "uniquely federal area[]" of foreign affairs, *id.*, which makes it hardly "instructive" where Georgia and Congress have legislated in an area of traditional state concern, Doc. 29 at 10.

*Crosby* is no help to NetChoice for several more reasons. The district court primarily relied on that case for the premise that federal and state law can conflict even when their goals align—so long as their "means" differ. *Id.* at 12. But the mere fact that the federal and state laws differed in *Crosby* was not what mattered. Congress had passed comprehensive foreign affairs legislation that imposed detailed sanctions on Burma to "improv[e] human rights practices" in that country—among other purely political goals. *Id.* at 368, 377. Crucially, the federal scheme delegated sweeping discretion to the President to modify, add to, or suspend those sanctions. *Id.* at 374–75. The Massachusetts law imposing quasi-sanctions of its own against the country "ma[de] it impossible" for the President "to take th[ose] discretionary action[s] open to him" under the federal statute. *Id.* at 377. That presented an obvious conflict with Congress's "clear[] inten[tion]

50

… to provide the President with flexible and effective authority over economic sanctions against Burma." *Id.* at 374. *Crosby* certainly did not establish a general rule that conflict exists wherever Congress and the states achieve the same ends through slightly divergent means.

On top of that, *Crosby* was really a field preemption case. *See Va. Uranium, Inc.*, 587 U.S. at 774–75 (plurality op.); *see also* Scalia & Garner, *supra*, at 291. Unlike obstacle preemption (which is the question at issue here), field preemption necessarily precludes "supplementary state law" in an area of regulation because Congress has "so comprehensively [legislated in that area] that it has left no room for" anything else. *Murphy*, 584 U.S. at 479. But when the question is whether state law poses an obstacle to the federal law's express purpose, the default rule is that the States *can* legislate further absent evidence of congressional intent in the statute that says otherwise. *See, e.g.*, *Marrache*, 17 F.4th at 1096–97.

If anything, the district court's analysis here drives home why courts should tread carefully before inferring obstacle preemption where preemptive intent is unclear at best and "doubtful" at worst. *Virginia Uranium, Inc.*, 587 U.S. at 773 (plurality op.); *see also Whiting*, 563 U.S. at 607. It quickly turns into a judicial

51

guessing game "about hidden legislative wishes," where a judge's own vision of what a statute *should* do "wind[s] up displacing perfectly legitimate state laws." *Virginia Uranium, Inc.*, 587 U.S. at 778 (plurality op.). Here, Congress expressed no purpose in tension with anything in Georgia's law. And you can't wring conflicting purposes out of silence. *See Wyeth*, 555 U.S. at 575.

Because nothing in Georgia's law stands as on obstacle to anything in the federal INFORM Act, this Court should reverse.

## II.  The remaining equity factors weigh against a preliminary injunction.

NetChoice is unlikely to succeed on its preemption claim, which alone warrants reversal. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009). But the equities also underscore the need to course correct the district court's erroneous decision. NetChoice failed to produce any evidence that compliance with Georgia's law imposes particularly meaningful costs on its members.

For example, no evidence in the record supports NetChoice's claim that Georgia's focus on sales where payment is processed off the marketplace would require monitoring "hundreds of millions" of new third-party listings that do not already fall within the federal INFORM Act's regulatory radar. Doc. 2-1 at 25. And common sense begs to differ, as Georgia's law (like its federal

counterpart), targets only large-scale transactions of "new or unused" products, O.C.G.A. § 10-1-940(a)(2); 15 U.S.C. § 45f(f)(4)(A)—which is almost certainly not the majority of activity on these websites (not that we know for sure, since NetChoice introduced no evidence on this subject).

For the third-party sellers that Georgia's law does bring into the fold, several of NetChoice's members already have policies or procedures in place, such that monitoring these users' sales activity would likely present a non-issue.  Facebook Marketplace, for example, retains broad discretion to terminate user accounts that fail to comply with its Seller Agreement—the terms of which Meta has not denied it could amend to allow for mandatory disclosure of sales where payment is processed offline.  Doc. 2-4 at 5.  Or take eBay: to curb the "fraud risk" associated with sales where payment is processed elsewhere, it banned the practice outright and fines sellers who request would-be buyers' contact information for that purpose.  Doc. 2-6 at 24; eBay Inc., *Offering to buy or sell outside of eBay policy* (last visited Sept. 24, 2024), https://tinyurl.com/5c2eb9zs.

On the other side of the ledger, the hardship to Georgia and its citizens outweighs any prejudice to NetChoice's members.  "[T]he inability to enforce its duly enacted [statutes]" always

53

"inflicts irreparable harm on the State." *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).  And Georgia passed its law to protect businesses and consumers alike, which makes the public's interest in its enforcement likewise self-obvious.

The district court dismissed these concerns out of hand, based on its mistaken belief that Georgia's law was preempted.  *See* Doc. 29 at 14.  But the equities considerations do not *assume* the parties are wrong on the merits (otherwise the equities would collapse entirely into the merits).  Assuming the Attorney General is correct and Georgia's law is not preempted, every day that goes by is another without enforcement of a sovereign State's legislation.  That is more than enough reason to deny a preliminary injunction.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court below.

Respectfully submitted.

Logan Winkles
  *Deputy Attorney General*

/s/ *Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Zachary A. Mullinax
  *Assistant Attorney General*
William D. Rodenberg
  *Honors Fellow*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Attorney General of
Georgia*

55

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 10,786 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Stephen J. Petrany*
Stephen J. Petrany