No. 24-12273

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NETCHOICE, LLC,

Plaintiff–Appellee,

v.

ATTORNEY GENERAL, State of Georgia,

Defendant–Appellant.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
No. 1:24-cv-2485

**BRIEF OF RETAIL LITIGATION CENTER, INC.
AS AMICUS CURIAE
IN SUPPORT OF THE APPELLANT**

Filed with Consent of All Parties

Keith R. Blackwell
ALSTON & BIRD LLP
1201 W. Peachtree St.
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (214) 881-7777

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Cir. Rule 26.1, *Amicus Curiae* Retail Litigation Center, Inc. states that, in addition to the persons listed in the Certificate of Interested Persons and Corporate Disclosure Statement filed by Appellants on September 25, 2024, the following persons and entities have an interest in the outcome of this case:

1. Keith R. Blackwell, Counsel for *Amicus Curiae*

2. Retail Litigation Center, *Amicus Curiae*

3. Deborah White, Counsel for *Amicus Curiae*

4. Larissa M. Whittingham, Counsel for *Amicus Curiae*

The Retail Litigation Center is not a publicly traded corporation. It has no parent corporation, and no publicly held company has 10% or greater ownership of their stock.

# TABLE OF CONTENTS

Table of Contents ..................................................................................... i

Table of Authorities.................................................................................. ii

Interests of Amicus Curiae ...................................................................... 1

Statement of Compliance with Rule 29(a) ............................................... 2

Statement of the Issue .............................................................................. 2

Summary of Argument.............................................................................. 2

Argument................................................................................................... 4

    I.    Organized Retail Crime Is a Pervasive, Expensive, and Increasingly Violent Problem for the Nation's Retailers and Their Employees and Customers. ................................................. 4

    II.    Reducing Organized Retail Crime Requires the Cooperation of Online Marketplaces Where the Criminals Sell Stolen Merchandise, and the Federal INFORM Act Was a Critical Step Towards Securing that Cooperation. ......................... 11

    III.    Organized Retail Criminals Now Are Exploiting a Gap in the Coverage of the INFORM Act, and Georgia's Act 564 Is a Necessary and Reasonable Measure To Mitigate that Exploitation. ................................................................................. 17

Conclusion ............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*NetChoice, LLC v. Carr*,
No. 1:24-cv-2485, 2024 U.S. Dist. LEXIS 114950
(N.D. Ga. June 30, 2024) .................................................................. 15

**Statutes**

2024 Georgia Laws Act 564 (S.B. 472) .................................................... 20

Georgia Inform Consumers Act, O.C.G.A. §§ 10-1-940, *et. seq* ........ 15, 20

Integrity, Notification, and Fairness in the Online Retail Market-
place for Consumers Act, 15 U.S.C. § 45f ........................................ 15–17

**Other Authorities**

*Attorney General Bonta, Retailers, Online Marketplaces Sign Col-
laborative Agreement to Better Combat Organized Retail Crime*,
State of Cali. Dep't of Justice (June 20, 2023), https://ti-
nyurl.com/4cruz3yn ............................................................................ 7

Becca Trate, *Combating Organized Retail Crime Will Require More
Than Targeting High-value Shoplifting*, Center for Data Innovation
(Oct. 23, 2023), https://tinyurl.com/2z6ukdz4 ................................. 18

*Combatting Retail Crime for Safer Communities*, Retail Indus.
Leaders Ass'n (last visited Sept. 23, 2024), https://ti-
nyurl.com/b7rtydeh ............................................................................ 12

Fred Burton, *Organized retail crime in focus*, Security (Sept. 8,
2023), https://tinyurl.com/5865rn8w .................................................. 5

*From Festive Cheer to Retail Fear: Addressing Organized Retail
Crime, Hearing Before the Subcomm. on Counterterrorism, Law
Enforcement, and Intelligence of the H. Comm. on Homeland Sec.*,
118th Cong. (Dec. 12, 2023) (statement of Summer Stephan, Pres.-
Elect, Nat. Dist. Attys. Ass'n), https://tinyurl.com/2kvea2kj ............ 17

Grant Baker & Isabella Lucy, *Retail Crime Data Center: Highlighting the Serious Impact of Criminal Organizations on American Business and Society*, U.S. Chamber of Comm. (Mar. 15, 2023), https://tinyurl.com/3mxzhm4j ................................................................ 6, 8

*Hearing Before the H. Comm. on Agri. & Consumer Affairs*, 2023–24 Sess. (Ga. Mar. 7, 2024) (testimony of Andrew Fox, Corporate Asset Protection Intelligence Manager, The Home Depot) .................... 19

Home Depot Product Authority, *The Rise of Organized Retail Crime and How The Home Depot is Tackling the Problem*, Home Depot (Sept. 5, 2024), https://tinyurl.com/yc2jacj8 ...................................... 5, 11

Kallen Dimitroff, *Organized Prime: Should Amazon be Responsible for its Sellers' Criminal Activity?*, 100 TEX. L. REV. ONLINE 127 (2022) ............................................................................................ 16

Kristin Finklea, Cong. Rsch. Serv., R48061, Criminal Justice Data: Organized Retail Crime (2024) .............................................................. 14

Kyle Iboshi, *Here's why thieves are stealing Lego sets*, KGW8 (Aug. 8, 2024), https://tinyurl.com/43s3rf9u...................................................... 19

Mark Faithfull, *Target Blames Organized Crime for Closing Doors on Nine Stores*, Forbes (Sept. 28, 2023) https://tinyurl.com/mhbnx7tz................................................................. 10

Mike Duff, *Fight Against Organized Retail Crime Continues Amid Legislation, Increased Advocacy*, Homepage News (May 9, 2023), https://tinyurl.com/vfhp7suz .......................................................... 11, 14

Nat. Retail Fed., *Organized Retail Crime*, Policy Issues (last visited Sept. 20, 2024), https://tinyurl.com/2tf5fr4s ............................................. 6

Nat. Retail Fed. & K2 Integrity, *Organized Retail Crime: An Assessment of a Persistent and Growing Threat* (Nov. 29, 2023), https://tinyurl.com/4epr678h......................................................... *passim*

*Operation Boiling Point*, Homeland Sec. Investigations (last updated Aug. 16, 2024), https://tinyurl.com/4u6sveej ........................ 4, 8, 10

iii

Pamela N. Danzinger, *Danger in the Store: Retail Crime Makes Everyone a Potential Victim*, Forbes (Oct. 17, 2023), https://tinyurl.com/2nj9v2te ................................................................... 9

Siddharth Cavale, *Organized Retail Crime: A Multi-billion Dollar Problem*, Reuters (June 29, 2023), https://tinyurl.com/5n8vpxnw ................................................. 5, 8–9, 11

Thomson Reuters, *What is organized retail crime?*, Thomson Reuters: Legal (July 12, 2024), https://tinyurl.com/2s3tazue ........................ 9

Tom Wickham, *Organized Retail Theft 101: What Is It and What Can Be Done About It?*, U.S. Chamber of Com. (May 25, 2022), https://tinyurl.com/tuzdpead ................................................................... 5

Tony D'Onofrio, *The new approach retailers are taking to curb organized retail crime*, ModernRetail (Jan. 24, 2024), https://tinyurl.com/mrafdndr ................................................................... 6

## INTERESTS OF AMICUS CURIAE

The Retail Litigation Center, Inc. (RLC) is a 501(c)(6) nonprofit trade association that represents national and regional retailers, including many of the country's largest and most innovative retailers, across a range of retail verticals, from home improvement to pet stores and apparel to beauty. The RLC is the only trade organization solely dedicated to representing the retail industry in the courts. Its members employ millions of people throughout the United States, provide goods and services to tens of millions more, and collectively account for tens of billions of dollars in annual sales. The RLC offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases. Since its founding in 2010, the RLC has filed more than 200 amicus briefs on issues of importance to the retail industry. Its amicus briefs have been favorably cited by multiple courts, including the U.S. Supreme Court. *See, e.g., South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 184 (2018); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 542 (2013); *Chewy, Inc. v. U.S. Dep't of Lab.*, 69 F.4th 773, 777–78 (11th Cir. 2023); *State v. Welch*, 595 S.W.3d 615, 630 (Tenn. 2020).

This brief is filed with the consent of all parties.

## STATEMENT OF COMPLIANCE WITH RULE 29(a)

No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person—except amicus curiae, their members, or their counsel—contributed money intended to fund the preparation or submission of this brief.

## STATEMENT OF THE ISSUE

Whether federal law preempts the recently amended Georgia Inform Consumers Act.

## SUMMARY OF THE ARGUMENT

Organized retail crime is a persistent and growing threat that not only drains billions of dollars from our national economy, but also presents serious dangers for public safety. Organized retail crime involves the coordinated and increasingly violent theft of large quantities of merchandise from retailers by criminal enterprises that subsequently sell—or "fence"— the stolen merchandise for profit. Some of their most egregious tactics—smash-and-grab robberies and flash-mob looting—have garnered significant media coverage. But until recently, less attention

was given—by the public and policymakers alike—to the fencing-side of these criminal enterprises' operations.

That changed, however, when Congress enacted the Integrity, Notification, and Fairness in the Online Retail Marketplace for Consumers ("INFORM") Act in 2022. The INFORM Act requires online marketplaces (on which fencing was pervasive at the time) to track sales, ascertain high-volume sellers, and collect certain information from those sellers that would enable law enforcement and retailers to identify them. By lifting the shroud of anonymity for sellers on these online marketplaces, Congress took a substantial step toward its goal of deterring and significantly reducing organized retail crime.

But the often-sophisticated criminal enterprises engaged in organized retail crime found a way to circumvent the INFORM Act. These enterprises migrated their fencing operations from the regulated online marketplaces to "peer-to-peer" platforms to which the federal INFORM Act does not apply. On these peer-to-peer platforms, their fencing operations still enjoy anonymity and are thriving.

The Georgia General Assembly recognized this dangerous evolution in organized retail crime and responded by passing Act 564—an

amendment to the Georgia Inform Consumers Act ("GICA")—which expands the coverage of the information-collection requirements to include peer-to-peer platforms. The district court enjoined the enforcement of Act 564, concluding that it was preempted by the INFORM Act. Respectfully, the district court erred, and if its injunction stands, organized retail crime enterprises will continue to thrive on peer-to-peer platforms, hobbling the INFORM Act. This Court should vacate the injunction.

## ARGUMENT

### I.   Organized Retail Crime Is a Pervasive, Expensive, and Increasingly Violent Problem for the Nation's Retailers and their Employees and Customers.

Organized retail crime is "the systematic largescale theft of retail goods … and the subsequent resale of [those] goods for financial gain."[1] It is not—and it is not fairly comparable to—traditional shoplifting, which is committed principally by unaffiliated individuals who steal

---

[1] Nat. Retail Fed. & K2 Integrity, *Organized Retail Crime: An Assessment of a Persistent and Growing Threat*, at 1 (Nov. 29, 2023), https://tinyurl.com/4epr678h ("NRF Report"); *see also Operation Boiling Point*, Homeland Sec. Investigations (last updated Aug. 16, 2024), https://tinyurl.com/4u6sveej ("Homeland Security Investigations (HSI) defines [organized retail crime] as the association of two or more persons engaged in illegally obtaining items of value from retail establishments, through theft and/or fraud, as part of a criminal enterprise." (internal punctuation omitted)).

merchandise for their personal use and consumption.[2] Rather, organized retail crime is a highly coordinated operation, involving sophisticated criminals who steal with "the explicit aim" of "resell[ing] stolen goods for profit."[3] Put plainly, organized retail crime is "not theft for need, but theft for greed."[4] Organized retail crime continues to grow, as "retailers experienced a 26.5 [percent] increase in organized retail criminal incidents" from 2022 to 2023.[5] Moreover, organized retail crime has become far more sophisticated in recent years, and today, its perpetrators commonly engage in "careful planning, deliberate targeting of retailers, and high-level coordination."[6] As the criminals escalate their tactics, the impact of

---

[2] NRF Report at 1.

[3] *Id.*

[4] Home Depot Prod. Auth., *The Rise of Organized Retail Crime and How The Home Depot is Tackling the Problem*, Home Depot (Sept. 5, 2024), https://tinyurl.com/yc2jacj8.

[5] Fred Burton, *Organized retail crime in focus*, Security (Sept. 8, 2023), https://tinyurl.com/5865rn8w; *see also* Tom Wickham, *Organized Retail Theft 101: What Is It and What Can Be Done About It?*, U.S. Chamber of Com. (May 25, 2022), https://tinyurl.com/tuzdpead ("Organized retail theft rates have spiked significantly.").

[6] Siddharth Cavale, *Organized Retail Crime: A Multi-billion Dollar Problem*, Reuters (June 29, 2023), https://tinyurl.com/5n8vpxnw.

organized retail crime becomes more tangible for retailers and consumers alike.

Retailers sustain substantial financial losses—both direct and indirect—as a result of organized retail crime. As the National Retail Federation has explained, organized retail crime "imposes direct financial costs on retailers in terms of forgone revenue and higher operational costs associated with security and loss prevention measures."[7]  In 2022, for example, retailer "shrink" amounted to 1.6 percent of gross retail revenues.[8] That figure "represents $112.1 billion in losses" and reflects significant organized retail crime activity.[9] In response to these staggering losses, many retailers have increased security measures in their brick-

---

[7] NRF Report at 21.

[8] Nat. Retail Fed., *Organized Retail Crime*, Policy Issues (last visited Sept. 20, 2024), https://tinyurl.com/2tf5fr4s.

[9] *Id.*; *see also* Grant Baker & Isabella Lucy, *Retail Crime Data Center: Highlighting the Serious Impact of Criminal Organizations on American Business and Society*, U.S. Chamber of Com. (Mar. 15, 2023), https://tinyurl.com/3mxzhm4j ("Organized retail crime cost stores an average of over $700,000 per $1 billion in sales in 2020."). "While retail shrink encompasses many types of loss, it is primarily driven by theft, including organized retail crime." Nat. Retail Fed., *supra*.

and-mortar stores.[10] Providing this increased security also imposes direct and significant costs on retailers.[11] But the financial impact of organized retail crime does not stop there.

Organized retail crime also has substantial, indirect financial consequences for retailers, most notably because crime and the security measures necessary to prevent it often lead to reduced sales revenues. When organized retail criminals succeed in purloining large quantities of merchandise, the sheer scale of their crime—and sometimes, its violent means—generates negative publicity for the retail victim, which reduces customer visits to retail stores.[12] The security measures employed by

---

[10] *See, e.g.*, Tony D'Onofrio, *The new approach retailers are taking to curb organized retail crime*, ModernRetail (Jan. 24, 2024), https://tinyurl.com/mrafdndr ("[M]any leaders have added physical and visual deterrents, like locked cases and alarm tags, to sales floors to strengthen their loss prevention [] programs.").

[11] NRF Report at 21 (noting "increased expenditures on security and insurance, and higher labor costs to compensate workers at stores that experience elevated levels of" organized retail crime).

[12] *See id.* (noting "temporary dips in revenue at targeted stores as widespread media coverage" of violent thefts "reduces the number of customer visits"); *see also Attorney General Bonta, Retailers, Online Marketplaces Sign Collaborative Agreement to Better Combat Organized Retail Crime*, Cal. Dept. of Justice (June 20, 2023), https://tinyurl.com/4cruz3yn (detailing an agreement between the California Attorney General, retailers, and several online marketplace members of NetChoice).

retailers in response to organized retail crime may also deter shoppers. "For example, the use of lockboxes to protect items that are popular targets for [organized retail crime] reportedly dissuades some customers from making purchases."[13]

Retailers are not the only ones who bear the costs.[14] Indeed, as the frequency and severity of organized retail crime increases, these costs have to be factored into pricing, and some impact may be passed on to consumers.[15] According to the Department of Homeland Security, "[i]t is estimated that the average American family will pay more than $500 annually in additional costs due to the impact" of organized retail crime.[16] The costs also are passed indirectly to federal, state, and local governments, which experience a loss of tax revenue as a result of organized retail crime. "Estimates reveal [that organized retail crime] costs …

---

[13] *Id.*

[14] *See, e.g.*, Baker & Lucy, *supra* ("While the impact of [organized retail crime] may be primarily felt by retailers, it is having a ripple effect across the entire economy, and sectors beyond retail are taking notice of its macroeconomic impact.").

[15] *See, e.g.*, Cavale, *supra* ("When retailers face high costs, their profit margins take a hit and they typically look to raise prices for shoppers. That means that, in the end, shoppers may bear the cost of retailers' losses to organized retail crime.").

[16] *Operation Boiling Point, supra.*

8

nearly $15 billion in lost tax revenue, not including lost sales taxes."[17] In addition, many state and local governments have found it necessary to increase their spending on law enforcement in response to organized retail crime.[18]

Organized retail crime is not just a substantial economic problem. The means of organized retail crime today more commonly involve violence and threats of violence, and it has become a serious public-safety issue as well. Relative to shoplifting and other forms of retail theft, organized retail crime poses the "highest threat of violence, with 67 [percent] reporting more violence and aggression among that class of retail criminals."[19] Between 2014 and 2022, 16 percent of the groups engaged in organized retail crime used violence—such as "smash-and-grab" tactics, "use of firearms or other weapons, battery, flash mob tactics or threats of

---

[17] *Id.*

[18] Thomson Reuters, *What is organized retail crime?*, Thomson Reuters: Legal (July 12, 2024), https://tinyurl.com/2s3tazue; *see also* Cavale, *supra* p. 3 ("states such as Illinois, Colorado, Connecticut, Washington and California, where law enforcement has set up special task forces" have spent "hundreds of millions of dollars" fighting organized retail crime).

[19] Pamela N. Danzinger, *Danger in the Store: Retail Crime Makes Everyone a Potential Victim*, Forbes (Oct. 17, 2023), https://tinyurl.com/2nj9v2te.

violence against store employees or customers"—in their crimes.[20] And the violence associated with organized retail crime is only growing.[21] As the threat of violence grows, many retailers will face a dilemma between devoting an unsustainable level of resources to protect their customers, employees, and assets, on the one hand, or simply closing their stores, on the other.[22] Simply put, organized retail crime is "detrimental to both businesses, small and large alike, and the overall economy as [it] pose[s] both societal and health risks to the community."[23]

---

[20] NRF Report at 12.

[21] *See Operation Boiling Point*, *supra* (There is a "growing number of thefts that turn violent."); NRF Report at 12 ("[R]ecent entrants to ORC may be more inclined to use violent tactics.").

[22] *See, e.g.*, Mark Faithfull, *Target Blames Organized Crime for Closing Doors on Nine Stores*, Forbes (Sept. 28, 2023) https://tinyurl.com/mhbnx7tz. In addition to the expense of providing security measures to protect customers and employees, retailers may be forced to increase employee compensation to attract and retain employees who otherwise would be reticent to face the "perceived safety risks" presented by organized retail crime. NRF Report at 21.

[23] *Operation Boiling Point*, *supra*.

II.   **Reducing Organized Retail Crime Requires the Cooperation of Online Marketplaces Where the Criminals Sell Stolen Merchandise, and the Adoption of the Federal INFORM Act Was a Critical Step Towards Securing that Cooperation.**

Organized retail crime persists and grows because it is lucrative for some criminals, and, therefore, reducing the problem of organized retail crime requires measures to make it less profitable. An important part of the solution is deterring and preventing the thefts that feed organized retail criminal enterprises,[24] and in this respect, the nation's retailers have stepped up. In recent years, many retailers have adopted new and improved security measures to deter and prevent thefts from their stores, often at substantial cost from both a financial perspective and a customer-experience perspective (such as the challenging decision facing retailers about whether to put certain products behind locks to deter theft, but at the cost of customer ease of access).[25] The RLC's sister association,

---

[24] "The crime ring generally has two parts—those individuals who steal large quantities of merchandise from a numbers of stores[] and those who convert the stolen goods into cash." Cavale, *supra*.

[25] *See, e.g.*, Home Depot Prod. Auth., *supra* (discussing The Home Depot's efforts, including "extensive training," "in-store asset protection measures," and implementation of "new technologies to make in-store theft more difficult"); Mike Duff, *Fight Against Organized Retail Crime*

11

the Retail Industry Leaders Association (RILA), which represents the nation's leading retailers, has developed strategic programs to assist the retail community. Among other things, RILA has partnered with the National District Attorneys Association to improve communications between "leading retailers and district attorneys' offices from around the country," to better enable them to "work together to identify criminal networks targeting local retailers."[26] But despite these extensive, and often costly, efforts to deter and prevent theft, organized retail crime persists.

While retailers can take steps to reduce thefts in their stores, that is only half the battle. After stealing merchandise, organized retail criminals move to the profit center of their criminal enterprise, fencing the

---

*Continues Amid Legislation, Increased Advocacy*, Homepage News (May 9, 2023) ("52.4% of retailers said they are increasing budgets for capital and equipment to combat criminals from artificial intelligence-based video surveillance to self-service locking cases and even autonomous security robots."); Cavale, *supra* ("In addition to working with law enforcement agencies, retailers are putting up plexiglass cases and steel cables to lock down merchandise, and adding security and large alarm systems to their stores.").

[26] *Combatting Retail Crime for Safer Communities*, Retail Indus. Leaders Ass'n (last visited Sept. 23, 2024), https://tinyurl.com/b7rtydeh.

stolen goods.[27] Just as many legitimate retailers are shifting many of their sales operations online, criminal fencing operations are increasingly using online marketplaces to sell stolen goods.[28] But tracking and identifying fencing operations on online marketplaces is difficult.[29] Indeed, "[t]he large number of legitimate sellers on popular online marketplaces provides greater anonymity and better cover to resell [stolen] goods compared with physical retail venues, which involve face-to-face interactions with customers who may recognize the illicit origin of goods."[30] Moreover, "online marketplaces significantly reduce barriers to entry for sellers, including [] fences."[31]

The difficulty of tracking fences online only compounds another difficulty associated with organized retail crime—the absence of "consistent and consolidated data regarding [organized retail crime]."[32] This lack of

---

[27] In some ways, fencing operations are the driving force behind organized retail crime, as groups often "consider fencing plans during advance preparations for booster operations." NRF Report at 15.

[28] *See id.* ("[Organized retail crime] fencing operations rely on online marketplaces as a resale channel.").

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] NRF Report at 5.

data often leaves law enforcement agencies and retailers uncertain about the strategies and commitments of limited resources that would most effectively deter and prevent thefts. The lack of data also reduces "public awareness about the scale and consequences of" organized retail crime.[33] And to some extent, it may have impaired legislative efforts to understand and mitigate the full impacts of organized retail crime.[34]

Some retailers have attempted to address the dearth of data on organized retail crime by employing large loss-prevention teams to track, investigate, and improve their understanding of the criminal enterprises.[35] But with respect to online fencing operations, retailers and law enforcement have had to rely to a significant extent on data collected, compiled, and made available by the online marketplaces (*e.g.*, Amazon, eBay) on which the fencing occurs (and from which the online

---

[33] NRF Report at 5. Even where organized retail crime incidents are reported, media coverage, which tends to "focus on sensational incidents that feature violence or brazen daytime theft operations," skews public perception of the crime. NRF Report at 13.

[34] *See* Kristin Finklea, Cong. Rsch. Serv., R48061, Criminal Justice Data: Organized Retail Crime 6 (2024) ("Without these data, Congress may not be able to accurately assess the proper role of the federal government, if any, in addressing [organized retail crime]-related issues.").

[35] *See* Duff, *supra*.

marketplaces reap a significant profit). Until recently, the collection and reporting of this information was virtually nonexistent. That changed, however, when several state legislatures—and eventually, Congress—enacted laws to increase the transparency of transactions involving high-volume sellers online and thereby deter and reduce online fencing.

Georgia was one of the first states to enact legislation that targeted online fencing operations. In 2022, the Georgia General Assembly enacted GICA, O.C.G.A. §§ 10-1-940 *et seq.*, which required online marketplaces to identify potential fences and collect relevant data from them. Shortly after the enactment of GICA, Congress passed the INFORM Act, 15 U.S.C. § 45f. Like GICA, the purpose of the INFORM Act is to deter the sale of stolen merchandise online by "bring[ing] transparency to online transactions." *NetChoice, LLC v. Carr*, No. 1:24-cv-2485, 2024 U.S. Dist. LEXIS 114950, at *3 (N.D. Ga. June 30, 2024).[36]

---

[36] When it was enacted, the INFORM Act's provisions largely mirrored GICA. *Compare, e.g.*, O.C.G.A. § 10-1-941, *with* 15 U.S.C. § 45f(a); *see also NetChoice, LLC*, 1:24-cv-2485, 2024 U.S. Dist. LEXIS 114950, at *2 ("Much like GICA, the INFORM Act seeks to bring transparency to online transactions and to deter sales of stolen, counterfeit, and dangerous products.").

To achieve this goal, the INFORM Act requires "high-volume third-party sellers" who offer and sell goods through online marketplaces to provide certain information—bank account information, contact information, tax identification, and a working email and phone number—to those marketplaces. 15 U.S.C. § 45f(a)(1)(A). High-volume sellers are those that, during a continuous 12-month period, complete at least 200 discrete sales with aggregate gross revenues of at least $5,000. 15 U.S.C. § 45f(f)(3)(A). Under the INFORM Act, online marketplaces have a responsibility to track sales and identify the high-volume sellers who are required to report this identifying information. 15 U.S.C. § 45f(a)(1)(B). As a result of the increased collection of identifying information by online marketplaces under the INFORM Act, law enforcement and retail investigators can more easily track criminal fencing operations.[37] Moreover, the loss of anonymity—and the correspondingly increased risk to criminals of detection and identification by law enforcement—is a powerful

---

[37] *See* Kallen Dimitroff, *Organized Prime: Should Amazon be Responsible for its Sellers' Criminal Activity?*, 100 TEX. L. REV. ONLINE 127, 138 (2022) (citations omitted)).

deterrent to the misuse of online marketplaces for fencing stolen merchandise.[38]

### III. Organized Retail Criminals Now Are Exploiting a Gap in the Coverage of the INFORM Act, Which Georgia's Act 564 Is Intended to Mitigate.

As set forth above, the INFORM Act requires online marketplaces to track sales by, and collect identifying data from, high-volume sellers. But there is a significant gap in its coverage. Under the INFORM Act, when "calculating the number of discrete sales or transactions or the aggregate gross revenues" for purposes of identifying high-volume sellers, an online marketplace is only "required to count sales or transactions made through the online marketplace and for which payment was processed by the online marketplace, either directly or through its payment processor." 15 U.S.C. § 45f(f)(3)(B). Many online marketplaces—such as Amazon and eBay—commonly process payment for sales made on the

---

[38] *See From Festive Cheer to Retail Fear: Addressing Organized Retail Crime, Hearing Before the Subcomm. on Counterterrorism, Law Enforcement, and Intelligence of the H. Comm. on Homeland Sec.*, 118th Cong. (Dec. 12, 2023) (statement of Summer Stephan, Pres.-Elect, Nat'l Dist. Attys. Ass'n), https://tinyurl.com/2kvea2kj (The INFORM Act "is a step in the right direction to stop organized criminals from selling stolen goods on online marketplaces" because "[i]t removes the anonymity of the seller and makes it easier for law enforcement to find [] online sellers of stolen goods and prosecute them.").

marketplace, and these marketplaces must collect data pursuant to the INFORM Act. But some other online marketplaces—including Craigslist, Offerup, and Facebook Marketplace—do not regularly process payment for sales. Instead, these "peer-to-peer" platforms allow sellers to offer merchandise and identify prospective purchasers, but payment for the sales may be made off the platform, either through physical meetings or on another payment-only platform. The INFORM Act does not require these peer-to-peer platforms to collect information about high-volume sellers.

This loophole undermines the purpose of the INFORM Act, as "[m]any peer-to-peer ecommerce sites have weak identification policies for sellers and disregard the threat [organized retail crime] fencing operations pose to the integrity and reputation of their platforms."[39] On peer-to-peer platforms, criminal enterprises still can successfully fence stolen

---

[39] NRF Report at 16; *see also* Becca Trate, *Combating Organized Retail Crime Will Require More Than Targeting High-value Shoplifting*, Center for Data Innovation (Oct. 23, 2023), https://tinyurl.com/2z6ukdz4 ("Peer-to-peer venues, which often operate as online classified advertisements and do not process financial transactions, have fewer barriers to entry and rarely attempt to collect or verify seller information.").

merchandise under the shroud of anonymity that they enjoyed on other online marketplaces before the adoption of the INFORM Act.

Organized retail crime enterprises have identified this loophole, and they are exploiting it. Law enforcement and loss-prevention professionals report an increasing use of peer-to-peer platforms for fencing by organized retail crime enterprises.[40] Hard data also show this shift. In an analysis of 8,821 listings on two peer-to-peer platforms, the National Retail Federation reports finding "25 [percent] of search results for typical [organized retail crime] goods or keywords had elements associated with [organized retail crime]."[41] And anecdotal evidence corroborates that organized retail crime enterprises are exploiting the INFORM Act loophole. For example, law enforcement recently recovered "$200,000 worth of stolen Lego sets" with "[p]olice reports show[ing] stolen Lego sets listed on Facebook Marketplace and other online platforms."[42]

---

[40] NRF Report at 16; *see also, e.g.*, *Hearing Before the H. Comm. on Agri. & Consumer Affairs*, 2023–24 Sess. (Ga. Mar. 7, 2024) (testimony of Andrew Fox, Corporate Asset Protection Intelligence Manager, The Home Depot).

[41] NRF Report at 16.

[42] Kyle Iboshi, *Here's why thieves are stealing Lego sets*, KGW8 (Aug. 8, 2024), https://tinyurl.com/43s3rf9u.

To keep up with the criminals, lawmakers must adapt as quickly as criminals are adapting. In Georgia, they have. Earlier this year, the Georgia General Assembly amended GICA to regulate transactions made "through" an online marketplace, whether "payment was processed by the online marketplace or through a third party," so long as the transactions were "entered into . . . by utilizing" an online marketplace. 2024 Georgia Laws Act 564 (S.B. 472); O.C.G.A. § 10-1-940(a)(2). Under the amended GICA, peer-to-peer platforms—like the online marketplaces regulated by the INFORM Act—are required to identify high-volume sellers and collect their identifying information. Contrary to the decision below, this narrow expansion of GICA does not conflict with the INFORM Act.

When Congress passed the INFORM Act, the prevailing focus among retailers and law enforcement alike was the traditional online marketplaces covered by the Act, which, at the time, hosted the majority of online fencing.[43] But following the passage and success of the INFORM Act, organized retail crime enterprises have transitioned to peer-to-peer

---

[43] NRF Report at 15.

marketplaces. Georgia recognized this trend and, accordingly, sought to regulate transactions made through peer-to-peer platforms.

## CONCLUSION

The Court should vacate the preliminary injunction entered by the district court and allow Georgia to enforce Act 564.

*/s/ Keith R. Blackwell*
Keith R. Blackwell
ALSTON & BIRD LLP
1201 W. Peachtree St.
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (214) 881-7777

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B)(i), and 11 Cir. R. 32-4 because it contains 3994 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and 11 Cir. R. 32-3 because it has been prepared in a proportionally spaced typeface (14-point Century) using Microsoft Word and is double-spaced.

*/s/ Keith R. Blackwell*
Keith R. Blackwell
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit on October 2, 2024, by using the appellate CM/ECF system, and service was accomplished on all counsel of record by the appellate CM/ECF system.

*/s/ Keith R. Blackwell*
Keith R. Blackwell
*Counsel for Amicus Curiae*
