# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

NETCHOICE, LLC,

*Plaintiff-Appellee,*

v.

ATTORNEY GENERAL, STATE OF GEORGIA

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of Georgia,
No. 1:24-cv-02485 (Judge Steven D. Grimberg)

———————————

## BRIEF FOR APPELLEE

———————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are
 members of the Virginia bar

*Counsel for Plaintiff-Appellee*
*NetChoice, LLC*

November 25, 2024

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellee NetChoice, LLC, hereby certifies that it has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

Appellee also certifies, pursuant to Circuit Rule 26.1, that Appellant's Certificate of Interested Parties is correct and contains a complete list of attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal.

November 25, 2024

s/Erin E Murphy
Erin E Murphy

## STATEMENT REGARDING ORAL ARGUMENT

Appellee NetChoice, LLC, respectfully submits that oral argument would materially aid the decisional process because this appeal presents an important issue of federal law.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT................................................................CIP-1

STATEMENT REGARDING ORAL ARGUMENT.................................. i

TABLE OF AUTHORITIES................................................................ iv

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION ........................................................4

STATEMENT OF THE ISSUE...............................................................5

STATEMENT OF THE CASE.................................................................5

    A. The Rise of E-Commerce and Online Marketplaces........................5

    B. Various States Enact Laws Regulating Online Marketplaces .........8

    C. The Federal Government Enacts the INFORM Act .....................15

    D. Georgia Dramatically Expands Its Inform Consumers Act...........17

    E. The Present Lawsuit ...................................................................20

SUMMARY OF ARGUMENT.................................................................21

STANDARD OF REVIEW ...................................................................26

ARGUMENT .....................................................................................26

I. The District Court Correctly Held That NetChoice Is Likely To Succeed
   On The Merits Of Its Challenge To Act 564.......................................26

    A. The District Court Correctly Concluded That the Federal INFORM
       Act Expressly Preempts Act 564 .................................................27

       1. The federal INFORM Act's directive that online marketplaces
         "shall *only* be required to count" on-platform transactions
         overrides Act 564's conflicting requirement to count additional,
         off-platform transactions .........................................................27

       2. Georgia's contrary arguments are meritless ............................31

B. Although the District Court Did Not Reach the Issue, Act 564 Also Runs Afoul of the First Amendment ......................................................44

    1. Act 564 triggers heightened First Amendment scrutiny .........................44

    2. Act 564 cannot survive heightened scrutiny ...........................................47

II. The District Court Correctly Held That NetChoice Has Satisfied All Other Requirements For A Preliminary Injunction.............................................51

CONCLUSION ......................................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ......................................................... 30

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ................................................................ 30

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......................................................................... 43

*Am. Librs. Ass'n v. Pataki*,
969 F.Supp. 160 (S.D.N.Y. 1997) ...................................................... 31

*Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*,
182 F.3d 1284 (11th Cir. 1999) ......................................................... 36

*Am.'s Health Ins. Plans v. Hudgens*,
742 F.3d 1319 (11th Cir. 2014) ......................................................... 51

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ......................................................... 34

*Ardestani v. INS*,
502 U.S. 129 (1991) .......................................................................... 27

*Arizona v. United States*,
567 U.S. 387 (2012) .......................................................................... 42

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......................................................................... 44

*Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*,
522 F.3d 1190 (11th Cir. 2008) ......................................................... 31

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ................................................................... 48, 49

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987) .......................................................................... 36

iv

*Caminetti v. United States*
242 U.S. 470 (1917)........................................................................31

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023).......................................... 23, 27, 35, 39

*Carson v. Monsanto Co.*,
92 F.4th 980 (11th Cir. 2024)..............................................................40

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)........................................................................33

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)........................................................................35

*Colo. Dep't of Pub. Health & Env't, Hazardous Materials
& Waste Mgmt. Div. v. United States*,
693 F.3d 1214 (10th Cir. 2012)..........................................................43

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)................................................................... 40, 42

*Curling v. Raffensperger*,
50 F.4th 1114 (11th Cir. 2022)...........................................................26

*Dunkins v. Thigpen*,
854 F.2d 394 (11th Cir. 1988)............................................................32

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................52

*Figueroa v. Foster*,
864 F.3d 222 (2d Cir. 2017)..............................................................32

*Garcia v. Vanguard Car Rental USA, Inc.*,
540 F.3d 1242 (11th Cir. 2008)................................................... 23, 34

*Georgia v. President of U.S.*,
46 F.4th 1283 (11th Cir. 2022)...................................... 26, 51, 53, 54

*Gonzalez v. Governor of Ga.*,
978 F.3d 1266 (11th Cir. 2020)..........................................................26

v

*Heat Techs., Inc. v. Papierfabrik August Koehler SE*,
    2020 WL 12309512 (N.D. Ga. June 5, 2020) .................................................... 34

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ............................................................................................. 46

*Jones v. Google LLC*,
    73 F.4th 636 (9th Cir. 2003) ........................................................................ 36, 37

*Life Techs. Corp. v. Promega Corp.*,
    580 U.S. 140 (2017) ............................................................................................. 29

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ........................................................................................ 25, 47

*Marrache v. Bacardi U.S.A., Inc.*,
    17 F.4th 1084 (11th Cir. 2021) .......................................................................... 39

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ............................................................................................. 45

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) ........................................................................................ 44

*MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*,
    60 F.4th 1314 (11th Cir. 2023) ..................................................................... 39, 41

*Murphy v. Dulay*,
    768 F.3d 1360 (11th Cir. 2014) .......................................................................... 36

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ................................................................................. 46, 50, 51

*Nickels v. Grand Trunk W. R.R., Inc.*,
    560 F.3d 426 (6th Cir. 2009) .............................................................................. 32

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) .............................................................................. 32

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................................................ 53

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)................................................................47

*Patel v. Garland*,
    596 U.S. 328 (2022)...............................................................28

*Patel v. U.S. Att'y Gen.*,
    971 F.3d 1258 (11th Cir. 2020) .............................................28

*Pharm. Care Mgmt. Ass'n v. Gerhart*,
    852 F.3d 722 (8th Cir. 2017)..................................................32

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016)...............................................................35

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)...............................................................46

*S. Blasting Servs., Inc. v. Wilkes Cnty.*,
    288 F.3d 584 (4th Cir. 2002)..................................................36

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) .............................................53

*Smith v. Illinois*,
    469 U.S. 91 (1984)................................................................32

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)...............................................................45

*Sw. Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)......................................................... 23, 37

*Tamburello v. Comm-Tract Corp.*,
    67 F.3d 973 (1st Cir. 1995) ...................................................32

*Taylor v. Polhill*,
    964 F.3d 975 (11th Cir. 2020).................................................27

*Teltech Sys., Inc. v. Bryant*,
    702 F.3d 232 (5th Cir. 2012)..................................................43

*Torres v. Lynch*,
578 U.S. 452 (2016)...................................................................40

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .................................. 26, 53

*United States v. Chinchilla*,
987 F.3d 1303 (11th Cir. 2021) ...........................................34

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019)...................................................................39

*Victor Elias Photography, LLC v. Ice Portal, Inc.*,
43 F.4th 1313 (11th Cir. 2022)...........................................34

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988)...................................................................47

*Waks v. Empire Blue Cross/Blue Shield*,
263 F.3d 872 (9th Cir. 2001)................................................32

*Warshauer v. Solis*,
577 F.3d 1330 (11th Cir. 2009) ..........................................27

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019)...................... 45, 46, 48, 50, 51

*Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*,
471 U.S. 626 (1985)....................................... 49, 50, 51

**Statutes**

7 U.S.C. §228c ............................................................................36

15 Okla. Stat. §799A.2 *et seq.* ...........................................12

15 Okla. Stat. §799A.7................................................... 12, 17

15 U.S.C. §45f.....................1-2, 15-16, 20-22, 26, 28-30, 38, 42

18 U.S.C. §848 ................................................................ 36, 38

28 U.S.C. §1292 ...........................................................................4

28 U.S.C. §1331 ...................................................................................4

42 U.S.C. §1320d-7 ...........................................................................38

42 U.S.C. §1395dd ............................................................................38

42 U.S.C. §2000h-4 ...........................................................................38

73 Pa. Stat. §201-9.4 *et seq.* .............................................................12

73 Pa. Stat. §201-9.4 ................................................................... 12, 14

815 Ill. Comp. Stat. 356/1-5 *et seq.* ...............................................12

2021 Ark. Laws Act 555 (S.B. 470) (Apr. 5, 2021) .................................11

2022 Ala. Laws Act 2022-441 (H.B. 318) (Apr. 14, 2022) ....................12

2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (Sept. 30, 2022)...................12

2022 Colo. Legis. Serv. Ch. 21 (H.B. 22-1099) (Mar. 17, 2022) ...........11

2022 Ga. Laws Act 820 (S.B. 332) ...................................................9

2022 Ill. Legis. Serv. P.A. 102-757 (H.B. 1091) (May 13, 2022) ...........12

2022 Iowa Legis. Serv. Ch. 1114 (H.F. 2401) (June 13, 2022) ..............12

2022 La. Sess. Law Serv. Act 316 (S.B. 442) (June 10, 2022)...............12

2022 Mich. Legis. Serv. P.A. 153 (H.B. 5487) (July 19, 2022)..............12

2022 N.C. Laws S.L. 2022-30 (S.B. 766) (June 30, 2022).....................12

2022 Ohio Laws File 89 (Sub. H.B. 272) (Apr. 6, 2022) .......................12

2022 Okla. Sess. Law Serv. Ch. 378 (S.B. 418) (May 26, 2022)...........12

2022 Pa. Legis. Serv. Act 2022-64 (H.B. 1594) (July 11, 2022) ............12

2024 Cal. Legis. Serv. Ch. 172 (S.B. 1144)........................................17

Ala. Code §8-41-1 *et seq.* .................................................................12

Ark. Code §4-119-101 *et seq.* ...........................................................11

Ark. Code §4-119-102 ...............................................................11, 13, 14

Ark. Code §4-119-103 ...................................................................11, 13

Ark. Code §4-119-104 ...................................................................11, 14

Ark. Code §4-88-103 ..............................................................................14

Cal. Civ. Code §1749.8 *et seq.* .............................................................12

Cal. Civ. Code §1749.8 ...........................................................................12

Cal. Civ. Code §1749.8.2 ................................................................. 12, 13

Cal. Civ. Code §1749.8.4 ................................................................. 12, 14

Colo. Rev. Stat. §6-1-1401 *et seq.* ......................................................12

Colo. Rev. Stat. §6-1-1402 .............................................................. 12, 14

Iowa Code §554F.1 *et seq.* ...................................................................12

Iowa Code §554F.8 ........................................................................... 12, 14

La. Stat. §51:3261 *et seq.* ....................................................................12

Mich. Comp. Laws §445.903n *et seq.* .................................................12

Mich. Comp. Laws §445.903*o*................................................................14

N.C. Gen. Stat. §66-490 *et seq.*............................................................12

O.C.G.A. §10-1-390.................................................................................11

O.C.G.A. §10-1-397.........................................................................11, 20

O.C.G.A. §10-1-405.................................................................................11

O.C.G.A. §10-1-940.......................................................................... 9, 19

O.C.G.A. §10-1-941...................................................................... 9, 10, 45

O.C.G.A. §10-1-942............................................................ 9, 10, 13, 14, 46

O.C.G.A. §10-1-943.................................................................................9

O.C.G.A. §10-1-944.................................................................. 9

O.C.G.A. §10-1-945.....................................................9, 10, 11, 20

Ohio Rev. Code Ann. §1349.65 *et seq.* ....................................12

Ohio Rev. Code §1349.65 ..........................................................12

Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ............................15

## Regulation

45 C.F.R. §160.202 ...................................................................37

## Other Authorities

*Am. Heritage Dictionary of the Eng. Language*,
    https://tinyurl.com/bdfh8mpc (last visited Nov. 25, 2024)......................... 28, 32

*Merriam-Webster Dictionary*, https://tinyurl.com/yckpevjj
    (last visited Nov. 25, 2024).................................................... 20, 28, 31

*Oxford English Dictionary* (3d ed. 2010) ..............................28

Craigslist, *Avoiding Scams*, https://tinyurl.com/nhb67xz4
    (last visited Nov. 25, 2024)....................................................6

Craigslist, *Paid Posting Fees*, https://tinyurl.com/mpb64maa
    (last visited Nov. 25, 2024)....................................................6

S. 936, 117th Cong. (2021) .....................................................9

U.S. Senate Comm. on the Judiciary, *Durbin, Cassidy, Grassley, Hirono,
    Coons, Tillis Introduce Bill to Ensure Greater Transparency for Third-
    Party Sellers of Consumer Products Online* (Mar. 23, 2021),
    https://tinyurl.com/5f77bjzp ..................................................8

**INTRODUCTION**

Georgia Act 564 imposes unprecedented and unconstitutional burdens on widely used online marketplaces that serve as the modern-day analog of the classifieds section in print newspapers.  While the federal INFORM Act requires online marketplaces to collect and retain information about certain "high-volume third party seller[s]," it sensibly limits that obligation by specifying that, in determining which sellers meet the "high-volume" threshold, "an online marketplace *shall only be required* to count sales … for which payment was processed by the online marketplace."  15 U.S.C. §45f(f)(3)(B) (emphasis added).  After all, when an online marketplace processes the payment for a third-party sale, it thereby generates the information it needs to comply with the INFORM Act's recordkeeping and monitoring requirements.  On the flipside, online marketplaces have no realistic way to track third-party transactions when their terms are determined through private communications and payment is exchanged offline.

Before it was amended through Act 564, the Georgia Inform Consumers Act ("GICA") mirrored the federal INFORM Act.  Dkt.2-2 at 2-3.  Under the guise of making minor definitional changes, however, Act 564 dramatically expands online marketplaces' obligations under GICA by forcing them to count *not only* third-party sales for which payment is processed through the online marketplace, but also additional sales "made by utilizing the online marketplace."  Dkt.2-2 at 3.  That

transforms GICA from a workable burden applicable to a limited set of e-commerce marketplaces into a nearly impossible requirement that all manner of online services—including classifieds platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp—investigate and retain information on transactions that occur entirely off-platform, merely because the platform plays a role in facilitating third-party speech.  And this requirement puts it squarely at odds with federal law, as the INFORM Act expressly forbids any "State" from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements."  15 U.S.C. §45f(g).

The district court correctly blocked Act 564 from taking effect, holding that the law is expressly preempted by the INFORM Act.  As the court explained, Act 564 openly defies the INFORM Act's command that online marketplaces "shall *only be required* to count" on-platform transactions by requiring them to count additional, off-platform transactions as well.  Dkt.29 at 9.  That is a "conflict" under "[a]ny ordinary meaning" of the word.  Dkt.29 at 9.  Indeed, as the district court explained, the conflict is so direct that even if one were to ignore the INFORM Act's express-preemption clause, Act 564 would still be invalid under implied-preemption principles.  *See* Dkt.29 at 9-13.  So while Georgia's effort to convert the INFORM Act's *express*-preemption provision into a superfluous codification of *implied*-preemption principles fails, it would not save Act 564 anyway.

While that suffices to sustain the preliminary injunction, Act 564 also clearly violates the First Amendment. The law plainly triggers at least intermediate scrutiny because it places enormous burdens on online marketplaces' expressive activity of publishing third-party speech. Unlike the INFORM Act, which regulates only the non-speech conduct of processing payment, Act 564 forces online marketplaces as the price for engaging in First-Amendment protected activity to attempt to monitor private communications about off-platform transactions and essentially commandeers them to regulate third parties on the state's behalf. And Act 564 plainly flunks any form of heightened scrutiny. Forcing online marketplaces to investigate off-platform activity, obtain and maintain sensitive information that they would not ordinarily collect, and ensure that third parties comply with disclosure obligations that the state does not directly impose or enforce on sellers (who actually have the requisite data), is not remotely tailored to further the state's asserted interest in "combating organized retail crime," Dkt.2-2 at 2 (capitalization altered). Indeed, Act 564 is so burdensome and circuitous in its means that it could not survive even if it were viewed as an ordinary disclosure requirement (and there is nothing ordinary about it). While the district court did not reach the First Amendment issue, it provides an alternative ground for affirming the court's conclusion that Plaintiff-Appellant NetChoice, LLC ("NetChoice") is likely to succeed on the merits of its challenge to Act 564.

The district court was also correct to find all other requirements for preliminary injunctive relief satisfied. If forced to comply with Act 564, NetChoice members would unquestionably be forced to incur hefty compliance costs, including by "chang[ing] their website functionality to gain better visibility and track third-party communications related to potential offline transactions." Dkt.29 at 14. On top of that, NetChoice members and the millions of Georgians who use their online services would suffer an irreparable loss of First Amendment freedoms, as Act 564's substantial penalties and enormous practical burdens would inevitably force regulated platforms to remove some content. In contrast, Georgia has no valid interest in enforcing a preempted and unconstitutional law, and the pre-Act 564 version of GICA and the federal INFORM Act (which NetChoice does not challenge) adequately protect any valid state interests. *Accord* Dkt.29 at 5. The preliminary injunction should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 because NetChoice's causes of action arise under federal law. Dkt.1 ¶11. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because the state timely appealed the district court's order granting NetChoice's motion for preliminary injunction. *See* Dkt.31.

## STATEMENT OF THE ISSUE

Whether the district court's order preliminarily enjoining enforcement of Georgia Act 564 should be affirmed.

## STATEMENT OF THE CASE

### A.    The Rise of E-Commerce and Online Marketplaces

E-commerce takes a variety of forms.  Some e-commerce platforms, including Amazon.com, eBay, Etsy, and Wal-Mart Marketplace, allow consumers to purchase items from third-party sellers practically anywhere in the United States.  These websites typically require the buyer to provide a shipping address and complete the sale online; the platform processes the payment and charges the seller a fee, which is often calculated as a percentage of the total sales price.  Dkt.2-6 at Ex.1, Ex.2, Ex.3.  Some of these platforms expressly prohibit third-party sellers from encouraging prospective buyers to purchase items they see on the platform through a different venue, or connecting with a prospective buyer on the platform but then completing the transaction offline.  *See, e.g.*, Dkt.2-6 at 24.

Other online marketplaces operate in the space that was once served by classified advertisements in print newspapers:  They connect individuals who are looking to exchange goods or services in person.  For example, the website Craigslist disseminates tens of millions of classified advertisements (organized by category and location) each month from users around the world.  Craigslist charges its users a small fee for listing jobs, property rentals, and some kinds of items, but it does not

collect any other fees from buyers or sellers if and when a sale is consummated.[1] Craigslist does not process payments between consumers and third-party sellers, either.  Instead, the buyer and seller typically meet in person and exchange cash or some other mutually agreeable form of payment.[2]

OfferUp is another classifieds platform; it empowers users to "buy and sell locally," enabling them to market items online and then sell them offline to buyers in their local community.  Dkt.2-6 at Ex.4, Ex.5.  OfferUp's goal is to be the platform of choice for local commerce by connecting its users through an interface that makes selling an item as easy as snapping a picture from a mobile device.  Dkt.2-5 ¶3. While OfferUp does give third-party sellers the option of selling certain types of items nationwide—in which case the buyer provides shipping information and OfferUp facilitates an electronic payment through a third-party payment processor called Stripe—it estimates that this option is used for only 2% of the items sold through its platform.  Dkt.2-5 ¶9.

Facebook Marketplace provides yet another example.  Like OfferUp, Facebook Marketplace gives its U.S. users the option of listing items for sale,

---

[1] *See* Craigslist, *Paid Posting Fees*, https://tinyurl.com/mpb64maa (last visited Nov. 25, 2024) ("Publishing your posting is a one time charge. [C]raigslist does not have any subscription fees, or additional charges.") (emphasis omitted).

[2] Craigslist, *Avoiding Scams*, https://tinyurl.com/nhb67xz4 (last visited Nov. 25, 2024).

arranging in-person meetings with prospective buyers, and completing the sale offline.  Dkt.2-6 at Ex.6.  For a small percentage of items, Facebook Marketplace also gives users the option to buy, sell, and ship items using the "Meta Pay Checkout" feature, which processes secure payments between a buyer and third-party seller via credit card, debit card, or PayPal.  Dkt.2-4 ¶15.  But payment for most transactions on Facebook Marketplace takes place offline.

E-commerce is not limited to sites specifically designated as "marketplaces"; it also occurs through a host of "social media" services—e.g., Facebook, LinkedIn, and X (formerly known as Twitter).  For example, Facebook's social networking services (as distinguished from Facebook Marketplace) allow individuals to sign up for an account, establish mutual connections, and share content with family and friends.  Dkt.2-4 ¶4.  Facebook users can post status updates, photos, videos, and links; follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities); join Groups or attend Events that relate to topics of interest; post ads; and privately message one another via Meta's Messenger app. Dkt.2-4 ¶¶4, 7.  While these features are not specifically designed for promoting, buying, and selling products, they can be and are used for those purposes.  Dkt.2-4 ¶7.

Like Facebook, the neighborhood website Nextdoor offers a variety of social networking services, including tools for listing classified advertisements.  On

Nextdoor, users are placed in a neighborhood based on their address, and they automatically receive updates from nearby neighbors, businesses, and public services. Dkt.2-6 at Ex.8. Among other things, Nextdoor allows a merchant (1) to create a "business page" through which it can market its products to local Nextdoor users; (2) to post content on users' "newsfeed"; and (3) to run paid advertisements. Countless sales are made using these tools. Dkt.2-6 at Ex.9. In addition, Nextdoor allows users to post classified advertisements for personal items and homemade goods through its "For Sale and Free" section. Dkt.2-6 at Ex.7.

## B.    Various States Enact Laws Regulating Online Marketplaces.

When the COVID-19 pandemic struck, online shopping exploded. As Americans' online purchases of consumer goods soared to nearly $800 billion in 2020 and $870 billion in 2021, some elected officials raised concerns about the potential for third-party sellers to misuse online marketplaces. In March 2021, for example, a group of U.S. Senators voiced concerns about the potential "online sale of counterfeit goods by anonymous sellers" and "organized retail crime rings ... stealing items from stores to resell those items in bulk online."[3] These Senators proposed federal legislation aimed at ensuring greater transparency among third-

---

[3] *See, e.g.*, U.S. Senate Comm. on the Judiciary, *Durbin, Cassidy, Grassley, Hirono, Coons, Tillis Introduce Bill to Ensure Greater Transparency for Third-Party Sellers of Consumer Products Online* (Mar. 23, 2021), https://tinyurl.com/5f77bjzp.

party sellers in online marketplaces, but the legislation was not enacted. *See* S. 936, 117th Cong. (2021).

In the absence of federal legislation, some states took action—Georgia among them. In May 2022, Georgia enacted GICA. *See* 2022 Ga. Laws Act 820 (S.B. 332) (codified at O.C.G.A. §§10-1-940 through -945). GICA's linchpin is its definition of "high-volume third-party seller," which determines the extent of the regulatory burden on online marketplaces and their users. As originally enacted, the statute defined "high-volume third-party seller" as "a person"—other than the owner or operator of the online marketplace—"who sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform," and, "in any continuous 12 month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products of an aggregate total of $5,000.00 or more in gross revenues in this state made through the online marketplace." *Id.* §2.

GICA requires online marketplaces to (1) collect contact information, a bank account number, and a tax identification number from any "high-volume third-party seller" and (2) verify that information and periodically prompt the high-volume seller to keep it up to date. O.C.G.A. §10-1-941. For most, this tax identification number is a Social Security Number ("SSN"). GICA further provides that "an online marketplace shall require any high-volume third-party seller with an aggregate total

of $20,000.00 or more in annual gross revenues on its platform to provide to the online marketplace and disclose to consumers in a clear and conspicuous manner" its full name, its physical address, contact information "that will allow for direct, unhindered communication with such seller by consumers," and "[w]hether the high-volume third-party seller used a different seller to supply the product to the consumer upon purchase." *Id.* §10-1-942. If the seller does not comply, the marketplace must "suspend any future sales activity of such seller." *Id.* §§10-1-941(c), -942(c)-(d). Georgia does not impose or enforce this disclosure obligation on the third-party seller directly, but instead puts those burdens on the online marketplaces and punishes them (and not the sellers) for non-compliance. *Id.* §10-1-945.

In its original form, GICA specifies that, when determining whether a third-party seller has met the "high-volume" thresholds, the online marketplace need only count transactions "for which payment was processed by the online marketplace or through a third party." Dkt.2-2 at 3. This limitation is critical to ensuring that the Act's burdens are reasonable and constitutional. After all, it is relatively easy for a company that handles payment processing (like Amazon or eBay) to identify high-volume sellers, as the company can readily track each user's total sales and gross revenue based on existing records of *online* transactions. But it would be extraordinarily burdensome (and likely impossible) for companies like Craigslist,

Meta Platforms, Nextdoor, and OfferUp to gather accurate information about which third-party listings lead to *offline* transactions between two private parties, where payment is typically made in cash. Dkt.2-4 at 12-16; Dkt.2-5 at 9-12. It is one thing to regulate private companies by reference to information they already collect in the ordinary course of processing payment, and quite another to require private companies to discover and maintain information about third parties that the companies would not otherwise possess.

The Georgia Attorney General is tasked with enforcing GICA. *See* O.G.C.A. §10-1-945. The statute authorizes the Attorney General to "bring a civil action" to enforce compliance, enjoin further violations, "[o]btain damages, restitution, or other compensation on behalf of the residents of this state," and "[o]btain other remedies permitted under state law." *Id.* §10-1-945(a). "Any violation of [the Inform Consumers Act] shall additionally be a violation of" Georgia's Fair Business Practices Act, which authorizes (among other things) civil penalties of up to $5,000 per violation. *Id.* §10-1-945(b); *see id.* §§10-1-390, -397(b), -405.

By September 2022, 12 other states had enacted similar statutes obligating online marketplaces to collect and verify information from high-volume third-party sellers, and to require such sellers to disclose certain information to consumers.[4]

---

[4] *See* 2021 Ark. Laws Act 555 (S.B. 470) (Apr. 5, 2021) (codified at Ark. Code §4-119-101 *et seq.*); 2022 Colo. Legis. Serv. Ch. 21 (H.B. 22-1099) (Mar. 17, 2022)

Nearly all of those laws contain the same, sensible limitation on regulatory scope found in the original version of Georgia's law. That is, in determining which sellers meet the "high volume" thresholds, online marketplaces need only consider sales for which payment was processed by the online marketplace itself, whether directly or through an affiliated payment processor; they need not attempt to investigate off-platform sales. *See, e.g.*, Ohio Rev. Code §1349.65(B); Cal. Civ. Code §1749.8(b).

While all 13 of the state "Inform Consumers" statutes use the same "high-volume" thresholds—200 discrete sales, totaling $5,000, over 12 consecutive months during the previous 24-month period—there are a host of differences among those laws. For example:

- Arkansas requires every seller that reaches 200 sales and $5,000 in gross revenue to make certain disclosures not only to online marketplaces but

---

(codified at Colo. Rev. Stat. §6-1-1401 *et seq.*); 2022 Ohio Laws File 89 (Sub. H.B. 272) (Apr. 6, 2022) (codified at Ohio Rev. Code Ann. §1349.65 *et seq.*); 2022 Ala. Laws Act 2022-441 (H.B. 318) (Apr. 14, 2022) (codified at Ala. Code §8-41-1 *et seq.*); 2022 Ill. Legis. Serv. P.A. 102-757 (H.B. 1091) (May 13, 2022) (codified at 815 Ill. Comp. Stat. 356/1-5 *et seq.*); 2022 Okla. Sess. Law Serv. Ch. 378 (S.B. 418) (May 26, 2022) (codified at 15 Okla. Stat. §799A.2 *et seq.*); 2022 La. Sess. Law Serv. Act 316 (S.B. 442) (June 10, 2022) (codified at La. Stat. §51:3261 *et seq.*); 2022 Iowa Legis. Serv. Ch. 1114 (H.F. 2401) (June 13, 2022) (codified at Iowa Code §554F.1 *et seq.*); 2022 N.C. Laws S.L. 2022-30 (S.B. 766) (June 30, 2022) (codified at N.C. Gen. Stat. §66-490 *et seq.*); 2022 Pa. Legis. Serv. Act 2022-64 (H.B. 1594) (July 11, 2022) (codified at 73 Pa. Stat. §201-9.4 *et seq.*); 2022 Mich. Legis. Serv. P.A. 153 (H.B. 5487) (July 19, 2022) (codified at Mich. Comp. Laws §445.903n *et seq.*); 2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (Sept. 30, 2022) (codified as amended at Cal. Civ. Code §1749.8 *et seq.*).

also to consumers.  *See* Ark. Code §§4-119-102(2), -103(c).  In contrast, Georgia requires consumer-facing disclosures only for "high-volume third-party seller[s] with an aggregate total of $20,000.00 or more in annual gross revenues" on the relevant marketplace.  O.C.G.A. §10-1-942(a).  California uses yet another standard:  It requires consumer-facing disclosures when the company had at least $20,000 in gross annual revenues "from transactions with buyers in California through the online marketplace in either of the two prior calendar years."  Cal. Civ. Code §1749.8.2(a).

- Arkansas requires a covered third-party seller to disclose to consumers its "full name," "full physical address," whether it "also engages in the manufacturing, importing, or reselling of consumer products," "a working telephone number," a "working email address," and "[a]ny other information determined to be necessary to address circumvention or evasion of the" statute.  Ark. Code §4-119-103(c).  In contrast, several other states (e.g., Georgia, Colorado, and Michigan) require disclosure of just one type of contact information "that will allow for direct, unhindered communication" between consumers and the seller (e.g., phone, email *or* electronic messaging), as well as disclosure of "[w]hether the high-volume third-party seller used a different seller to supply the product to the

consumer upon purchase." O.C.G.A. §10-1-942(a); *accord* Colo. Rev. Stat. §6-1-1402(4); Mich. Comp. Laws §445.903*o*(9).

- Arkansas, Colorado, and Pennsylvania have adopted "Inform Consumers" laws that purport to regulate "third-party sellers" and "online marketplaces" that operate anywhere in the United States. *See* Ark. Code §4-119-102(3), (5)(A); Colo. Rev. Stat. §6-1-1401(3)(a), (5)(a); 73 Pa. Stat. §201-9.4(q). The other 10 states' "Inform Consumers" laws are limited to in-state activity, though the exact contours of those limitations are far from clear given the interstate nature of e-commerce. *See, e.g.*, O.C.G.A. §10-1-940(a)(3), (5); *see also* Dkt.1 ¶¶71-73.

- The 13 states that have enacted "Inform Consumers" laws also impose a range of different penalties on online marketplaces that fail to comply with them. *Compare, e.g.*, Iowa Code §554F.8 (state attorney general may "[a]ssess civil penalties in an amount not more than one hundred thousand dollars"), *with* Cal. Civ. Code §1749.8.4 (state attorney general may recover "civil penalty not to exceed ten thousand dollars ... for each violation," plus "[r]easonable attorney's fees and costs"), *and* Ark. Code §§4-119-104, 4-88-103 (state authorities may prosecute knowing and willful violations as a Class A misdemeanor).

In sum, by October 2022, an uneven patchwork of state-level regulation had emerged, requiring online marketplaces to collect and verify a variety of personal information from their users, securely retain that sensitive information, impose disclosure requirements on certain users, disseminate those mandatory disclosures, and suspend users who failed to comply.

### C.    The Federal Government Enacts the INFORM Act.

In December 2022, Congress stepped in, enacting the Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act—a.k.a., the INFORM Act.  *See* Pub. L. No. 117-328, §301, 136 Stat. 4459, 5555-62 (Dec. 29, 2022) (codified at 15 U.S.C. §45f).  When the federal INFORM Act took effect in June 2023, it replaced the emerging patchwork of state-by-state regulation with a single, nationwide framework for regulating online marketplaces that connect prospective buyers and third-party sellers.  *See id.* §301(h), 136 Stat. at 5562.

Like the state laws that preceded it, the federal INFORM Act defines "high-volume third party seller" as a person who "sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform" and "in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross revenues."  15 U.S.C. §45f (f)(3), (5)-(6).  And the federal INFORM Act limits its scope to transactions "made through the online

marketplace and for which payment was processed by the online marketplace," *id.* §45f(f)(3)(B), as opposed to off-platform transactions conducted directly by private parties:

> For purposes of calculating the number of discrete sales or transactions or the aggregate gross revenues ... an online marketplace shall only be required to count sales or transactions *made through the online marketplace* and *for which payment was processed by the online marketplace*, either directly or through its payment processor.

*Id.* §45f(f)(3)(B) (emphasis added). The INFORM Act thus sensibly requires online marketplaces to collect, maintain, and ensure dissemination of sellers' information only when they, as payment processors, have ready access to the relevant data to determine who qualifies as a "high-volume third party seller."

Congress confirmed its intent to supplant the state-by-state patchwork by enacting a broad express-preemption clause: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section." *Id.* §45f(g). Congress' decision to expressly preempt state regulations reflects the reality that online marketplaces invariably operate across state lines. For that very reason, the express-preemption clause played a vital role in marshaling political support for the law. For example, NetChoice initially raised concerns about the law, but ultimately concluded in light of the express-preemption provision that the law reflected a sensible "compromise" that "avoid[s] a complex patchwork of

state laws related to seller vetting." Dkt.2-6 at Ex.10; *cf.* Dkt.2-6 at Ex.11. Amazon and eBay likewise supported the INFORM Act because they recognized that it would "establish[] a federal standard, preventing an unworkable patchwork of state-level regulations." Dkt.2-6 at Ex.12; *see* Dkt.2-6 at Ex.13.

Congress' enactment of the federal INFORM Act came as no surprise to the states. Indeed, the Oklahoma INFORM Act expressly anticipated the possibility that it would be overtaken by federal legislation. *See* 15 Okla. Stat. §799A.7(C) ("If no federal law that requires online marketplaces to verify and disclose information as described in this act goes into effect prior to January 1, 2023, the Attorney General may promulgate rules necessary to implement and enforce this act."). To the best of NetChoice's knowledge, no state has enacted a new "Inform Consumers" statute since the federal INFORM Act was signed into law; nor has any state attempted to enforce an existing state-level "Inform Consumers" statute.[5] Most states thus appear to understand that the federal INFORM Act broadly preempts state-law analogs.

### D. Georgia Dramatically Expands Its Inform Consumers Act.

Georgia did not get the message. On May 6, 2024, Governor Kemp signed Act 564 (formerly known as S.B. 472), which dramatically expands the scope of—and the regulatory burdens imposed by—GICA, and in doing so jumps the tracks

---

[5] California recently enacted an amendment to its Inform Consumers Act that is similar to Georgia Act 564, but it is not slated to take effect until July 1, 2025. *See* 2024 Cal. Legis. Serv. Ch. 172, §3 (S.B. 1144).

from permissible recordkeeping and disclosure obligations to impermissible investigation mandates. Act 564 strikes from GICA the limitation (found in the federal INFORM Act and the state-law analogs that preceded it) that the only sales that count toward "high-volume" status are those "made through the online marketplace *and for which payment was processed by the online marketplace*." Dkt.2-2 at 2-3 (emphasis added). Having removed this crucial guardrail, Act 564 expands GICA's coverage to encompass all sales "*made by utilizing* [an] online marketplace." Dkt.2-2 at 2-3.

Consequently, Act 564 goes well beyond mandating the retention of information needed to process payments and requires that classifieds platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp investigate, maintain information about, and impose and police disclosure obligations on third-party sellers based on sales that occur entirely offline—in-person, cash transactions that these classifieds platforms have no realistic way to monitor. That demand is not just impractical but incredibly burdensome and intrusive. If Act 564 takes effect, it would require classifieds platforms to begin collecting and retaining sensitive data— including Social Security Numbers—for millions of Georgia users who simply list items for sale, in order to determine which of those users may be approaching the "high-volume" thresholds for sales and total revenue. To even attempt to comply, a classifieds platform would need to ask every individual who lists an item whether

the listing led to a sale, where the sale occurred, and what the buyer paid. But the platform would have no realistic way of requiring sellers to answer those questions—or of knowing whether those who respond are telling the truth. And if platforms have no feasible way to confidently determine who is a "high-volume" seller (which seems likely), then they will be forced to remove protected speech to avoid the risk of noncompliance. Dkt.2-4 ¶¶41-45; Dkt.2-5 ¶31.

Moreover, Act 564 is so broadly worded that it appears to encompass not only individuals who post a "for sale" listing on classifieds platforms, but also those who advertise items for sale, whether formally or informally, on social-networking services such as Facebook and Nextdoor—both of which arguably meet Georgia's broad statutory definition of "online marketplace." *See* O.C.G.A. §10-1-940(a)(3); Dkt.1 ¶¶20, 43. Act 564 thus appears to require these online services to track all activity on their sites that might lead to an off-platform sale, investigate whether such sales occur, collect enough information about those sales to determine who is a "high volume seller," then maintain and compel disclosure of information about those who meet that threshold. This would be hugely burdensome, if not impossible.

Act 564 imposes harsh penalties for noncompliance. While Georgia does not impose or enforce any disclosure obligations on the high-volume third-party sellers themselves, an online marketplace that fails to collect the required information from a "high-volume third-party seller" or mandate and convey the required consumer-

facing disclosures commits "an unfair or deceptive act or practice in violation of the Georgia Fair Business Practices Act." Dkt.2-6 at Ex.14. As Attorney General Carr has emphasized, this "could result in the imposition of significant civil penalties"— up to $5,000 *per violation*, even if there is no evidence of actual harm to consumers. Dkt.2-6 at Ex.14; *see* O.C.G.A. §§10-1-945(b), -397(b).

### E.    The Present Lawsuit

NetChoice is an Internet trade association whose members operate a variety of online services regulated by Act 564, including Facebook Marketplace, Nextdoor, and OfferUp. Dkt.2-3 ¶¶3-4. Within a month of Act 564's enactment, NetChoice sued to challenge the law on behalf of its members. Dkt.1 ¶¶1, 9. Among other things, NetChoice argued that the federal INFORM Act expressly preempts Act 564 because Georgia's new third-party-seller rules "conflict[] with"—i.e., "are 'different' from, and not 'in agreement or accord' with"—Congress' third-party seller rules." Dkt.1 ¶¶50-52 (quoting Conflict, *Merriam-Webster Dictionary*, https://tinyurl.com/yckpevjj (last visited Nov. 25, 2024)); *see* 15 U.S.C. §45f(g). NetChoice also argued that Act 564 violates the First Amendment, as it imposes massive burdens on protected expressive activity and is not remotely tailored to advancing the state's asserted interest in "combatting organized retail crime." Dkt.1 ¶¶63-68. NetChoice promptly moved for a preliminary injunction enjoining the Georgia Attorney General from enforcing Act 564. Dkt.2.

The district court granted NetChoice's motion for preliminary relief on the day Act 564 was scheduled to take effect. The court held that the federal INFORM Act "provides a ceiling on the recordkeeping requirements of online marketplaces" vis-à-vis high-volume third party sellers by (1) decreeing that "[a]n online marketplace shall *only be required* to count sales or transactions made through the online marketplace," and (2) "expressly prohibit[ing] state laws that conflict with its requirements." Dkt.29 at 8-9 (quoting 15 U.S.C. §45f(f)(3)(B), (g)). Given that clear statutory text, the court could "see[] no scenario where Act 564's expansion upon the reach of the federal INFORM Act does not run afoul of its explicit limiting term: 'only.'" Dkt.29 at 9. The court thus concluded that, "regardless of whether [one] gives 'conflict' its ordinary meaning or imports the narrower definition from implied conflict preemption doctrine, Act 564 cannot be reconciled with the text of the INFORM Act." Dkt.29 at 13. In view of that holding, the court found it unnecessary to reach NetChoice's First Amendment claim. Dkt.29 at 6 & n.7. This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly held that NetChoice is likely to succeed on its claim that Act 564 is preempted by the federal INFORM Act. The INFORM Act creates a regime under which "an online marketplace shall *only be required* to count sales or transactions made through the online marketplace and for which payment

was processed by the online marketplace, either directly or through its payment processor." 15 U.S.C. §45f(f)(3)(B) (emphasis added). That sensibly ensures that online marketplaces are not saddled with a near-impossible obligation to track offline, in-person transactions in which they are not involved. And to guard against state efforts to disrupt that uniform national rule, the INFORM Act forbids states from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements." *Id.* §45f(g). That is precisely what Act 564 does, as it requires online marketplaces to count *not only* sales for which they process payment, but a broader set of sales made "by utilizing" an online marketplace—even if payment is exchanged offline and the online marketplace would have no reason to collect the information absent GICA's mandate. Dkt.2-2 at 2-3. As the district court explained, these two statutes plainly "conflict": The federal law "only require[s]" online marketplaces "to count certain transactions," while the Georgia law "require[s]" them "to count additional transactions too." Dkt.29 at 9.

Georgia does not (and cannot) meaningfully dispute that, under "[a]ny ordinary meaning of 'conflict,'" the federal INFORM Act's requirement to count *only* on-platform sales "conflicts with" Act 564's requirement to count *not only* on-platform sales, but also all manner of off-platform sales. Dkt.29 at 9. The state instead spends the bulk of its brief urging the Court to ignore the word's ordinary meaning and construe the INFORM Act's express-preemption clause as a mere

codification of implied "conflict preemption" principles. That argument violates several basic rules of statutory interpretation (and is unavailing in all events).

First, statutory terms generally carry their "common and ordinary meaning." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246 (11th Cir. 2008). The INFORM Act does not use the phrase "conflict preemption"; it uses the verb "conflict." Nothing in the statute conveys any suggestion that the latter was really meant to silently import the former. Second, Georgia's interpretation of §45f(g) runs afoul of the canon against superfluity. Reading §45f(g) as merely codifying conflict-preemption principles would deprive that provision of any force; after all, those same *implied*-preemption principles would apply even if the INFORM Act were silent about preemption. Third, Georgia's reading defies the rule that "words must be read and interpreted in their context." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (alterations omitted). It makes no sense to import implied-preemption principles, which to some degree reflect concerns about a lack of express congressional action to displace state law, into text that expressly displaces state law. And this Court has expressly rejected application of the "presumption against preemption" when, as here, Congress has enacted an express-preemption provision. *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc). The state's effort to analogize §45f(g) to *anti*-preemption provisions in other statutes that use the word "conflict" fails for largely the same reasons: It likewise makes no sense to equate §45f(g),

23

which affirmatively *expands* the INFORM Act's preemptive effect beyond the default rules of implied preemption, with a provision that expressly *constrains* a statute's preemptive effect by stating, e.g., that Congress *does not* intend to preempt state law absent a "direct and positive conflict." In all events, the district court correctly concluded that the conflict between the federal INFORM Act and Act 564 would make the latter invalid even under "implied conflict preemption doctrine." Dkt.29 at 13.

Although the district court had no need to reach the issue, NetChoice is also likely to succeed on its claim that Act 564 violates the First Amendment. Act 564 triggers (at least) intermediate scrutiny for several independent reasons. For one thing, it imposes massive burdens on classifieds platforms' curated dissemination of protected speech, including by forcing platforms to investigate and maintain information about third parties' offline sales. Act 564 also compels speech by forcing high-volume sellers to disclose sensitive information and forcing online marketplaces to convey consumer-facing disclosures. And the law burdens the First Amendment rights of those who use online marketplaces too, as its onerous requirements are virtually certain to suppress listings and advertisements that users would like to post and view.

Act 564 cannot withstand any form of heightened scrutiny. According to Georgia, the law advances the state's interest in "protecting retail stores and

consumers from theft and fraud." Br.36; *see* Dkt.2-2 at 2; Dkt.2-6 at Ex.15. But Act 564 is nowhere close to "narrowly tailored to achieve" that asserted interest in a manner that avoids unnecessary abridgement of speech. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001). Act 564 burdens huge swathes of constitutionally protected expression, as the vast majority of listings that appear on platforms like Facebook Marketplace, Nextdoor, and OfferUp have nothing to do with "organized retail crime." And that burden is wholly unjustified, as Act 564 is unlikely to have any meaningful deterrent effect on retail theft. To the extent bad actors wish to evade "high volume" status (and the attendant disclosure obligations), they can simply create multiple "seller" accounts, spread their online transactions among several different websites, or conduct more of their illegal activities entirely offline. Indeed, Act 564 is so burdensome and circuitous in its means that it cannot pass muster even under the less stringent First Amendment standard that applies to ordinary disclosure obligations (which it is decidedly not).

Finally, the district court correctly concluded that NetChoice's members would suffer irreparable injury absent injunctive relief and that all other equitable considerations tip in NetChoice's favor. Georgia does not (and cannot) dispute that NetChoice members would incur unrecoverable costs if forced to comply with Act 564, and binding precedent teaches that "unrecoverable monetary loss is an irreparable harm." *Georgia v. President of U.S.*, 46 F.4th 1283, 1302 (11th Cir.

2022). Binding precedent likewise teaches that a state suffers "no harm" when it is blocked from enforcing a law that is preempted by federal legislation. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). This Court should affirm the district court's order granting NetChoice a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a preliminary injunction for abuse of discretion. *Curling v. Raffensperger*, 50 F.4th 1114, 1120-21 (11th Cir. 2022). Any underlying legal conclusions are reviewed de novo. *Id.*

## ARGUMENT

### I. The District Court Correctly Held That NetChoice Is Likely To Succeed On The Merits Of Its Challenge To Act 564.

Likelihood of success on the merits is "generally the most important" element of the four-part test for preliminary injunctive relief. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020). Here, NetChoice satisfies this requirement twice over. First, as the district court held, Act 564's requirement that online marketplaces collect information about off-platform sales is preempted by the federal INFORM Act, which says that online marketplaces "shall *only be required to count*" on-platform sales and expressly preempts any conflicting state law requirements. Dkt.29 at 9 (quoting 15 U.S.C. §45f(f)(3)(B)). In addition, while the district court found it unnecessary to reach the issue, Act 564 violates the First Amendment because it imposes major burdens on constitutionally protected speech,

while doing little, if anything, to advance the state's asserted interest in "combatting organized retail crime." Federal preemption and the First Amendment thus supply two independent bases for affirming the district court's conclusion that NetChoice is likely to succeed on the merits.

## A. The District Court Correctly Concluded That the Federal INFORM Act Expressly Preempts Act 564.

Under the Supremacy Clause, "state laws that interfere with, or are contrary to, federal law" are invalid. *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020). When, as here, "Congress has enacted an express-preemption provision," courts must "identify the state law that it preempts according to ordinary principles of statutory interpretation." *Carson*, 72 F.4th at 1267. In this case, the relevant tools of interpretation—text, context, statutory structure, and common sense—all point to the same conclusion: The federal INFORM Act preempts Act 564.

### 1. The federal INFORM Act's directive that online marketplaces "shall *only* be required to count" on-platform transactions overrides Act 564's conflicting requirement to count additional, off-platform transactions.

a. "The starting point in statutory interpretation is the language of the statute itself." *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)). Here, the INFORM Act's express-preemption clause provides: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule,

requirement, or standard that *conflicts with* the requirements of this section." 15 U.S.C. §45f(g) (emphasis added).

The INFORM Act does not supply any specialized definition of "conflict," so the term must be given "its ordinary, contemporary, [and] common meaning." *Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1273 (11th Cir. 2020), *aff'd sub nom. Patel v. Garland*, 596 U.S. 328 (2022). In ordinary usage, the verb "conflict" connotes that two things "differ" or are "at variance"; that they are not "in agreement or accord"; or that they "clash." *See* Conflict, *Merriam-Webster Dictionary*; Conflict, *Am. Heritage Dictionary of the Eng. Language*, https://tinyurl.com/bdfh8mpc (last visited Nov. 25, 2024); Conflict, *Oxford English Dictionary* (3d ed. 2010).

The district court correctly held that Act 564 "conflicts with" the federal INFORM Act under "[a]ny ordinary meaning of 'conflict.'" Dkt.29 at 9. As the court explained, one of the INFORM Act's key "requirements" is that, when determining who is a "high-volume third party seller," "an online marketplace shall *only be required* to count sales or transactions ... for which payment was processed by the online marketplace." Dkt.29 at 3 (quoting 15 U.S.C. §45f(f)(3)(B)). "[B]y using the word 'only,'" the federal INFORM Act "provides a ceiling on the recordkeeping requirements of online marketplaces." Dkt.29 at 8-9 (quoting 15 U.S.C. §45f(f)(3)(B)). "Act 564 goes beyond that ceiling," as it requires online marketplaces to count *not only* sales for which payment is processed through the

online marketplace, but additional sales for which payment is exchanged through other means. Dkt.29 at 9. That is a clear conflict. Indeed, the district court saw "no scenario where Act 564's expansion upon the reach of the federal INFORM Act does not run afoul of its explicit limiting term: 'only.'" Dkt.29 at 9. Accordingly, the plain text of the INFORM Act expressly preempts Act 564's "conflict[ing]" requirements. 15 U.S.C. §45f(g).

b. The phrases surrounding "conflict[]" in §45f(g) reinforce that conclusion. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) ("[A] word is given more precise content by the neighboring words with which it is associated."). The clause defines the political entities to which it applies in the broadest possible terms: Its preemptive effect reaches every "State," "political subdivision of a State," and "territory of the United States." 15 U.S.C. §45f(g). The clause also describes *what* is preempted in the broadest possible terms—"any law, regulation, rule, requirement, or standard." *Id.* The clause's temporal reach is similarly expansive. It forbids states not only from "establish[ing]" new measures but also from "continu[ing]" existing measures "in effect." *Id.* The breadth of these neighboring phrases confirms that the INFORM Act's preemption clause has a wide scope that readily encompasses Act 564.

The INFORM Act's enforcement provisions likewise support reading its preemption clause to displace any inconsistent state requirement, as they expressly

contemplate that the FTC and state attorneys general will work together to enforce a single federal standard. *See* 15 U.S.C. §45f(c)(2)(A), (d)(1). Indeed, the Act takes pains to ensure that federal and state authorities will not initiate duplicative or overlapping actions. When a state attorney general brings a suit to enforce the INFORM Act, he or she must notify the FTC, which is expressly authorized to intervene and "be heard on all matters arising therein." *Id.* §45f(d)(2), (3). Similarly, if the FTC initiates an enforcement action, a state may join that action but may not file a separate action. *Id.* §45f(d)(4)-(5). Those provisions presuppose that states cannot impose burdens on online marketplaces vis-à-vis off-platform transactions that the federal law leaves unregulated.

c. The historical context confirms that the federal INFORM Act precludes states from adopting their own, divergent standards. As explained, the federal law followed a wave of state laws imposing similar—but not identical—requirements. *See supra* pp.9-15. That patchwork of state-level regulation prompted Congress to enact the INFORM Act and to include an express-preemption clause. *See supra* pp.15-17. That is hardly surprising; as courts have emphasized time and again, when it comes to inherently interstate technology like the Internet, federal rules are generally preferable to state ones. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). Indeed, given the impracticality of complying with 50 state laws and 50 different

standards, allowing state-by-state legislation would likely make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Commerce Clause concerns. *Am. Librs. Ass'n v. Pataki*, 969 F.Supp. 160, 183 (S.D.N.Y. 1997).

In short, the tools of statutory interpretation overwhelmingly confirm what the district court concluded: The federal INFORM Act "provides a ceiling" for online marketplaces' recordkeeping requirements with respect to high-volume third party sellers, expressly prohibiting states from extending those requirements beyond "transactions consummated through the marketplace or its payment processor." Dkt.29 at 8-9, 12. Because "Act 564 goes beyond that ceiling," it is invalid. Dkt.29 at 9.

### 2. Georgia's contrary arguments are meritless.

a. In arguing otherwise, the state all but ignores "[t]he primary principle of statutory construction," which "requires courts to give effect to the plain meaning of the words used 'in their ordinary and usual sense.'" *Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*, 522 F.3d 1190, 1194-95 (11th Cir. 2008) (quoting *Caminetti v. United States,* 242 U.S. 470, 485-86 (1917)). Remarkably, Georgia buries its first and only mention of the ordinary meaning of "conflict" on p.44 of its brief. And when it finally gets around to discussing ordinary meaning, Georgia ignores that "conflict" often means "differ" from. Conflict, *Merriam-Webster Dictionary*;

Conflict, *Am. Heritage Dictionary of the Eng. Language*. Indeed, courts routinely describe legal requirements that are different—even if not flatly incompatible—as "conflicting requirements."[6] The same goes for "conflicting rules"[7] and "conflicting standards."[8] That alone brings the present case within the plain meaning of "conflict," as Georgia concedes that Act 564's information-collection requirements "meaningfully differ[] from" the INFORM Act's requirements, Br.28. In any event, Georgia also concedes (as it must) that "conflict" means that two things "clash" or are "at variance." Br.44. As explained, the INFORM Act's directive to count *only* on-platform sales and Act 564's command to count *additional*, off-platform sales "clash" and are "incompatible." *See supra* pp.28-29; *accord* Dkt.29 at 8-9.

Georgia's contention that "[t]here is no opposition of any kind between [Act 564] and the federal INFORM Act," Br.44, blinks reality. The state attempts to portray §45f(f)(3)(B)'s command that online marketplaces "shall only be required to count" on-platform transactions as "a limitation on the reach of the *federal* law" that "does not purport to or even suggest that it is a limitation on anyone else." Br.45;

---

[6] *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 730 (8th Cir. 2017); *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 875-76 (9th Cir. 2001).

[7] *See, e.g.*, *Figueroa v. Foster*, 864 F.3d 222, 228-29 (2d Cir. 2017); *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 976 (1st Cir. 1995).

[8] *See, e.g.*, *Smith v. Illinois*, 469 U.S. 91, 95-96 & n.3 (1984) (per curiam); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301-02 (4th Cir. 2010); *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 430 (6th Cir. 2009); *Dunkins v. Thigpen*, 854 F.2d 394, 397 n.7 (11th Cir. 1988).

*see* Br.31. But the state ignores the express-preemption clause of §45f(g), which undeniably *does* contain "language circumscribing state action." *Contra* Br.31 (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 608 (2011)). As the district court explained, §45f(f)(3)(B) creates a "require[ment]" to count "*only*" on-platform transactions, and §45f(g) expressly forbids states from adopting "any law … that conflicts with" that "requirement[]." Dkt.29 at 12. "Giving these two provisions their natural, compounding effect, no state can adopt a law that requires an online marketplace to account for any other type of transaction when determining who qualifies as a high-volume third-party seller." Dkt.29 at 12. Because "Act 564 does just that," Dkt.29 at 12, it is invalid.

b. Lacking any remotely persuasive argument based on the ordinary meaning of "conflict," Georgia insists that the federal INFORM Act uses "conflict" as a "term of art that calls for the application of ordinary [implied] conflict preemption principles," under which state law is preempted only if it is "impossible to comply with both" state and federal law or state law "stands as an obstacle to Congress's purposes." Br.25, 27. But if Congress wanted implied conflict-preemption principles to apply, then it would not have bothered including an express-preemption provision. Given that Congress went to the trouble of enacting such a provision, this Court "must assume that Congress intended the ordinary meaning of the words [it] used … absent a clearly expressed legislative intent to the contrary." *Arcia v. Fla.*

*Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014); *see also, e.g.*, *Garcia*, 540 F.3d at 1246 ("When statutory terms are undefined, we typically infer that Congress intended them to have their common and ordinary meaning, unless it is apparent from context that the disputed term is a term of art.").  And the INFORM Act does not use the phrase "conflict preemption." *Contra* Br.41.  The statute instead deploys "conflict" as a verb—in the middle of a broad, express-preemption clause.  That is hardly the sort of "clearly expressed legislative intent" that would justify deviating from ordinary meaning.  *Cf. United States v. Chinchilla*, 987 F.3d 1303, 1312-14 (11th Cir. 2021) (declining to read the phrase "authorized stay" as a "term of art" synonymous with "stay authorized by the Attorney General"); *Heat Techs., Inc. v. Papierfabrik August Koehler SE*, 2020 WL 12309512, at *3-7 (N.D. Ga. June 5, 2020) (statute expressly precluding all "conflicting tort, restitutionary, and other laws" does not codify conflict-preemption doctrine).

Georgia's crabbed reading of §45f(g) also runs headlong into the canon against superfluity.  *See Victor Elias Photography, LLC v. Ice Portal, Inc.*, 43 F.4th 1313, 1319 (11th Cir. 2022) ("A statute should be construed to give effect to all its provisions, 'so that no part of it will be inoperative or superfluous, void or insignificant.'").  As Georgia admits, "conflict preemption" is a form of *implied* preemption.  Because "principles of implied preemption" emanate from the Supremacy Clause, they apply even "when Congress has been *silent* with respect to

pre-emption." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 532 (1992) (Blackmun, J., concurring) (emphasis added).  Here, Congress was decidedly not silent about preemption; the federal INFORM Act includes an express-preemption clause.  Yet under Georgia's reading, that provision would accomplish nothing since implied conflict-preemption principles would apply with or without it.  Georgia has no explanation for why Congress would have included §45f(g) if it did not intend to preempt anything beyond what the Supremacy Clause would already preempt even if Congress said nothing at all.

Moreover, Georgia's effort to import implied-preemption principles into an express-preemption clause would engender not just superfluity but doctrinal incoherence.  It is settled law that the presumption against preemption, which generally applies in implied-preemption cases, does not apply when Congress includes an express-preemption provision.  *See Carson*, 72 F.4th at 1267 (citing *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).  Thus, to interpret an express-preemption clause as triggering an implied-preemption analysis would import the presumption against preemption into a context where both this Court and the Supreme Court have instructed it does not belong.

Perhaps for that reason, Georgia does not identify any case that has interpreted an express-preemption clause to do nothing more than codify implied-preemption principles simply because it used the verb "conflicts."  The state instead relies

heavily on cases that do not involve express-preemption provisions at all, but rather involve savings provisions—or, as Justice Scalia put it, "*antipre-emption* provisions, prescribing that nothing in [the relevant federal statute] shall be deemed to pre-empt state law unless certain conditions are met," *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 295 (1987) (Scalia, J., concurring). *See* Br.26, Br.27, Br.43. For example, *American Manufacturing Mutual Insurance Co. v. Tison Hog Market, Inc.*, 182 F.3d 1284 (11th Cir. 1999), involved not an "express preemption provision," *contra* Br.25-26, 42-43, but an anti-preemption clause: "[T]his section *shall not preclude* a state from enforcing a requirement, with respect to payment for livestock purchased by a packet at a stockyard subject to this chapter, which is not in conflict with this chapter or regulations thereunder." 182 F.3d at 1287 n.2 (emphasis added) (quoting 7 U.S.C. §228c). Similarly, *Southern Blasting Services, Inc. v. Wilkes County*, 288 F.3d 584 (4th Cir. 2002) (cited at Br.26), involved a provision that expressly disclaimed any "intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter," absent "a direct and positive conflict" between federal and state law. *Id.* at 590 (quoting 18 U.S.C. §848).[9]

---

[9] The other two cases the state cites—*Murphy v. Dulay*, 768 F.3d 1360 (11th Cir. 2014), and *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2003)—are even farther afield. *Murphy* involved regulations that expressly codified impossibility preemption and obstacle preemption, *see* 768 F.3d at 1368 (citing 45 C.F.R.

Georgia's contention that the broad express-preemption clause of §45f(g) must have the exact same effect as these anti-preemption clauses just because they all "use[] the term 'conflict,'" Br.26, defies law and logic. "[W]ords must be read and interpreted in their context, not in isolation." *Sw. Airlines*, 596 U.S. at 455 (alterations omitted). The provisions in *Guerra*, *Southern Blasting Services*, and *Tison Hog* all use "conflict" in the context of an obvious effort to *limit* a statutory scheme's preemptive force to something less than what ordinary implied-preemption principles would otherwise require—e.g., by taking "field preemption" or "obstacle preemption" off the table. Such anti-preemption provisions *must* be read to limit the otherwise-applicable rules of implied preemption because otherwise they would serve no purpose at all. Section 45f(g), by contrast, would serve no purpose unless it *expands* the INFORM Act's preemptive force beyond ordinary implied-preemption principles; to have any effect, §45f(g) must invalidate some state "law[s]" and "regulation[s]" that would not be preempted by statutory silence. Georgia is thus left with neither an explanation for why Congress would enact an express-preemption provision that does nothing nor any precedent supporting its effort to effectively read §45f(g) out of the INFORM Act.

---

§160.202(1)-(2)), while *Jones* involved a statute that does not even use the term "conflict," *see* 73 F.4th at 642.

Georgia notes that Congress has used even broader language in other express-preemption clauses.  *See* Br.36.  But the fact that Georgia has unearthed a handful of other statutes that use varied formulations to set a nationwide ceiling or preempt an entire field undercuts its claim that there are some magic words Congress employs when it wants to preserve a uniform federal standard.  And the state's argument cuts both ways, as Congress also quite plainly "knows how to" enact an anti-preemption (or "savings") provision "when it wants to"—*see, e.g.*, 18 U.S.C. §848; 42 U.S.C. §§1320d-7(a)(2), 1395dd(f), 2000h-4—yet it "chose not to do so here."  *Cf.* Br.36. In all events, no one is claiming Congress wanted to "broadly preempt or field preempt" all state regulations having anything to do with online marketplaces.  *Cf.* Br.36.  But Congress made crystal clear that it wanted online marketplaces to be responsible for tracking *only* sales for which they process payment, 15 U.S.C. §45f(f)(3), as marketplaces naturally have the requisite visibility into those sales. And Congress sensibly preempted any state law "that conflicts with th[at] requirement[]."  *Id.* §45f(g).  As a state law that sweeps in additional sales, Act 564 plainly fits the bill.

With text, context, and precedent stacked up against it, Georgia seeks refuge in the "presumption against preemption," which is a general rule "that 'the historic police powers of the States are not superseded unless that [i]s the clear and manifest purpose of Congress."  Br.34 (alteration in original) (quoting *Marrache v. Bacardi*

*U.S.A., Inc.*, 17 F.4th 1084, 1095 (11th Cir. 2021)); *see* Br.4-5, 26-27, 40-41, 46-48. But, as noted, under binding precedent, that presumption has no role to play here. Georgia concedes that §45f(g) is an "express preemption provision," Br.42, and rightly so; the provision's text "explicitly manifests Congress's intent to displace state law." *MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*, 60 F.4th 1314, 1321 (11th Cir. 2023). And as this Court recently reaffirmed, when "Congress has enacted an express-preemption provision, … no presumption against preemption applies." *Carson*, 72 F.4th at 1267.

The state cannot evade that unambiguous, binding precedent. On the state's own account, the presumption applies only "[w]hen there is no 'clear congressional command' to override state law." Br.35 (quoting *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (plurality op.)). No matter how it is interpreted, §45f(g) is just such a command: It expressly forbids "State[s] from "establish[ing] or continu[ing] in effect" a category of "law[s]" and other "requirement[s]." As *Carson* correctly teaches, it makes zero sense to "presume" that Congress did not intend to displace state law where, as here, Congress expressly stated that it *does* intend to displace state law.[10] This Court's task is thus simply to determine "the right and fair reading

---

[10] Straining to avoid the en banc court's clear command, the state claims that "there was no need to apply any background presumption" in *Carson* because there was no question that the state law fell within the "express language of the preemption provision." Br.47. Not so: After the en banc decision in *Carson*, the panel still

of" that express-preemption provision, without any thumb on the scale. *Torres v. Lynch*, 578 U.S. 452, 471-73 (2016). And the district court correctly concluded that §45f(g) expressly preempts Act 564. *See* Dkt.29 at 7-9.

c. Even if §45f could plausibly be interpreted as just superfluously codifying implied "conflict preemption" principles, *but see supra* pp.33-37, that would not change the bottom line. As Georgia concedes, under the Supreme Court's "conflict preemption" jurisprudence, a state law is invalid if (1) "it is impossible for a private party to comply with both state and federal law"; or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). Georgia spends more than five pages of its brief arguing that it is possible to simultaneously comply with both the INFORM Act and Act 564, *see* Br.27-32, but that is not (and has not ever been) disputed. Instead—as the district court correctly held—Act 564 is invalid not only under express-preemption principles, but under "obstacle" preemption principles as well. *See* Dkt.29 at 9-13.

---

needed to "determine the scope of [the preemption] provision's state-law displacement." *Carson v. Monsanto Co.*, 92 F.4th 980, 989 (11th Cir. 2024). And the panel began that endeavor by recognizing that "no presumption against preemption applies" and applying "ordinary principles of statutory interpretation"— just as the district court did here. *Id.*

To "determine what constitutes an unconstitutional obstacle to federal law," a court must "examin[e] the federal statute as a whole and identify[] its purpose and intended effects." *MSP Recovery Claims*, 60 F.4th at 1322. The district correctly explained that the federal INFORM Act charts a "calibrated middle path": It requires online marketplaces to collect and maintain information about third-party transactions, but only when the marketplace already possesses (or can readily obtain) that information by virtue of the payment-processing role it has chosen to take on. Dkt.29 at 12. Confirming that Congress did not intend to saddle classifieds platforms like Facebook Marketplace, Nextdoor, and OfferUp with an onerous obligation to monitor third parties' in-person, cash transactions, the INFORM Act specifies that an online marketplace "shall only be required" to account for transactions consummated through the marketplace or its payment processor. Dkt.29 at 12.

Act 564 "poses an unconstitutional obstacle" to Congress' balanced approach by attempting to force classifieds platforms to investigate private parties' independent off-platform dealings—the very thing Congress said they are *not* required to do. Dkt.29 at 10-12. And that obstacle is particularly pronounced because the interstate nature of online services means that even one more aggressive state law could disrupt Congress's design all throughout the nation.

Georgia's efforts to resist that conclusion are unavailing.  The state blithely asserts that "there is no evidence in the text or structure of the federal [INFORM] Act that Congress intended to set a nationwide ceiling" on the information-collection requirements that "states c[an] impose on online marketplaces."  Br.37-38; *see* Br.33-34, 35.  Yes, there is:  The INFORM Act specifies that "an online marketplace shall only be required to count" on-platform transactions and that "[n]o State … may establish" any conflicting "requirement."  15 U.S.C. §45f(f)(3)(B), (g).  Georgia cannot wish away this clear evidence of the INFORM Act's purpose and intended effects by simply pretending it does not exist.  Far from engaging in "speculation about [Congress's] *implicit* intentions," Br.38, the district court gave effect to the *explicit* commands of §45f(f)(3)(B) and (g).  *See* Dkt.29 at 12.  Georgia's suggestion that the district court found preemption based on "deliberate federal inaction," Br.38, is exactly backwards.

The state insists that there is no "conflict" between Act 564 and the federal INFORM Act because both advance the same general "'goal' of protecting retail stores and consumers from theft and fraud."  Br.36.  But the district court correctly made short work of that argument too, applying the well-established principle that "the fact of a common end hardly neutralizes conflicting means."  Dkt.29 at 12 (quoting *Crosby*, 530 U.S. at 379-80); *see also, e.g.*, *Arizona v. United States*, 567 U.S. 387, 406 (2012) (state law "impos[ing] criminal penalties on aliens who seek

or engage in unauthorized employment" was conflict-preempted, even though it "attempt[ed] to achieve one of the same goals as federal law"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 425 (2003) (state law imposing disclosure requirements on insurers was conflict-preempted, even though it promoted the federal government's "goal" of "obtaining compensation for Holocaust victims").[11] Sections 45f(f)(3)(B) and (g) reflect a clear "federal decision" about the "right degree" of regulation to impose on online marketplaces vis-à-vis monitoring high volume third-party sellers. Dkt.29 at 12. And Act 564 defies Congress' intent by "adopt[ing] a different and more expansive scope of what online marketplaces are required to do in precisely the manner the INFORM Act prohibits." Dkt.29 at 12. "Despite the laws' similar goal, their means nonetheless conflict." Dkt.29 at 12.

"At bottom, regardless of whether the Court gives 'conflict' its ordinary meaning or imports the narrower definition from implied conflict preemption doctrine, Act 564 cannot be reconciled with the text of the INFORM Act." Dkt.29 at 13. This Court should affirm.

---

[11] The state attempts to limit this principle by insisting that it applies only to "uniquely federal" areas of law, such as foreign affairs. Br.50. But courts have routinely applied the principle in other contexts. *See, e.g.*, *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 239 (5th Cir. 2012) (state law regulating misrepresentation of telephone caller's identification to call recipient); *Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214, 1224 (10th Cir. 2012) (state law regulating storage of hazardous waste).

**B.     Although the District Court Did Not Reach the Issue, Act 564 Also Runs Afoul of the First Amendment.**

This Court could also affirm on the separate ground that Act 564 very likely violates the First Amendment.  Because Act 564 imposes major burdens on the rights to speak, listen, and associate, it triggers heightened scrutiny.  And the exceedingly onerous obligations it imposes on speakers—and not sellers engaged in the potential illegal activity it targets—cannot begin to satisfy that scrutiny.  Indeed, Act 564 is so burdensome that it would violate the First Amendment even if viewed as an ordinary disclosure requirement (though there is nothing ordinary about it).

**1.     Act 564 triggers heightened First Amendment scrutiny.**

Act 564 triggers heightened scrutiny in multiple ways.  First, it impinges on the First Amendment rights of companies that operate online marketplaces, i.e., NetChoice's members.  Just as the First Amendment protects a newspaper's right to disseminate advertisements and classified listings, it protects NetChoice members' right to disseminate third-party sellers' speech and to exercise editorial discretion regarding the listings, advertisements, and other content they wish to disseminate and display on their own websites.  *See, e.g.*, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2401-03, 2405-06 (2024); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

Act 564 severely burdens those expressive activities by forcing those engaged in them (1) to investigate and maintain information about third-party sales that occur

entirely off-platform, which they otherwise would have no reason or ability to track; (2) to mandate and carry disclosures by "high-volume third-party sellers"; and (3) to verify the accuracy of such information and disclosures. By so requiring, Act 564 "exacts a penalty" from those who choose to disseminate third-party speech that entails any kind of offer of an item for sale (which of course is itself protected speech). *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). Laws that impose such burdens on constitutionally protected speech are subject to heightened First Amendment scrutiny. *See Wash. Post v. McManus*, 944 F.3d 506, 515-17, 520 (4th Cir. 2019) (state law requiring "online platforms" to publicly post certain facts about the paid advertisements they carry triggered heightened scrutiny because it "deter[red] hosting" that constitutionally protected speech); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

Second, Act 564 compels speech—multiple times over. For one, it forces online marketplaces to require anyone who could potentially qualify as a high-volume seller based on off-platform activity to turn over information sufficient for the online marketplace to make a judgment about whether further disclosures are mandated. For another, if the third party qualifies as a high-volume seller, Act 564 mandates disclosure of personal information, including sensitive items such as bank information and SSNs, to online marketplaces. O.C.G.A. §10-1-941(a). Finally, it

forces some of those sellers to provide—and online marketplaces to convey—consumer-facing disclosures. *Id.* §10-1-942(a). Time and again, the Supreme Court has applied heightened scrutiny to laws that compel speech, including "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 773-75 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-801 (1988).

Third, Act 564 will inevitably result in the suppression of significant amounts of constitutionally protected user posts and item listings on the online services it regulates. Dkt.2-4 ¶¶41-45; Dkt.2-5 ¶¶31-32. Act 564 will prompt some users to refrain from perfectly legitimate speech to avoid having to hand over their bank information and SSNs to online marketplaces commandeered to act as the state's enforcement agents. Dkt.2-5 ¶29. Moreover, given the steep compliance costs and hefty civil sanctions for non-compliance, online services will inevitably conclude that some user content they would otherwise display and disseminate raises too many risks. *See McManus*, 944 F.3d at 516-17. The law thus not only overrides the online marketplaces' editorial discretion and restricts potential high-volume sellers' right to speak, but also burdens the First Amendment rights of users of online marketplaces who would willingly view the suppressed listings and advertisements. *Cf. Virginia*

*v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (permitting bookseller to vindicate "the First Amendment rights of bookbuyers").

### 2. Act 564 cannot survive heightened scrutiny.

Act 564 burdens huge swathes of protected speech, and thus unquestionably triggers at least intermediate scrutiny.[12]  The state therefore must show that the law is "narrowly tailored to achieve" a substantial governmental interest without unnecessarily abridging constitutionally protected speech.  *Lorillard Tobacco*, 533 U.S. at 556; *see also Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017).  It cannot pass that test.

The Georgia Attorney General's official website describes GICA as an effort "to prevent criminals from selling stolen goods on any online marketplace platform and to protect Georgians who unknowingly purchase these stolen and counterfeit goods."  Dkt.2-6 at Ex.14.  Act 564 purports to advance these same goals.  *See* Dkt.2-2 at 1 ("This Act shall be known and may be cited as the 'Combating Organized Retail Crime Act.'"); Dkt.2-6 at Ex.15.  While the state undoubtedly has a legitimate interest in combating organized retail crime and in helping consumers avoid stolen

---

[12] Indeed, strict scrutiny should apply since (1) Act 564 burdens more than just commercial speech and (2) its heavy burdens on protected expression should receive strict scrutiny regardless of whether they affect only "commercial speech."  *See Lorillard Tobacco*, 533 U.S. at 572 (Thomas, J., concurring in part and concurring in the judgment).

or counterfeit goods, Act 564 is not remotely tailored to advance those interests in a way that avoids unnecessary abridgement of speech.

To begin, Act 564 is wildly overinclusive; it burdens huge swathes of constitutionally protected expression that have nothing to do with "organized retail crime." Instead of targeting misleading or unlawful speech (or even consummated sales), the Act imposes onerous obligations on online marketplaces—even classifieds platforms that do not participate in transactions and instead merely provide a forum for third-party speech that may or may not culminate in an off-platform sale. And because it is practically impossible for classifieds platforms and other online services to monitor the huge volume of *off-platform* transactions that their services may in some way facilitate—which is essential to determine who is a "third party seller" under Act 564—the law will almost certainly force them to restrict speech that they would otherwise carry and that has zero connection to retail theft or other unlawful conduct. *See* Dkt.2-4 ¶¶41-45; Dkt.2-5 ¶¶31-32; *cf. McManus*, 944 F.3d at 510 (attempt to combat foreign election interference by forcing "online platforms" to disclose information about third-party political ads was "too circuitous and burdensome" to satisfy heightened scrutiny).

On the flipside, Act 564 is "wildly underinclusive when judged against its asserted justification." *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). Notwithstanding its title, the Act does not even prohibit (much less prevent)

"organized retail crime" or impose any civil or criminal penalty on individuals who traffic in stolen, counterfeit, or dangerous consumer goods. Indeed, it does not *directly* regulate third-party sellers at all. Rather than require high-volume sellers, who have ready information about the volume, nature, and location of their own sales, to make certain disclosures whenever and wherever they offer an item for sale, Act 564 instead imposes obligations and potential penalties *solely* on websites that are engaged in speech—but *not* in the processing of sales. Regulating speakers rather than those involved in the primary activity the state purports to target is the antithesis of narrowly tailoring a law to avoid unnecessary abridgement of speech. And this misdirection of obligations and penalties will render the Act nearly useless in stopping illegal sales by organized criminals, as it will take little effort for actual criminals to evade the law. At most, Act 564 might inconvenience them by impelling them to conduct more of their illegal activities entirely offline, to spread their online transactions among several different websites, or to create multiple "seller" accounts. "That is not how one addresses a serious social problem." *Id.* at 802.

Before the district court, the state argued that Act 564 should instead be analyzed under the less stringent standard announced in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). That is not the correct standard. Act 564 is nothing like a traditional disclosure requirement, which requires someone engaged in commercial activity to provide "information

about the terms under which" the "services" it is offering "will be available." *Id.* at 651. Act 564 instead requires *someone else* (i.e., an online marketplace) to compel those who provide a service (i.e., third-party sellers) to disclose certain information in *the latter group's* possession. *Zauderer* has never been understood to apply to efforts to require "neutral-third party platforms" to disclose information about *someone else*'s speech or services, *McManus*, 944 F.3d at 515-17, let alone to task platforms with sole legal responsibility for making sure *other* parties comply with disclosure mandates.

Moreover, the Supreme Court has held that "*Zauderer* has no application" when a government-mandated disclosure "is not limited to 'purely factual and uncontroversial information about the terms under which ... services will be available.'" *NIFLA*, 585 U.S. at 768-69. Requiring private parties to give a private company sensitive personal information such as a bank account number and Social Security Number is *neither* related to the terms on which services will be available *nor* uncontroversial. After all, a third-party seller could reasonably be concerned about whether the company will securely maintain its data or whether the company will be obliged to share it with the state. *See* Dkt.2-5 ¶¶19, 29, 32.

In all events, Act 564 is so burdensome and circuitous in its means that it could not satisfy the *Zauderer* standard. It is one thing to require someone engaged in commercial activity to provide "purely factual and uncontroversial information

about the terms under which" the "services" it is offering "will be available." *Zauderer*, 471 U.S. at 651. But it is another thing entirely to compel someone engaged in speech, but not sales activity, to collect and disseminate information about other speakers. *See McManus*, 944 F.3d at 511, 515-17, 520-21 (applying heightened scrutiny to obligation that "online platforms" disclose information about their advertisers). There is a world of difference between requiring *The New York Times* to disclose the terms on which it sells subscriptions and forcing it to investigate and police all its advertisers and demand that they make various disclosures about themselves. Yet Act 564 jumps those tracks, requiring online services to investigate and unearth information about third parties' off-platform transactions, and to extract from anyone who meets the "high volume" threshold information that the services themselves must then convey. To the extent that can even be understood as a "disclosure" requirement, it is the model of an "unduly burdensome" one. *NIFLA*, 585 U.S. at 776; *accord Zauderer*, 471 U.S. at 651.

## II. The District Court Correctly Held That NetChoice Has Satisfied All Other Requirements For A Preliminary Injunction.

1. The district court correctly concluded that NetChoice members would face irreparable injury absent preliminary injunctive relief. *See* Dkt.29 at 13-15. This Court has long recognized that "unrecoverable monetary loss is an irreparable harm." *Georgia*, 46 F.4th at 1302; *see, e.g.*, *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014). And the district court found, based on

uncontroverted evidence, that "[i]f forced to comply with Act 564, NetChoice's members will suffer unrecoverable expenditures of resources in trying to comply." Dkt.29 at 14. For example, Facebook Marketplace and OfferUp "would likely need to change their website functionality to gain better visibility and track third-party communications related to potential offline transactions." Dkt.29 at 14; *see* Dkt.2-4 ¶¶37-38, 40; Dkt.2-5 ¶¶25-30. To the extent compliance is even feasible, it would be extremely costly. And, as the district court observed, NetChoice members would have no way to recover those costs from the state at the conclusion of this litigation given sovereign immunity. *See* Dkt.29 at 14. On top of that, not only NetChoice members but also the millions of Georgians who use their services faced an imminent threat of irreparable harm in the form of a constitutional violation. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Georgia does not appear to challenge the district court's finding of irreparable injury. *See* Br.52-54. The state quibbles with the volume of new product listings that Act 564 would require NetChoice members to monitor, speculating that online marketplaces could devise a system that carves out sales of unused items (which are not covered by Act 564). But Georgia ultimately offers nothing more than its counsel's *ipse dixit* assertion that NetChoice members "already have policies or procedures in place" that would "likely" make monitoring huge quantities of off-

platform transactions "a non-issue." Br.53. That speculation is squarely contradicted by the sworn testimony of NetChoice members themselves, *see* Dkt.2-4 ¶¶37-38, 40; Dkt.2-5 ¶¶25-30, and provides no basis for disturbing the district court's finding of significant, unrecoverable compliance costs, Dkt.29 at 14.

2. The district court was also right to conclude that "[n]either harm to Georgia nor public interest weigh[ed] against issuing the injunction." Dkt.29 at 15. That conclusion follows directly from the court's holding that Act 564 is preempted, as "neither the government nor the public has any legitimate interest in enforcing" an invalid state law. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *accord Alabama*, 691 F.3d at 1301; *see also Georgia*, 46 F.4th at 1303 ("[O]ur system does not permit [the government] to act unlawfully even in pursuit of desirable ends."). Moreover, the public interest would be affirmatively harmed if the law took effect, as companies could be forced to remove all sorts of otherwise unproblematic listings in Georgia out of an abundance of caution. *See* Dkt.2-4 ¶¶43-45; Dkt.2-5 ¶¶31-32.

The state fails to identify any error in that analysis. The state asserts that it is "always" harmed by "[t]he inability to enforce [a] duly enacted" statute, Br.53, but that is not the case when, as here, the statute is unconstitutional. *See, e.g.*, *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). Further, Act 564 is unlikely to make any appreciable contribution to the state's asserted interest in "combatting organized

retail crime," *see supra* pp.48-49, and the state has "many other tools" at its "disposal" for advancing its asserted interests while the parties litigate the merits of NetChoice's claims, *Georgia*, 46 F.4th at 1303. For example, the state remains free to enforce the federal INFORM Act and existing laws that directly prohibit retail theft and counterfeiting. In sum, the district court was eminently justified in granting NetChoice's motion to preliminarily enjoin Act 564.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

*s/*Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellee NetChoice, LLC*

November 25, 2024

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,627 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32-4.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

November 25, 2024

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**ADDENDUM**

## TABLE OF CONTENTS

15 U.S.C. §45f.................................................................................. 1a

O.C.G.A. §10-1-941......................................................................... 10a

O.C.G.A. §10-1-942......................................................................... 12a

O.C.G.A. §10-1-943......................................................................... 14a

O.C.G.A. §10-1-944......................................................................... 14a

O.C.G.A. §10-1-945......................................................................... 14a

### 15 U.S.C. §45f.  Collection, verification, and disclosure of information by online marketplaces to inform consumers

**(a) Collection and verification of information**

**(1) Collection**

**(A) In general**

An online marketplace shall require any high-volume third party seller on such online marketplace's platform to provide, not later than 10 days after qualifying as a high-volume third party seller on the platform, the following information to the online marketplace:

**(i) Bank account**

**(I) In general**

A bank account number, or, if such seller does not have a bank account, the name of the payee for payments issued by the online marketplace to such seller.

**(II) Provision of information**

The bank account or payee information required under subclause (I) may be provided by the seller in the following ways:

**(aa)** To the online marketplace.

**(bb)** To a payment processor or other third party contracted by the online marketplace to maintain such information, provided that the online marketplace ensures that it can obtain such information within 3 business days from such payment processor or other third party.

**(ii) Contact information**

Contact information for such seller as follows:

**(I)** With respect to a high-volume third party seller that is an individual, the individual's name.

**(II)** With respect to a high-volume third party seller that is not an individual, one of the following forms of contact information:

**(aa)** A copy of a valid government-issued identification for an individual acting on behalf of such seller that includes the individual's name.

**(bb)** A copy of a valid government-issued record or tax document that includes the business name and physical address of such seller.

### (iii) Tax ID

A business tax identification number, or, if such seller does not have a business tax identification number, a taxpayer identification number.

### (iv) Working email and phone number

A current working email address and phone number for such seller.

### (B) Notification of change; annual certification

An online marketplace shall--

**(i)** periodically, but not less than annually, notify any high-volume third party seller on such online marketplace's platform of the requirement to keep any information collected under subparagraph (A) current; and

**(ii)** require any high-volume third party seller on such online marketplace's platform to, not later than 10 days after receiving the notice under clause (i), electronically certify that--

**(I)** the seller has provided any changes to such information to the online marketplace, if any such changes have occurred; or

**(II)** there have been no changes to such seller's information.

### (C) Suspension

In the event that a high-volume third party seller does not provide the information or certification required under this paragraph, the online marketplace shall, after providing the seller with written or electronic notice and an opportunity to provide such information or certification not later than 10 days after the issuance of such notice, suspend any future sales activity of such seller until such seller provides such information or certification.

## (2) Verification

### (A) In general

An online marketplace shall--

**(i)** verify the information collected under paragraph (1)(A) not later than 10 days after such collection; and

**(ii)** verify any change to such information not later than 10 days after being notified of such change by a high-volume third party seller under paragraph (1)(B).

**(B) Presumption of verification**

In the case of a high-volume third party seller that provides a copy of a valid government-issued tax document, any information contained in such document shall be presumed to be verified as of the date of issuance of such document.

**(3) Data use limitation**

Data collected solely to comply with the requirements of this section may not be used for any other purpose unless required by law.

**(4) Data security requirement**

An online marketplace shall implement and maintain reasonable security procedures and practices, including administrative, physical, and technical safeguards, appropriate to the nature of the data and the purposes for which the data will be used, to protect the data collected to comply with the requirements of this section from unauthorized use, disclosure, access, destruction, or modification.

**(b) Disclosure required**

**(1) Requirement**

**(A) In general**

An online marketplace shall--

**(i)** require any high-volume third party seller with an aggregate total of $20,000 or more in annual gross revenues on such online marketplace, and that uses such online marketplace's platform, to provide the information described in subparagraph (B) to the online marketplace; and

**(ii)** disclose the information described in subparagraph (B) to consumers in a clear and conspicuous manner--

**(I)** on the product listing page (including via hyperlink); or

**(II)** in the order confirmation message or other document or communication made to the consumer after the purchase is finalized and in the consumer's account transaction history.

**(B) Information described**

The information described in this subparagraph is the following:

**(i)** Subject to paragraph (2), the identity of the high-volume third party seller, including--

**(I)** the full name of the seller, which may include the seller name or seller's company name, or the name by which the seller or company operates on the online marketplace;

**(II)** the physical address of the seller; and

**(III)** contact information for the seller, to allow for the direct, unhindered communication with high-volume third party sellers by users of the online marketplace, including--

**(aa)** a current working phone number;

**(bb)** a current working email address; or

**(cc)** other means of direct electronic messaging (which may be provided to such seller by the online marketplace), provided that the requirements of this item shall not prevent an online marketplace from monitoring communications between high-volume third party sellers and users of the online marketplace for fraud, abuse, or spam.

**(ii)** Whether the high-volume third party seller used a different seller to supply the consumer product to the consumer upon purchase, and, upon the request of an authenticated purchaser, the information described in clause (i) relating to any such seller that supplied the consumer product to the purchaser, if such seller is different than the high-volume third party seller listed on the product listing prior to purchase.

## (2) Exception

### (A) In general

Subject to subparagraph (B), upon the request of a high-volume third party seller, an online marketplace may provide for partial disclosure of the identity information required under paragraph (1)(B)(i) in the following situations:

**(i)** If such seller certifies to the online marketplace that the seller does not have a business address and only has a residential street address, or has a combined business and residential address, the online marketplace may--

**(I)** disclose only the country and, if applicable, the State in which such seller resides; and

**(II)** inform consumers that there is no business address available for the seller and that consumer inquiries should be submitted to the seller by phone, email, or other means of electronic messaging provided to such seller by the online marketplace.

**(ii)** If such seller certifies to the online marketplace that the seller is a business that has a physical address for product returns, the online marketplace may disclose the seller's physical address for product returns.

**(iii)** If such seller certifies to the online marketplace that the seller does not have a phone number other than a personal phone number, the online marketplace shall inform consumers that there is no phone number available for the seller and that consumer inquiries should be submitted to the seller's email address or other means of electronic messaging provided to such seller by the online marketplace.

**(B) Limitation on exception**

If an online marketplace becomes aware that a high-volume third party seller has made a false representation to the online marketplace in order to justify the provision of a partial disclosure under subparagraph (A) or that a high-volume third party seller who has requested and received a provision for a partial disclosure under subparagraph (A) has not provided responsive answers within a reasonable time frame to consumer inquiries submitted to the seller by phone, email, or other means of electronic messaging provided to such seller by the online marketplace, the online marketplace shall, after providing the seller with written or electronic notice and an opportunity to respond not later than 10 days after the issuance of such notice, suspend any future sales activity of such seller unless such seller consents to the disclosure of the identity information required under paragraph (1)(B)(i).

**(3) Reporting mechanism**

An online marketplace shall disclose to consumers in a clear and conspicuous manner on the product listing of any high-volume third party seller a reporting mechanism that allows for electronic and telephonic reporting of suspicious marketplace activity to the online marketplace.

**(4) Compliance**

If a high-volume third party seller does not comply with the requirements to provide and disclose information under this subsection, the online marketplace shall, after providing the seller with written or electronic notice and an opportunity to provide or disclose such information not later than 10 days after the issuance of such notice, suspend any future sales activity of such seller until the seller complies with such requirements.

**(c) Enforcement by Federal Trade Commission**

**(1) Unfair and deceptive acts or practices**

A violation of subsection (a) or (b) by an online marketplace shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

**(2) Powers of the Commission**

**(A) In general**

The Commission shall enforce subsections (a) and (b) in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

**(B) Privileges and immunities**

Any person that violates subsection (a) or (b) shall be subject to the penalties, and entitled to the privileges and immunities, provided in the Federal Trade Commission Act (15 U.S.C. 41 et seq.).

**(3) Regulations**

The Commission may promulgate regulations under section 553 of Title 5 with respect to the collection, verification, or disclosure of information under this section, provided that such regulations are limited to what is necessary to collect, verify, and disclose such information.

**(4) Authority preserved**

Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.

**(d) Enforcement by State attorneys general**

**(1) In general**

If the attorney general of a State has reason to believe that any online marketplace has violated or is violating this section or a regulation promulgated under this section that affects one or more residents of that State, the attorney general of the State may bring a civil action in any appropriate district court of the United States, to--

**(A)** enjoin further such violation by the defendant;

**(B)** enforce compliance with this section or such regulation;

**(C)** obtain civil penalties in the amount provided for under subsection (c);

**(D)** obtain other remedies permitted under State law; and

**(E)** obtain damages, restitution, or other compensation on behalf of residents of the State.

### (2) Notice

The attorney general of a State shall provide prior written notice of any action under paragraph (1) to the Commission and provide the Commission with a copy of the complaint in the action, except in any case in which such prior notice is not feasible, in which case the attorney general shall serve such notice immediately upon instituting such action.

### (3) Intervention by the Commission

Upon receiving notice under paragraph (2), the Commission shall have the right--

**(A)** to intervene in the action;

**(B)** upon so intervening, to be heard on all matters arising therein; and

**(C)** to file petitions for appeal.

### (4) Limitation on State action while Federal action is pending

If the Commission has instituted a civil action for violation of this section or a regulation promulgated under this section, no State attorney general, or official or agency of a State, may bring a separate action under paragraph (1) during the pendency of that action against any defendant named in the complaint of the Commission for any violation of this section or a regulation promulgated under this section that is alleged in the complaint. A State attorney general, or official or agency of a State, may join a civil action for a violation of this section or regulation promulgated under this section filed by the Commission.

### (5) Rule of construction

For purposes of bringing a civil action under paragraph (1), nothing in this section shall be construed to prevent the chief law enforcement officer, or official or agency of a State, from exercising the powers conferred on such chief law enforcement officer, or official or agency of a State, by the laws of the State to conduct investigations, administer oaths or affirmations, or compel the attendance of witnesses or the production of documentary and other evidence.

**(6) Actions by other State officials**

**(A) In general**

In addition to civil actions brought by attorneys general under paragraph (1), any other officer of a State who is authorized by the State to do so, except for any private person on behalf of the State attorney general, may bring a civil action under paragraph (1), subject to the same requirements and limitations that apply under this subsection to civil actions brought by attorneys general.

**(B) Savings provision**

Nothing in this subsection may be construed to prohibit an authorized official of a State from initiating or continuing any proceeding in a court of the State for a violation of any civil or criminal law of the State.

**(e) Severability**

If any provision of this section, or the application thereof to any person or circumstance, is held invalid, the remainder of this section and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected by the invalidation.

**(f) Definitions**

In this section:

**(1) Commission**

The term "Commission" means the Federal Trade Commission.

**(2) Consumer product**

The term "consumer product" has the meaning given such term in section 2301 of this title and section 700.1 of title 16, Code of Federal Regulations.

**(3) High-volume third party seller**

**(A) In general**

The term "high-volume third party seller" means a participant on an online marketplace's platform who is a third party seller and, in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross revenues.

**(B) Clarification**

For purposes of calculating the number of discrete sales or transactions or the aggregate gross revenues under subparagraph (A), an online marketplace shall

only be required to count sales or transactions made through the online marketplace and for which payment was processed by the online marketplace, either directly or through its payment processor.

**(4) Online marketplace**

The term "online marketplace" means any person or entity that operates a consumer-directed electronically based or accessed platform that--

**(A)** includes features that allow for, facilitate, or enable third party sellers to engage in the sale, purchase, payment, storage, shipping, or delivery of a consumer product in the United States;

**(B)** is used by one or more third party sellers for such purposes; and

**(C)** has a contractual or similar relationship with consumers governing their use of the platform to purchase consumer products.

**(5) Seller**

The term "seller" means a person who sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform.

**(6) Third party seller**

**(A) In general**

The term "third party seller" means any seller, independent of an online marketplace, who sells, offers to sell, or contracts to sell a consumer product in the United States through such online marketplace's platform.

**(B) Exclusions**

The term "third party seller" does not include, with respect to an online marketplace--

**(i)** a seller who operates the online marketplace's platform; or

**(ii)** a business entity that has--

**(I)** made available to the general public the entity's name, business address, and working contact information;

**(II)** an ongoing contractual relationship with the online marketplace to provide the online marketplace with the manufacture, distribution, wholesaling, or fulfillment of shipments of consumer products; and

**(III)** provided to the online marketplace identifying information, as described in subsection (a), that has been verified in accordance with that subsection.

**(7) Verify**

The term "verify" means to confirm information provided to an online marketplace pursuant to this section, which may include the use of one or more methods that enable the online marketplace to reliably determine that any information and documents provided are valid, corresponding to the seller or an individual acting on the seller's behalf, not misappropriated, and not falsified.

**(g) Relationship to State laws**

No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section.

**(h) Effective date**

This section shall take effect 180 days after December 29, 2022.

## O.C.G.A. §10-1-941

**(a)** An online marketplace shall require any high-volume third-party seller on its platform to provide, not later than ten days after qualifying as such, the following information to the online marketplace:

**(1)** A bank account number or, if the high-volume third-party seller does not have a bank account, the name of the payee for payments issued by the online marketplace to the high-volume third-party seller. This information may be provided by the high-volume third-party seller to the online marketplace or to a third party contracted by the online marketplace to maintain such information; provided, however, that the online marketplace ensures that it can obtain such information on demand from the third party;

**(2)** Contact information, which shall include:

**(A)** If the high-volume third-party seller is an individual, such individual's name; or

**(B)** If the high-volume third-party seller is not an individual, then:

**(i)** A copy of a valid government issued identification for an individual acting on behalf of such seller that includes the individual's name; or

**(ii)** A copy of a valid government issued record or tax document that includes the business name and physical address of the high-volume third-party seller;

**(3)** A business tax identification number or, if the high-volume third-party seller does not have a business tax identification number, a taxpayer identification number; and

**(4)** A current working email address and telephone number for the high-volume third-party seller.

**(b)** An online marketplace shall:

**(1)** Periodically, but not less than annually, notify each high-volume third-party seller on its platform of the requirement to keep current the information required under subsection (a) of this Code section; and

**(2)** Require each high-volume third-party seller on its platform to, not later than ten days after receiving the notice under paragraph (1) of this subsection, electronically certify as to the information required under subsection (a) of this Code section that:

**(A)** The high-volume third-party seller has provided any changes to such information, if any such changes have occurred;

**(B)** There have been no changes to such information; or

**(C)** The high volume third-party seller has previously provided any changes to such information to the online marketplace.

**(c)** In the event that a high-volume third-party seller does not provide the information or certification required under this Code section, the online marketplace shall, after providing such seller with written or electronic notice and an opportunity to provide such information or certification not later than ten days after the issuance of such notice, suspend any future sales activity of such seller until such seller provides such information or certification.

**(d)(1)** An online marketplace shall verify:

**(A)** The information and documents collected under subsection (a) of this Code section not later than ten days after such collection; and

**(B)** Any change in such information or to such documents not later than ten days after being notified of such change by a high-volume third-party seller under subsection (b) of this Code section.

**(2)** If a high-volume third-party seller provides a copy of a valid government issued tax document, any information contained within such tax document shall be presumed to be verified as of the date such document was issued.

## O.C.G.A. §10-1-942

**(a)** Except as provided in subsection (b) of this Code section, an online marketplace shall require any high-volume third-party seller with an aggregate total of $20,000.00 or more in annual gross revenues on its platform to provide to the online marketplace and disclose to consumers in a clear and conspicuous manner the following identity information:

**(1)** Full name of the high-volume third-party seller, including the high-volume third-party seller's name or company name or the name by which such seller or company operates on the online marketplace;

**(2)** Physical address of the high-volume third-party seller;

**(3)** Contact information for the high-volume third-party seller that will allow for direct, unhindered communication with such seller by consumers of the online marketplace, including:

**(A)** A current working telephone number;

**(B)** A current working email address; or

**(C)** Other means of direct electronic messaging, which may be provided to such high-volume third-party seller by the online marketplace;

provided, however, that the requirements of this paragraph shall not prohibit the online marketplace from preventing actual fraud, abuse, or spam through such communication; and

**(4)** Whether the high-volume third-party seller used a different seller to supply the product to the consumer upon purchase, and, upon the request of an authenticated purchaser, the information described in paragraphs (1) through (3) of this subsection relating to any such seller that is different than the high-volume third-party seller listed on the product listing page prior to purchase.

Such identity information shall be provided on the product listing page, directly or via hyperlink or, after the purchase is finalized, in the order confirmation message or other document or communication made to a consumer and in the consumer's account transaction history.

**(b)** Upon the request of a high-volume third-party seller, an online marketplace may provide for partial disclosure of the identity information required under subsection (a) of this Code section if the high-volume third-party seller certifies to the online marketplace that such seller:

**(1)** Does not have a business address and only has a residential street address, or has a combined business and residential address, then the online marketplace:

**(A)** Shall disclose only the country and, if applicable, the city and state in which such seller resides; and

**(B)** Shall inform consumers that there is no business address available for the high-volume third-party seller and that consumer inquiries should be submitted to such seller by telephone, email, or other means of electronic messaging provided to such seller by the online marketplace;

**(2)** Is a business that has a physical address for product returns, then the online marketplace shall disclose such seller's physical address for product returns; or

**(3)** Does not have a telephone number other than a personal telephone number, then the online marketplace shall inform consumers that there is no telephone number available for such seller and that consumer inquiries should be submitted to such seller's email address or other means of electronic messaging provided to such seller by the online marketplace.

**(c)** If an online marketplace becomes aware that a high-volume third-party seller has made a false representation to the online marketplace in order to justify the provision of a partial disclosure of the identity information under subsection (b) of this Code section, or that a high-volume third-party seller that has requested and received such a provision for a partial disclosure has not provided responsive answers within a reasonable time frame to consumer inquiries submitted to the seller by telephone, email, or other means of electronic messaging provided to such seller by the online marketplace, then, after providing the high-volume third-party seller with written or electronic notice and an opportunity to respond not later than ten days after the issuance of such notice, the online marketplace shall suspend any future sales activity of the high-volume third-party seller unless such seller consents to the disclosure of the identity information required under subsection (a) of this Code section.

**(d)** If a high-volume third-party seller does not comply with the requirements to provide and disclose information under this Code section, then, after providing such seller with written or electronic notice and an opportunity to provide or disclose such

information not later than ten days after the issuance of such notice, the online marketplace shall suspend any future sales activities of such seller until the seller complies with such requirements.

## O.C.G.A. §10-1-943

An online marketplace shall disclose to consumers in a clear and conspicuous manner on the product listing of any high-volume third-party seller a reporting mechanism that allows for electronic and telephonic reporting of suspicious marketplace activity to the online marketplace.

## O.C.G.A. §10-1-944

**(a)** Information or documents collected solely to comply with the requirements of this article shall not be used for any other purpose unless required by law.

**(b)** An online marketplace shall implement and maintain reasonable security procedures and practices, including administrative, physical, and technical safeguards, appropriate to the nature of the data and the purposes for which the data will be used, to protect the information or documents collected to comply with the requirements of this article from unauthorized use, disclosure, access, destruction, or modification.

## O.C.G.A. §10-1-945

**(a)** If the Attorney General has reason to believe that any online marketplace has violated or is violating this article and such violation affects one or more residents of this state, the Attorney General may bring a civil action in any appropriate court to:

   **(1)** Enjoin further such violation by the defendant;

   **(2)** Enforce compliance with this article;

   **(3)** Obtain damages, restitution, or other compensation on behalf of the residents of this state; and

   **(4)** Obtain other remedies permitted under state law.

**(b)** Any violation of this article shall additionally be a violation of Part 2 of Article 15 of this chapter, the "Fair Business Practices Act of 1975"; provided, however, that only public remedies as administered by the Attorney General shall be available under such part for violations of this article.

**(c)** Nothing in this article shall be construed to prohibit any district attorney, law enforcement officer, official, or agency of this state from initiating or continuing any proceeding in a court against an online marketplace for a violation of any other civil law or a criminal law of this state.