In the

# United States Court of Appeals
## for the Eleventh Circuit

NetChoice, LLC,

*Plaintiff-Appellee,*

v.

Attorney General, State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:24-cv-02485 — Steven D. Grimberg, *Judge*

## REPLY BRIEF OF APPELLANT

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Logan B. Winkles
  *Deputy Attorney General*
Zachary A. Mullinax
  *Assistant Attorney General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that, in addition to the Certificate of Interested Persons and Corporate Disclosure Statement in the opening brief, the following persons and entities may have an interest in the outcome of this case:

Blackwell, Keith R., Counsel for Amicus Curiae Retail Litigation Center, Inc.;

Retail Litigation Center, Inc., Amicus Curiae supporting Defendant-Appellant.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

# TABLE OF CONTENTS

**Page**

Table of Authorities ......................................................... ii

Introduction ................................................................ 1

Argument .................................................................... 5

    I.  NetChoice is unlikely to succeed on the merits of its preemption claim because Georgia's law does not "conflict" with the federal INFORM Act's requirements. .................... 5

        A.  The federal INFORM Act does not expressly preempt the Georgia law because it is possible to comply with both laws and Georgia's law does not stand as an "obstacle" to federal objectives. ....................... 6

            1.  The statute imposes ordinary conflict-preemption principles. ................................................ 7

            2.  Georgia's law complements, rather than obstructs, the federal INFORM Act. ......................... 14

        B.  Georgia's law does not "conflict" with federal law under any plausible meaning of the term. ............... 21

    II.  NetChoice's First Amendment claim cannot support a preliminary injunction. ....................................... 24

        A.  NetChoice cannot defend a preliminary injunction via a legal claim the district court declined to address. ........ 24

        B.  NetChoice's First Amendment claim is unlikely to succeed, anyway. .......................................... 26

    III.The equities weigh against a preliminary injunction. ........ 32

Conclusion ................................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Ala. Ass'n of Realtors v. HHS,*
 594 U.S. 758 (2021) ....................................................20, 23

*Arcara v. Cloud Books, Inc.,*
 478 U.S. 697 (1986) ........................................................ 27

*Arizona v. United States,*
 567 U.S. 387 (2012) ........................................................ 19

*Ark. Educ. Television Comm'n v. Forbes,*
 523 U.S. 666 (1998) ........................................................ 27

*Cal. Fed. Sav. & Loan Ass'n v. Guerra,*
 479 U.S. 272 (1987) ........................................................ 13

*Capron v. Office of the Att'y Gen. of Mass.,*
 944 F.3d 9 (1st Cir. 2019) ................................................. 5

*In re Checking Acct. Overdraft Litig.,*
 780 F.3d 1031 (11th Cir. 2015) ............................................ 28

*Club Madonna Inc. v. City of Miami Beach,*
 42 F.4th 1231 (11th Cir. 2022) ............................................ 27

*Colo. Dep't of Pub. Health & Env't v. United States,*
 693 F.3d 1214 (10th Cir. 2012) ............................................ 19

*Crosby v. Nat'l Foreign Trade Council,*
 530 U.S. 363 (2000) ........................................................ 19

*English v. Gen. Elec. Co.,*
 496 U.S. 72 (1990) ......................................................... 17

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
 373 U.S. 132 (1963) ........................................................ 5

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ................................................ 26

*Graham v. R.J. Reynolds Tobacco Co.*,
857 F.3d 1169 (11th Cir. 2017) ................................................ 16

*Hall v. Hall*,
584 U.S. 59 (2018) ..................................................................... 7

*Jones v. Google, LLC*,
73 F.4th 636 (9th Cir. 2024) ............................................... 2, 5, 12

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*,
955 F.3d 908 (11th Cir. 2020) ................................................... 2

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) ............. 1, 2, 5, 6, 7, 11, 14, 15, 24

*Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*,
423 F.3d 1056 (9th Cir. 2005) ................................................ 12

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) ................................................................ 27

*Moody v. NetChoice*,
603 U.S. 707 (2024) ......................................................... 4, 25, 26

*Murphy v. Dulay*,
768 F.3d 1360 (11th Cir. 2014) .............................................. 15

*NetChoice v. Attorney General, Fla.*,
34 F.4th 1196 (11th Cir. 2022) ....................................... 26, 27, 30

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ................................................................ 30

*Opis Mgmt. Res., LLC v. Sec'y, Fla. Agency for Health Care Admin.*,
713 F.3d 1291 (11th Cir. 2013) ................................................ 12

*Powers v. Ohio*,
499 U.S. 400 (1991) ........................................................ 4, 28

*Quik Payday, Inc. v. Stork*,
549 F.3d 1302 (10th Cir. 2008) ................................................ 20

*R.J. Reynolds Tobacco Co. v. FDA*,
96 F.4th 863 (5th Cir. 2024)..................................................... 29

*S. Blasting Servs. v. Wilkes Cnty.*,
288 F.3d 584 (4th Cir. 2002) ................................................... 11

*S. Pac. Co. v. Arizona*,
325 U.S. 761 (1945) ........................................................... 20

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)................................................... 25

*Smith v. Illinois*,
469 U.S. 91 (1984) ............................................................ 10

*Somers v. Digital Realty Tr. Inc.*,
850 F.3d 1045 (9th Cir. 2017) ................................................... 8

*Va. Uranium v. Warren*,
587 U.S. 761 (2019) ...................................................16, 17, 21

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) .........................................................28, 29

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) ................................................... 27

*WinRed, Inc. v. Ellison*,
59 F.4th 934 (8th Cir. 2023).................................................... 18

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct.,*
   471 U.S. 626 (1985) ........................................................4, 29, 30

**Statutes and Legislation**

5 U.S.C. § 8709................................................................... 13

7 U.S.C. § 136v..............................................................11, 13

10 U.S.C. § 987 ................................................................. 13

15 U.S.C. § 45f ........................................... 1, 3, 6, 10, 15, 18, 22, 23

15 U.S.C. § 5001............................................................... 13

17 U.S.C. § 301................................................................. 13

29 U.S.C. § 1144...............................................................2, 5, 10, 13

42 U.S.C § 2000bb............................................................. 8

49 U.S.C. § 5331............................................................... 13

49 U.S.C. § 31306a............................................................ 13

49 U.S.C. § 44703.............................................................. 13

49 U.S.C. § 45106.............................................................. 13

O.C.G.A. § 10-1-940 ........................................................19, 32

O.C.G.A. § 10-1-941 ........................................................26, 29

O.C.G.A. § 10-1-942 ......................................................... 29

O.C.G.A. § 16-8-14.2 ........................................................ 31

INFORM Consumers Act, Pub. L. No. 117-328, 136
   Stat. 4459 ................................................................... 15

INFORM Consumers Act, H.R. 5502, 117th Cong.
   (2022) ......................................................................... 15

S.B. 1144, 2023-24 Cal. Leg. (2024) .............................................. 18

S.B. 982, 2023-24 Cal. Leg. (2024) ................................................ 18

S.B. 343, 123d Ind. Gen. Assemb. (2023) ...................................... 18

**Other Authorities**

*Conflict*, Am. Heritage Dictionary of the Eng.
   Language, https://tinyurl.com/bdh3txta (last visited
   Jan. 13, 2025) ............................................................................ 9

*Conflict*, Merriam-Webster's Dictionary,
   https://tinyurl.com/5d8asj56 (last visited Jan. 13,
   2025) ..................................................................................... 9, 21

*Offering to buy or sell outside of eBay policy*, eBay Inc.,
   https://tinyurl.com/5c2eb9zs (last visited Jan. 13,
   2025) ........................................................................................ 33

*Informing Businesses about the INFORM Consumers
   Act*, FTC, https://tinyurl.com/48cpa87h (last visited
   Jan. 13, 2025) .......................................................................... 15

*Hate Speech*, Meta, https://tinyurl.com/4kuuzp4k (last
   visited Jan. 13, 2025) .............................................................. 33

# INTRODUCTION

It is the ordinary rule that state regulation can exceed federal requirements, even in areas Congress has addressed, absent the "clear and manifest purpose of Congress." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1095 (11th Cir. 2021). That is the case here, where Georgia's amended Inform Consumers Act regulates slightly beyond the almost identical federal INFORM Act.

NetChoice's attempt to put these statutes in "conflict" requires an outlandish misreading of that term. 15 U.S.C. § 45f(g). In NetChoice's view, any law that is "different" from the federal INFORM Act is preempted, but that is nonsensical. *All* state laws are "different" from the INFORM Act, and Congress would not use the term "conflict" if it actually meant to impose the supercharged field preemption NetChoice prefers. Georgia's law is not preempted, and it is not a close question.

Given the ordinary meaning and extensive court usage of the term "conflict," Congress's use of that term plainly imports conflict-preemption principles. Opening.Br.25. NetChoice's argument—Congress used the term "conflict" to mean something else entirely—is a weak attempt to avoid applying principles that doom NetChoice's case. Resp.Br.31–34; Doc. 29 at 8–9. If Congress meant "different," it would have said "different" (which

1

it has done elsewhere). If Congress wanted to field preempt, it would have used broad terms, such as prohibiting state regulation that "relates to" the federal INFORM Act's requirements. *E.g.*, 29 U.S.C. § 1144(a). Congress knows how to do that, does so all the time, and did not do that here. Instead, Congress chose the term "conflict," a term so "laden" with meaning, Doc. 29 at 7, that it would be legislative malpractice to expect anyone to understand it as anything other than conflict preemption.

Applying ordinary conflict-preemption principles, Georgia's law easily passes muster. Georgia's law doesn't make compliance with federal law impossible (as all agree), nor is it an obstacle to federal purposes. *See Marrache*, 17 F.4th at 1094. Georgia's law and the federal INFORM Act share purposes and means; they complement each other. Opening.Br.33–41. Georgia's law merely requires online marketplaces to count a few additional on-platform transactions toward high-volume seller status. Compliance with Georgia's law necessarily means compliance with federal law—how could that be an *obstacle* to federal law? "[S]tate laws that supplement … federal law[] do not stand as an obstacle … to Congress's objectives." *Jones v. Google, LLC*, 73 F.4th 636, 642 (9th Cir. 2024) (quotations omitted); *see also, e.g.*, *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 922 (11th

Cir. 2020). Like the district court, NetChoice skips the relevant obstacle preemption analysis entirely, never identifying how the laws are at cross purposes.

Moreover, even assuming that when Congress used the term "conflict" it meant something other than "conflict preemption," NetChoice still loses. The ordinary meaning of "conflict" is clash, to be at variance, to be in tension. Nothing in Georgia's law clashes with anything in the federal law. NetChoice argues that, since federal law defines high-volume third-party sellers based "only" on transactions where the online marketplace processes payment, Congress forbade States from requiring marketplaces to count any other transactions. *E.g.*, Resp.Br.28; Doc. 29 at 3. But as already explained, Opening.Br.31, that circular argument fails. The relevant provision cabins the *federal INFORM Act's* scope, § 45f(f)(3)(B), and the definition is explicitly limited to a specific subsection of the federal Act. Where a federal law limits its own reach, it does not thereby limit *state* regulation. Opening.Br.35–40.

With preemption a nonstarter, NetChoice retreats to claiming that Georgia's law violates the First Amendment. Resp.Br.44–51. But the district court didn't consider that claim, and this Court shouldn't take it up now, especially where there are unresolved

factual issues about the supposed burdens on NetChoice's members, not to mention dispositive questions about the proper scope of relief. *See, e.g.*, *Moody v. NetChoice*, 603 U.S. 707, 732 (2024) (facial relief proper where all applications unconstitutional).

But NetChoice's First Amendment claim fails, too. NetChoice never identifies a burden on its speech; it *says* Georgia's law restricts its members' editorial discretion, Resp.Br.46, but collecting and verifying some sellers' contact information has nothing to do with speech curation. NetChoice pivots to asserting the First Amendment interests of users, but it lacks standing to do so. *Powers v. Ohio,* 499 U.S. 400, 410–11 (1991). Anyway, requiring some sellers to provide identifying and contact information is a quintessentially valid "factual and uncontroversial" disclosure mandate. *Zauderer v. Office of Disciplinary Counsel of Sup. Ct.*, 471 U.S. 626, 651 (1985).

Lastly, even if NetChoice had some chance of success on the merits, the balance of hardships would be decisive. NetChoice claims (without evidence) that its members—among the wealthiest, most powerful companies in the world—couldn't possibly monitor what happens on their own platforms. But data collection is their business model. It's not that they can't comply

with Georgia's law—they'd just prefer not to. That hardly outweighs the public interest in preventing criminal operations from skirting Georgia's law via off-platform payments. Opening.Br.52–54. The Court should reverse.

## ARGUMENT

### I. NetChoice is unlikely to succeed on the merits of its preemption claim because Georgia's law does not "conflict" with the federal INFORM Act's requirements.

As already explained, the default rule is that States can regulate beyond the federal government, even on the same issues. Opening.Br.33–34; s*ee also, e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 146–47 (1963); *Jones*, 73 F.4th at 642. Congress ordinarily sets a regulatory floor, preserving States' authority to set additional, complementary standards. *Capron v. Office of the Att'y Gen. of Mass.*, 944 F.3d 9, 28 (1st Cir. 2019) (plaintiffs must "identify affirmative evidence that Congress … had a ceiling-setting … intent.").

The exception—preemption—comes in three sometimes-overlapping varieties: express preemption, field preemption, and conflict preemption. *Marrache*, 17 F.4th at 1094. Field and conflict preemption can be express or implied. *Jones*, 73 F.4th at 644; 29 U.S.C. § 1144(a) (preempting state law "relat[ing] to"

employee benefit plans); *see also* Opening.Br.25–26, 35–36.
Conflict preemption can be further subdivided into "impossibility"
preemption (where a regulated party cannot comply with both
laws) and "obstacle" preemption (where the state law stands as an
obstacle to the "purpose" of the federal law). *Marrache*, 17 F.4th
at 1094; *see also* Opening.Br.25.

Here, the federal INFORM Act expressly prohibits laws that
"conflict[]" with its requirements. § 45f(g). That term plainly
means Congress chose to apply ordinary conflict-preemption
principles. And applying those principles, NetChoice's argument
fails. But even if one accepted NetChoice's argument that
Congress did *not* mean to apply the well-understood principles of
*conflict* preemption when it used the word "conflict," NetChoice
still loses. Under any plausible meaning of the word, Georgia's
law does not "conflict" with federal law.

## A. The federal INFORM Act does not expressly preempt the Georgia law because it is possible to comply with both laws and Georgia's law does not stand as an "obstacle" to federal objectives.

NetChoice, following the district court, argues that Georgia's
law is preempted because the federal INFORM Act expressly
preempts any state law that "conflicts" with the Act. Resp.Br.28.
But, as already explained, there is no "conflict." Opening.Br.27–

41. Congress used the term "conflict" to clarify that ordinary conflict-preemption principles apply. NetChoice's alternative reading—the statute preempts any state law that is "different" from the Act, Resp.Br.20—is nonsensical. And applying conflict-preemption principles, Georgia's law is plainly valid.

## 1. The statute imposes ordinary conflict-preemption principles.

Congressional intent, the "ultimate touchstone in every preemption case[,] … primarily is discerned from" the statute's text. *Marrache*, 17 F.4th at 1094. And as even the district court recognized, in the preemption context, "conflict" is "laden with meaning." Doc. 29 at 7. When Congress transplants a well-defined term from another legal source, that term "presumably carrie[s] forward the same meaning;" it "brings the old soil with it." *Hall v. Hall*, 584 U.S. 59, 73 (2018).

When used in a preemption provision, then, "conflict" unmistakably conveys Congress's desire to import conflict-preemption principles: that is, federal law overrides state law where regulated entities cannot comply with both or the latter is an "obstacle" to the former. *Marrache*, 17 F.4th at 1094–95. Opening.Br.24–27.

Because ordinary conflict-preemption principles doom its case, NetChoice pushes back against this common-sense interpretation.  In NetChoice's view, when Congress used the term "conflict," Congress did not intend the meaning of that term arising from the enormous archive of well-established case law. Instead, it meant to use "conflict" to mean "different from." Resp.Br.20, 32.

NetChoice's arguments on this score would undermine statutory interpretation at the "cellular level." *Somers v. Digital Realty Tr. Inc.*, 850 F.3d 1045, 1051 (9th Cir. 2017) (Owens, J, dissenting), *rev'd and remanded*, 583 U.S. 149 (2018).  To start, NetChoice has no explanation for why, in a preemption clause, Congress would use the term "conflict"—a well-known and oft-used term in preemption cases—but mean something *other* than its well-known and oft-used meaning.  NetChoice's argument is equivalent to arguing that when Congress uses the term "compelling governmental interest," interpreters should look to dictionaries rather than the large body of court cases interpreting that phrase.  *E.g.*, 42 U.S.C § 2000bb(b)(1) (Religious Freedom Restoration Act).

Even if one were to ignore the mountain of case law using this specific phrase, NetChoice "blinks reality" when it tries to

transform "conflict" into "differ." Resp.Br.32. "Conflict" ordinarily refers to something that is "opposed" to or "contradictory" with something else. *Conflict*, Merriam-Webster's Dictionary, https://tinyurl.com/5d8asj56 (last visited Jan. 13, 2025); Opening.Br.44. Pancakes are *different* than syrup, but pancakes aren't *in conflict* with syrup.

NetChoice attempts a sleight-of-hand by locating dictionary definitions where one permissible use of the term "conflict" is "differ." Resp.Br.31–32 (citing *Conflict*, Merriam-Webster's Dictionary; *Conflict*, Am. Heritage Dictionary of the Eng. Language). But even NetChoice's own dictionaries plainly define conflict to require opposition or contradiction. *Conflict*, Merriam-Webster's Dictionary, https://tinyurl.com/5d8asj56 (last visited Jan. 13, 2025); *Conflict*, Am. Heritage Dictionary of the Eng. Language, https://tinyurl.com/bdh3txta (last visited Jan. 13, 2025). To the extent dictionaries include the term "differ," that is because differ itself can have a broad or a narrow meaning. Sometimes two things are just non-identical (pancakes and syrup), other times "differ" means affirmative disagreement. To the extent dictionaries identify "differ" as *one* possible meaning of "conflict," that latter meaning is implied. If there were need of further proof, the list of synonyms that NetChoice's own

dictionaries provide is telling. *See, e.g.*, *id.* (identifying "discord, strife, contention, dissension, clash" as synonyms of conflict).

Striving to tear "conflict" from its preemption context, NetChoice argues that courts have sometimes described differing legal standards as "conflicting." Resp.Br.32. But even setting aside that "differ" often has the stronger, narrower meaning of "conflicting," the cases NetChoice cites don't support its point. In *Smith v. Illinois*, for example, the Supreme Court described circuit courts' competing tests for evaluating detainees' ambiguous requests for counsel as "conflicting standards." 469 U.S. 91, 95 & n.3 (1984). Those standards were not just "different," the Court literally could not apply them all. One might also use the terms "dueling," or "contradictory," or many other words that mean "clashing." Unsurprisingly, NetChoice cites no case of any kind where a court read a provision using the term "conflict" to refer to laws that were merely not identical. *See* Resp.Br.32 & nn.6–8.

If Congress wanted to preempt all "different" laws, it could have done so. Opening.Br.36. A provision barring "any law [on this subject] … that [is different from] the requirements of this section," *see* § 45f(g), would do just that. Congress knows how to field preempt: Preempting state laws "in addition to or different from" the relevant federal law, or state laws that "relate to" the

federal law's subject matter, have the field-preemptive scope NetChoice wishes § 45f(g) had. *See, e.g.*, 29 U.S.C. § 1144(a) (preempting state law "relat[ing] to" employee benefit plans); 7 U.S.C. § 136v(b) (preempting state labeling requirements "in addition to or different from" federal requirements). The INFORM Act, of course, says nothing like that.

NetChoice asserts that § 45f(g) would be superfluous if Congress contemplated only conflict preemption, Resp.Br.34–35, but NetChoice has it backwards. Express preemption is *always* preferrable to implied preemption and is never superfluous. *Marrache*, 17 F.4th at 1094. Here, for instance, expressly codifying conflict preemption "makes clear that Congress did not intend to occupy the field." *S. Blasting Servs. v. Wilkes Cnty.*, 288 F.3d 584, 590 (4th Cir. 2002); *see also* Opening.Br.35–36. NetChoice explicitly acknowledges that Congress can "tak[e] field preemption … off the table" by using the term "conflict." Resp.Br.37. No doubt, if Congress had not included this phrase, NetChoice would be arguing for implied *field* preemption. That NetChoice is even now arguing for what amounts to field preemption just goes to show that Congress cannot be too careful in identifying the type of preemption.

NetChoice also has no meaningful response to courts uniformly applying conflict-preemption principles when Congress uses terms like "conflict" or "inconsistent." Opening.Br.25–26, 43. NetChoice asserts that some of those decisions use words other than "conflict," Resp.Br.36 n.9, but that is a makeweight objection. For instance, in *Opis Management Resources, LLC v. Secretary, Florida Agency for Health Care Administration*, this Court addressed a preemption challenge based on HIPAA's preemption of "contrary" state laws. 713 F.3d 1291, 1294 (11th Cir. 2013). The Court applied ordinary conflict-preemption principles to the challenged state law. *Id.* at 1296. And the Ninth Circuit similarly interpreted the express preemption of "inconsistent" state laws in the Children's Online Privacy Protection Act and the Telecommunications Act. *Jones*, 73 F.4th at 644; *Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072–73 (9th Cir. 2005). That makes perfect sense: "contrary" and "inconsistent" are both synonyms of "conflict." Surely when Congress uses the real McCoy it is even more obvious that conflict-preemption principles apply.

And there remains the large category of cases where courts *have* explicitly relied on the term "conflict" to import conflict-preemption principles. NetChoice tries to distinguish these cases

with the non sequitur that they involved what it terms "anti-preemption" provisions. Resp.Br.35–36. But it never explains how a so-called "anti-preemption" provision should be analyzed differently than a "regular" preemption provision. NetChoice cites a Justice Scalia concurrence, Resp.Br.36, which uses the phrase "anti-preemption" but doesn't advance an analytically distinct preemption category, *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 295 (1987) (Scalia, J., concurring). NetChoice identifies no case where a court analyzed a supposed "anti-preemption" provision differently than any other preemption provision.

NetChoice also argues that § 45f(g) uses the "broadest possible terms," Resp.Br.29, but that is patently untrue. The broadest possible terms would be phrases that preempt laws "relating to" the federal INFORM Act or which "go beyond" the Act. *See, e.g.*, 7 U.S.C. § 136v(b); 17 U.S.C. § 301(a); 29 U.S.C. § 1144(a); *see also* Opening.Br.35–36. The INFORM Act says nothing like that. What NetChoice means by broad is that the preemption provision covers "any law, regulation, rule, requirement, or standard," whether from a "State or political subdivision of a State, or territory of the United States." Resp.Br.29. That's not broad; it's routine. *See e.g.*, 5 U.S.C. § 8709(d)(1); 10 U.S.C. § 987(d)(1); 15 U.S.C. § 5001(g); 49 U.S.C.

§ 5331(f)(1); 49 U.S.C. § 31306a(l); 49 U.S.C. § 44703(j)(2); 49 U.S.C. § 45106(a).

As a final point, NetChoice's alternative standard is, on any level of inspection, nonsensical. NetChoice says it agrees § 45f(g) isn't a field-preemption provision, but it also says § 45f(g) preempts any state law asking online marketplaces to do more than what the federal INFORM Act requires. Resp.Br.38. That's field preemption. *Marrache*, 17 F.4th at 1094. But it is worse than that. NetChoice asserts that any law "different" from the federal INFORM Act is preempted. *All* laws are different from the federal INFORM Act. NetChoice would no doubt respond with some convoluted argument that it actually means "different in the space of regulating online marketplaces," but this just proves that NetChoice is gerrymandering a result it prefers and trying to shoehorn it into text that will not have it. Congress preempted neither "divergent" nor "more aggressive" state laws, Resp.Br.30, 41; it preempted *conflicting* state laws. The INFORM Act plainly codifies ordinary conflict-preemption principles.

### 2. Georgia's law complements, rather than obstructs, the federal INFORM Act.

Because ordinary conflict-preemption principles apply, NetChoice must show either that it is impossible to comply with

both laws or that Georgia's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Marrache*, 17 F.4th at 1094. NetChoice agrees that there is no impossibility preemption here, Resp.Br.40, so it rests its argument on the last refuge of regulated entities: obstacle preemption. Courts applying an obstacle preemption analysis must identify the federal law's purpose, determine the challenged State law's scope, and consider whether the latter thwarts the former's purpose. *See Murphy v. Dulay*, 768 F.3d 1360, 1377 (11th Cir. 2014); *Marrache*, 17 F.4th at 1094.

As already explained, the purposes here are simpatico. The federal INFORM Act is called the "Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act." INFORM Consumers Act, H.R. 5502, 117th Cong. § 1 (2022) (adopted in Pub. L. No. 117-328, 136 Stat. 4459, 5555). It aims to protect consumers from online marketplace fraud and to combat retail theft. *Id.*; *see also, e.g.*, *Informing Businesses about the INFORM Consumers Act*, FTC, https://tinyurl.com/48cpa87h (last visited Jan. 13, 2025). That's the same purpose as Georgia's law. Opening.Br.13–14.

Again, Georgia's law *advances* Congress's consumer protection goal, in no way making it harder for anyone to enforce

the INFORM Act (or the complementary civil and criminal state laws it contemplates, § 45f(d)(6)(B), (g)).  Opening.Br.36–37.  Indeed, Georgia could outright *ban* online marketplaces from this type of activity and it would not counter Congress's purposes. *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1188–89 (11th Cir. 2017) (en banc) ("[B]anning the sale of cigarettes do[es] not frustrate … a rule that requires a certain label when and if cigarettes are sold.").  The federal INFORM Act seeks to limit fraud in online marketplaces; it does not affirmatively require the existence of such marketplaces.

NetChoice never identifies what in Georgia's law is an obstacle to any purpose of the federal law.  Like the district court, NetChoice just argues that, while the federal law "only" requires counting transactions where payment is processed through the marketplace, Georgia's goes slightly further.  Doc. 29 at 12; Resp.Br.41; Opening.Br.48–49.  But NetChoice's argument assumes the conclusion of preemptive intent.  Congress provided that *its* law would count only certain transactions, but Congress nowhere indicated that the purpose of the law was to preclude States from regulating further.  If anything, that a federal statute limits its own reach makes obstacle preemption *less* likely, not

more.  Opening.Br.27–32; *see also Va. Uranium v. Warren*, 587 U.S. 761, 777–79 (2019) (lead op.).

Incredibly, NetChoice cites its *own* reluctant support for the federal INFORM Act as evidence that Congress chose some mythical "calibrated middle path" forbidding States from regulating NetChoice's members.  Resp.Br.16–17, 41.  That's not even "trying to peer inside legislators' skulls," it's trying to pass off failed lobbying as "hidden legislative wishes."  *Va. Uranium*, 587 U.S. at 777–78.

NetChoice also claims there was a "patchwork" of pre-INFORM Act state regulations, Resp.Br.15, but that is wrong and irrelevant.  The differences are minimal at best.  Some States have different thresholds for when seller disclosures are required, some require slightly different contact and identifying information from sellers, and some impose different penalties for noncompliance.  Resp.Br.12–14.  That's not a patchwork; that's federalism (and a normal part of interstate business).  Anyway: who cares?  That Congress legislates in an area where there are many state laws says nothing about obstacle preemption. NetChoice again *assumes* its premise that the federal INFORM Act was meant to be a regulatory ceiling, but "every subject that merits congressional legislation is, by definition, a subject of

national concern," *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990) (quotation omitted), and that doesn't "imply a grand statutory design to enforce uniformity writ large," *WinRed, Inc. v. Ellison*, 59 F.4th 934, 945 (8th Cir. 2023).

Nor do States "appear to understand" the INFORM Act is the final word on monitoring high-volume sellers. Resp.Br.17. In addition to Georgia's subsequent amendment, California expanded its definition of high-volume, third-party sellers to match Georgia's. S.B. 1144, 2023-24 Cal. Leg. (2024). It expanded its organized retail theft crime. S.B. 982, 2023-24 Cal. Leg. (2024). And Indiana adopted its own analogue. S.B. 343, 123d Ind. Gen. Assemb. (2023). NetChoice is the only one, apparently, who thinks States have no further role to play.

Seemingly admitting that the statutes share identical purposes, NetChoice "blithely" notes that similar ends don't justify conflicting means. Resp.Br.42. That's true in the abstract, but NetChoice can't establish tension between the laws' means, either. Georgia's law does nothing to impede the INFORM Act's chosen means, and the latter expressly authorizes States to enforce *both* the federal Act and their civil and criminal laws. § 45f(d)(1), (6).

NetChoice is also just wrong about how the Georgia law works (though it would not matter either way). Georgia's law does

not apply to "classified" ads, nor does it require platforms to "investigate … offline sales." *E.g.*, Resp.Br.18, 24. It covers only those transactions a seller has "*entered into … by utilizing* the online marketplace." O.C.G.A. § 10-1-940(a)(2) (emphasis added). Far from requiring online marketplaces to hire private detectives and hunt down users offline, the statute merely requires online marketplaces to monitor transactions entered into on-platform. An "entered into" transaction—one where the parties agree on-platform to the necessary terms—necessarily has all the information an online marketplace needs to determine whether the transaction counts towards the seller's "high-volume third-party" status. Georgia's law covers only those transactions where the remainder is just *performance* of the agreement: exchanging money for the product. But again, even if Georgia banned these marketplaces, it would be no obstacle to the federal law.

NetChoice also points to cases where a state law, despite ostensibly sharing a federal law's ends, obstructed those laws' primary goal: letting the federal government "speak for the Nation with one voice" in some uniquely national matter. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (diplomatic sanctions); *Arizona v. United States*, 567 U.S. 387 (2012) (immigration); *Colo. Dep't of Pub. Health & Env't v. United States*,

693 F.3d 1214 (10th Cir. 2012) (chemical weapons stockpiles). Setting aside that these cases are really about field preemption, not obstacle preemption, *see* Opening.Br.49–51, the federal INFORM Act makes no indication whatsoever that the United States must "speak with one voice" on the regulation of online marketplaces.

NetChoice next asserts that the internet, as an "inherently interstate technology" is best regulated at the national level, Resp.Br.30, but that would mean states cannot regulate the internet at all, which is obviously untrue. And NetChoice "reads too much into" the cases it cites in support. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1311 (10th Cir. 2008). "The courts have not held that certain [interstate technologies] always require uniform regulation." *Id.* Even for regulations affecting interstate railroads, courts have "examined particular types of regulation and made individual determinations." *Id.* at 1311–12 (citing *S. Pac. Co. v. Arizona*, 325 U.S. 761 (1945)).

Lastly, the presumption against preemption ends any doubt. NetChoice says the presumption doesn't apply to express preemption provisions, Resp.Br.38–39, but as already explained, NetChoice's citation of *Carson* does not get them that far, *see* Opening.Br.46–48. Congress must always "enact exceedingly

clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). That remains true in the express preemption context, where the question is the *scope* of preemption rather than its existence. *See* Opening.Br.47–48. Plus, Congress chose to import conflict-preemption principles, and one of those principles is the presumption against preemption. And courts must *always* be careful when applying obstacle preemption, lest they mistake their own views for "a latent statutory purpose lying *beyond* the text." *Va. Uranium*, 587 U.S. at 779 n.4.

Of course, the Court need not apply any presumption of any kind. Georgia's law is not an obstacle to the INFORM Act, and it is not a close question.

## B. Georgia's law does not "conflict" with federal law under any plausible meaning of the term.

The Court need not address the question, but assume for the sake of argument that the Court should intentionally blind itself to what the word "conflict" always means in the preemption context. NetChoice still can't establish Georgia's law "conflict[s]" with the INFORM Act under any plausible meaning of that term.

"[C]onflict" ordinarily means something that is "opposed" to or "contradictory with" something else. *Supra* at 9–10; *Conflict*,

Merriam-Webster's Dictionary, https://tinyurl.com/5d8asj56 (last visited Jan. 13, 2025).  Georgia's law imposes identical information collection and verification requirements as the INFORM Act.  The single distinction is that Georgia's law requires online marketplaces to count all (not just some) on-platform transactions towards a seller's revenue and sales totals.  That requirement neither opposes nor contradicts the INFORM Act's requirement that online marketplaces comply with a less comprehensive standard.  One sets a baseline, and the other builds on it.  Opening.Br.43–44.  Compliance with Georgia's law *necessarily* means an entity has complied with federal law.  That is not variance—that is agreement.

NetChoice's argument to the contrary again relies exclusively on one word in the INFORM Act: "only."  *See* Resp.Br.27–43.  Duplicating the district court, NetChoice argues that, since the federal definition of "high-volume third party seller" says online marketplaces "shall only be required" to count transactions where the marketplace processes payment, § 45f(f)(3)(B), States can't require them to consider *any* other transactions, *see, e.g.*, Resp.Br.26.

State Defendants already dispensed with this meritless argument and NetChoice provides nothing new here.  The word

"only" appears in a provision expressly limiting itself to one subparagraph of one subsection of the INFORM Act, which merely defines sellers covered by the federal Act: "For purposes of calculating [sales and revenue] *under subparagraph (A),*" online platforms need "only" count transactions where that platform processes payment. § 45f(f)(3)(B) (emphasis added). That's not a panoptic federal policy. It's a self-limiting statement about what one part of the INFORM Act covers. Opening.Br.45. NetChoice offers no response to this basic point.

Moreover, NetChoice's argument is pure question begging (just as it is in the obstacle-preemption context). NetChoice assumes the conclusion that the federal INFORM Act was meant to broadly preempt all non-identical state laws. If that's correct, the "only" in the high-volume third-party seller definition limits state law. But if not, the "only" limits *federal* law. Determining what the INFORM Act preempts is still the first step; the "only" is silent until then. That circular reliance on "only" is a "wafer-thin reed" on which to rest an entire preemption argument. *See Ala. Ass'n of Realtors*, 594 U.S. at 765.

NetChoice's tortured interpretation of "only" also makes a hash of the surrounding context. The federal INFORM Act takes pains to preserve States' ability to enforce their applicable civil

and criminal laws. § 45f(d)(6)(B). And it allows state officers to enforce its own requirements as well. § 45f(d)(1). Far from a "crystal clear" indication of congressional intent to occupy the field, Resp.Br.38, the federal INFORM Act limits its own reach, authorizes State enforcement, and lets States enact their own compatible supplemental laws. Even if the Court ignores ordinary conflict-preemption principles, nothing here "conflicts" with anything else.

## II. NetChoice's First Amendment claim cannot support a preliminary injunction.

NetChoice also makes a longshot argument that Georgia's law violates the First Amendment. The district court never addressed this claim. Neither should this Court, though it fails on the merits, too.

### A. NetChoice cannot defend a preliminary injunction via a legal claim the district court declined to address.

The immediate problem with NetChoice's First Amendment claim is that the district court didn't address it. *See* Doc. 29 at 6. While this Court might be able to affirm a lower court order for "any reason," *Marrache*, 17 F.4th at 1097, it does not address wholly new *claims*.

A preliminary injunction appeal is not a vehicle to litigate new claims for the first time. That's especially true where, as here, the district court's order included no relevant fact findings. Doc. 29 at 6–13. NetChoice's First Amendment claim could require fact findings about supposed burdens for online marketplaces, both as to the merits and the equities. There's no factual record for this Court to review. Doc. 29 at 6 n.7.

NetChoice cites no case where a plaintiff switched their preliminary injunction claim on appeal to sustain the injunction. *See* Resp.Br.44–51. In a similar posture, the D.C. Circuit could not find "any precedent for upholding a preliminary injunction based upon a legal theory not embraced by the district court. In this as in every such case, it is for the district court to determine, in the first instance," whether a preliminary injunction is proper. *Sherley v. Sebelius*, 644 F.3d 388, 397–98 (D.C. Cir. 2011).

And even if there were merit to the First Amendment claim, the district court would need to tailor relief. Assuming injunctive relief were warranted on First Amendment grounds, its scope would depend on *how* Georgia's law burdens NetChoice members' speech and which applications are problematic. *Moody*, 603 U.S. at 744. The Supreme Court recently reversed this Court for upholding a facial injunction even where it largely *agreed* with

this Court's analysis, *id.* at 727, 743–44; the Court should not impose, in the first instance, a facial injunction based on a First Amendment claim the district court did not even address.

## B.  NetChoice's First Amendment claim is unlikely to succeed, anyway.

**1.** Not everything NetChoice's members do is speech.  That's the whole point of *Moody*.  The Supreme Court faulted the Fifth and Eleventh Circuits for addressing only large social media companies' news feed curation.  *Id.* at 716–18.  But only "[t]o the extent that social-media platforms create expressive products, [do] they receive the First Amendment's protection."  *Id.* at 716.

Verifying some sellers' identities, requiring them to provide contact information, and suspending noncompliant sellers' commercial activity, O.C.G.A. § 10-1-941(a)–(c), *isn't speech*.  It is not even expressive conduct.  *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (expressive conduct requires intended message and it must be understood as having a message); *see also NetChoice v. Attorney General, Fla.*, 34 F.4th 1196, 1223 (11th Cir. 2022) (vacated on other grounds) (holding that user data retention requirement "does *not* trigger First Amendment scrutiny").

NetChoice seems to argue that, because its members operate speech-heavy platforms, and because Georgia's law will burden their business, it will burden their speech. Resp.Br.44–47. But that is not how the First Amendment works. Like a law authorizing closure of premises (even a bookstore) used for prostitution, Georgia's public safety law doesn't abridge speech just because it affects an entity that engages in speech. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986). If a bookstore were "closed due to fire or health code violations, the First Amendment would not aid the owner." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1242 (11th Cir. 2022) (quotation omitted).

NetChoice invokes cases where governments forced media outlets to convey third-party speech, Resp.Br.44–46, but a law requiring online marketplaces to verify sellers' information is nothing like a law forcing newspapers to publish op-eds they disagree with, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974), forcing a TV station to host a political candidate in a televised debate, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998), or an attempt to control how social media platforms run political ads, *Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019). There's no connection between verifying sellers' identities

and deciding what speech to publish. *See NetChoice*, 34 F.4th at 1223.

**2.** Perhaps recognizing that its own speech is not at issue, NetChoice relies heavily on the speech of others. *See, e.g.*, Resp.Br.45–47, 50. For instance, it argues that Georgia's law "compels speech" by requiring high-volume third-party sellers to provide identifying information. Resp.Br.45. But NetChoice lacks standing to assert others' speech interests.

Parties almost always have to assert their own interests. *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1038 (11th Cir. 2015). A narrow exception, third-party standing, applies when the litigant suffers an injury-in-fact, shares a close identity of interest with a third party, and there's some hindrance to that third party asserting their own interests. *Powers,* 499 U.S. at 410–11.

Third-party standing is inapposite here. Nothing is keeping online platform users from asserting their own claims. NetChoice says sellers might not list products to avoid providing contact or identifying information. Resp.Br.46. But that misses the point: if sellers are affected they can *sue*. NetChoice "ha[s] not explained how [others] would be hindered in their ability to assert their own rights." *In re Checking Acct. Overdraft Litig.*, 780 F.3d at 1039.

NetChoice invokes *Virginia v. American Booksellers Association*, Resp.Br.46–47, where the Supreme Court said a trade association could challenge a law on potential book buyers' behalf. 484 U.S. 383, 386 (1988). That law required bookstores to sell explicit materials in a separate section of their stores, so social stigma might have dissuaded potential buyers from engaging in protected activity (buying books), and presumably from suing, too. *See id.* at 389, 392–93. Here, there's no stigma keeping anyone from anything. They can vindicate their own interests.

**3.** Regardless, Georgia's law comes nowhere close to violating the First Amendment. At most, Georgia's law affects speech by requiring factual, noncontroversial, commercial disclosures. Those disclosures must be "reasonably related to the State's interest in preventing" consumer deception and not "[u]njustified or unduly burdensome." *Zauderer*, 471 U.S. at 651.

Requiring high-volume sellers to disclose purely factual identifying and contact information, O.C.G.A. §§ 10-1-941(a), 10-1-942(a), easily satisfies that standard. "[T]he state undoubtedly has a legitimate interest in combating organized retail crime and in helping consumers avoid stolen or counterfeit goods." Resp.Br.47–48. A seller's name, contact information, and identifying information are the epitome of factual and

uncontroversial. *Zauderer*, 471 U.S. at 651; *cf.*, *e.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 872, 878–82 (5th Cir. 2024) (displaying government-crafted images conveying the dangers of smoking is factual and uncontroversial).

Requiring sellers to disclose identifying and contact information and online marketplaces to provide a fraud reporting mechanism are also "reasonably related" to the State's consumer protection and anti-fraud interests. *NetChoice*, 34 F.4th at 1230. Sellers are less likely to traffic in stolen goods if their identity is known. Requiring them to disclose contact and identifying information is hardly a burden; sellers *necessarily* have all of their own identifying and contact information. And it is hard to imagine less controversial information than a seller's identifying and contact information, which most high-volume sellers are *trying* to advertise to the world.

NetChoice barely makes a straight-faced argument that Georgia's law fails *Zauderer*. It contends the seller disclosure requirements are "controversial" because they can include disclosing one's social security number. Resp.Br.50. Never mind that there are other ways to comply. *See* § 10-1-941(a)(3). Controversy isn't whether the discloser *wants* to disclose the information; it's whether the information is a disputed issue—like

the desirability of abortions. *See, e.g.*, *NIFLA v. Becerra*, 585 U.S. 755, 775 (2018). Sellers may or may not want to provide identifying and contact information, but that information is not controversial. *Zauderer*, 471 U.S. at 651.

NetChoice also says *Zauderer* doesn't apply because Georgia's law requires online marketplaces to obtain third-party disclosures rather than requiring those disclosures from covered sellers directly. Resp.Br.49–50. But to the extent *Zauderer* doesn't fit perfectly with respect to NetChoice's members it is because there's no *speech* from NetChoice members, so there's nothing for *Zauderer* to map onto. And from the sellers' perspective (the one that matters for speech purposes), this is exactly like *Zauderer*.

Finally, NetChoice argues that Georgia's law is overinclusive and underinclusive, Resp.Br.48, but that is neither true nor relevant. NetChoice says the law is overinclusive because it requires offline monitoring and underinclusive because it doesn't target organized retail thieves or third-party sellers directly. Resp.Br.48–49. Yet again, Georgia's law requires *no* offline monitoring. *Supra* at 18–19. And Georgia *does* target organized retail thieves directly. O.C.G.A. § 16-8-14.2. Georgia's decision not to "*directly* regulate third-party sellers at all," Resp.Br.49, isn't a problem—it's an actual "calibrated middle path,"

Resp.Br.41.  Regardless, none of this matters: strict scrutiny it is not part of the *Zauderer* test—or, for that matter, commercial speech regulations in general.  A "least restrictive means test" simply does not apply.

## III. The equities weigh against a preliminary injunction.

Even if there were some potential merit to NetChoice's arguments, the equities should preclude a preliminary injunction.  Opening.Br.52–54.  NetChoice repeatedly insists Georgia's law forces platforms to "investigate private parties' independent off-platform dealings," *e.g.*, Resp.Br.41, but repetition doesn't turn hyperbole into fact.  Georgia's law just goes a half-step further than the federal INFORM Act and requires that all (not just some) transactions *entered into through the online marketplace* must be counted.  *See supra* at 18–19; § 10-1-940(2); Opening.Br.13–14.  And the laws only come into play when a seller has 200 independent transactions of new or unused consumer goods worth at least $5,000 of revenue in the relevant time frame.  § 10-1-940(2).  Presumably, that's a small number of sellers (though NetChoice presented no evidence about that, Opening.Br.53, or about supposedly insurmountable compliance costs, *see, e.g.*, Resp.Br.4).

NetChoice's members are some of the wealthiest and most influential companies in the world, and their *business model* is tracking users' online activity and responding with targeted advertising and content. Far from "*ipse dixit*," Resp.Br.52, NetChoice's members are open about how thoroughly they monitor their users' on-platform activity, Opening.Br.53. eBay, for example, fines its users for sharing contact information in mere *contemplation* of off-platform sales. Doc. 2-6 at 24; Opening.Br.15–16; *Offering to buy or sell outside of eBay policy*, eBay Inc.*,* https://tinyurl.com/5c2eb9zs (last visited Jan. 13, 2025). Facebook must monitor all users' news feeds to know whether they're engaging in "hate speech." Doc. 2-4 at 5–9; *Hate Speech*, Meta, https://tinyurl.com/4kuuzp4k (last visited Jan. 13, 2025). NetChoice's members just don't *want* to comply with the law.

But without Georgia's law, sellers who want to flip stolen goods on unsuspecting consumers can take full advantage of NetChoice members' online marketplaces and collect payment off-platform. *See* Opening.Br.54. The amended Inform Consumers Act's slightly broader scope is a small price to pay for closing a loophole that the federal INFORM Act and Georgia's original law left open. Even if NetChoice *had* shown a likelihood of success on

the merits, the balance of equities overwhelmingly weighs against a preliminary injunction.

## CONCLUSION

This Court should reverse the judgment of the district court. Respectfully submitted.

/s/ *Stephen J. Petrany*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Logan B. Winkles
  *Deputy Attorney General*
Zachary A. Mullinax
  *Assistant Attorney General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,493 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Stephen J. Petrany*
Stephen J. Petrany